# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE RULE 45 SUBPOENA TO ) <br> NON-PARTY ) <br> NATIONAL ASSOCIATION OF ) <br> MINORITY AUTOMOBILE DEALERS ) <br> 9475 LOTTSFORD RD., SUITE 150 ) <br> LARGO, MD 20774 ) <br> ) <br> IN THE MATTER OF ) <br> ) <br> SOUTHERN MOTORS ) <br> CHEVROLET, INC., ) <br> 10300 ABERCORN EXTENSION ) <br> SAVANNAH, GA 31406 ) <br>      PLAINTIFF, ) <br> ) <br> VS. ) <br> ) <br> GENERAL MOTORS, LLC, ) <br> 300 RENAISSANCE CENTER ) <br> MC482-C14-C66 ) <br> DETROIT, MI 48265 ) <br>      DEFENDANT. ) <br> _____ ) | CIVIL ACTION FILE <br><br> NO.: _____ <br><br><br> MOTION OF NATIONAL ASSOCIATION <br> OF MINORITY AUTOMOBILE DEALERS' <br> TO QUASH OR MODIFY SUBPOENA <br><br><br> [UNDERLYING CIVIL ACTION FILED IN <br>  U.S. DISTRICT COURT FOR THE <br>  SOUTHERN DISTRICT OF GEORGIA <br>  SAVANNAH DIVISION <br>  CIVIL CASE NO. CV-414-152] |

## MOTION OF NATIONAL ASSOCIATION OF MINORITY
## AUTOMOBILE DEALERS' TO QUASH OR MODIFY SUBPOENA

The National Association of Minority Automobile Dealers (hereinafter,

"NAMAD"), by and through its undersigned counsel, hereby respectfully moves this

Court pursuant to Fed. R. Civ. P. 45(d)(3) for an order quashing the non-party

subpoena issued to it by Plaintiff, Southern Motors Chevrolet, Inc. (hereinafter,

"Southern Motors") for production of documents, pending in the U.S. District Court for the Southern District of Georgia, Savannah Division.

As set forth in detail in the accompanying Memorandum of Points and Authorities in Support of NAMAD's Motion to Quash Subpoena, the grounds for this motion are: (a) the subpoena presents an undue burden due to its exceptionally broad scope and the lack of any showing of relevance of the requested discovery to Plaintiff's claims; (b) the First Amendment of the Constitution protects NAMAD from being compelled to provide documents regards its (or its staff's and members') communications, strategy or deliberations; and (c) no exceptional circumstances justify compelling document production from NAMAD.

### CERTIFICATE OF COMPLIANCE

Rodney G. Moore hereby certifies pursuant to LCvR 7(m), that I discussed with opposing counsel the anticipated motion in a good faith effort to determine whether there is any opposition to the relief sought, and if there is, to narrow the areas of disagreement.

Respectfully submitted and executed this 26th day of January, 2015.

By: _____

RODNEY G. MOORE, ESQ.
ATTORNEYS FOR NATIONAL ASSOCIATION
OF MINORITY AUTOMOBILE DEALERS

By: _____

JEAN-MARIE SYLLA, JR., ESQ.
STATE BAR NO. 469371
LCvR 83.2 (C)(1) SPONSOR


TAYLOR, SYLLA & AGIN, LLP
THE WASHINGTON SQUARE BUILDING
1050 CONNECTICUT AVENUE, NW, 10TH FL.
WASHINGTON, DC 20036
TELEPHONE: 202.689.9512
FACSIMILE: 202.783.7858
EMAIL: JMS@TSAFIRM.COM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE RULE 45 SUBPOENA TO )
NON-PARTY )
NATIONAL ASSOCIATION OF )
MINORITY AUTOMOBILE DEALERS )    CIVIL ACTION FILE
 )    NO.: _____
IN THE MATTER OF )
 )    CERTIFICATE OF SERVICE
SOUTHERN MOTORS )
CHEVROLET, INC., )
 )
          PLAINTIFF, )
 )
VS. )    [UNDERLYING CIVIL ACTION FILED IN
 )    U.S. DISTRICT COURT FOR THE
GENERAL MOTORS, LLC, )    SOUTHERN DISTRICT OF GEORGIA
 )    SAVANNAH DIVISION
          DEFENDANT. )    CIVIL CASE NO. CV-414-152]
_____ )

## CERTIFICATE OF SERVICE

I hereby certify that the within and foregoing **MOTION OF NATIONAL ASSOCIATION OF MINORITY AUTOMOBILE DEALERS' TO QUASH OR MODIFY SUBPOENA; NATIONAL ASSOCIATION OF MINORITY AUTOMOBILE DEALERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH OR MODIFY SUBPOENA; DECLARATION OF RODNEY G. MOORE W/EXHIBITS 1 THROUGH 13; AND DECLARATION OF DAMON LESTER** has been served by First Class U.S. Mail to the following:

| | |
|---|---|
| Jennifer Bunting-Graden, Esq.<br>Rebecca Thornhill, Esq.<br>JONES DAY<br>1420 Peachtree Street, NE, Suite 800<br>Atlanta, Georgia  30309-3053<br>jbuntinggraden@jonesday.com<br>rmthornhill@jonesday.com | William J. Hunter, Esq.<br>I. Gregory Hodges, Esq.<br>Patricia T. Paul, Esq.<br>Timothy D. Roberts, Esq.<br>R. Benjamin Lingle, Esq.<br>OLIVER MANER LLP<br>218 West State Street<br>Post Office Box 10186<br>Savannah, Georgia  31412<br>bhunter@olivermaner.com<br>ghodges@olivermaner.com<br>ppaul@olivermaner.com<br>troberts@olivermaner.com<br>blingle@olivermaner.com |
| Thomas A. Withers, Esq.<br>GILLEN, WITHERS & LAKE, LLC<br>8 East Liberty Street<br>Savannah, Georgia  31401<br>twithers@gwllawfirm.com | |

Respectfully submitted and executed this 26th day of January, 2015.

By: _____

JEAN-MARIE SYLLA, JR., ESQ.
STATE BAR NO. 469371
LCvR 83.2 (C)(1) SPONSOR

TAYLOR, SYLLA & AGIN, LLP
THE WASHINGTON SQUARE BUILDING
1050 CONNECTICUT AVENUE, NW, 10TH FL.
WASHINGTON, DC  20036
TELEPHONE: 202.689.9512
FACSIMILE: 202.783.7858
EMAIL: JMS@TSAFIRM.COMDealers

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE RULE 45 SUBPOENA TO | ) | |
| NON-PARTY | ) | |
| NATIONAL ASSOCIATION OF | ) | |
| MINORITY AUTOMOBILE DEALERS | ) | CIVIL ACTION FILE |
| | ) | NO.: _____ |
| IN THE MATTER OF | ) | |
| | ) | |
| SOUTHERN MOTORS | ) | NATIONAL ASSOCIATION OF |
| CHEVROLET, INC., | ) | MINORITY AUTOMOBILE DEALERS' |
| | ) | MEMORANDUM OF LAW IN SUPPORT |
| PLAINTIFF, | ) | OF MOTION TO QUASH OR MODIFY |
| | ) | SUBPOENA AND MONETARY SANCTIONS |
| VS. | ) | |
| | ) | [UNDERLYING CIVIL ACTION FILED IN |
| GENERAL MOTORS, LLC, | ) | U.S. DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF GEORGIA |
| DEFENDANT. | ) | SAVANNAH DIVISION |
| | ) | CIVIL CASE NO. CV-414-152] |

## NATIONAL ASSOCIATION OF MINORITY AUTOMOBILE DEALERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH OR MODIFY SUBPOENA

COMES NOW The National Association of Minority Automobile Dealers

(hereinafter, "NAMAD"), recipient of a Subpoena to Produce Documents, and,

pursuant to Fed. R. Civ. P. 45 files this Brief in Support of Its Motion to Quash Or

Modify Subpoena to Produce Documents, showing this Honorable Court as follows:

## I. FACTUAL AND PROCEDURAL HISTORY

**A.    NAMAD, its Mission and Operations.**

NAMAD is a 501(c)(3) non-profit, tax-exempt organization headquartered in the Washington, D.C. area. (Declaration of Damon Lester, ¶ 3, attached hereto as "Exhibit A").  The organization's objective is to pursue the meaningful presence and participation of minority businesses and diverse employees across all aspects of the automotive economic sector. (Id. at ¶ 4).  NAMAD advocates for increased minority ownerships of dealerships, greater diversity in the automotive manufacturing environment, and greater engagement of minorities in automotive retail sales. (Lester Dec., ¶ 6).

NAMAD advances its mission by collaborating with local, regional and national policy-makers as well as domestic and international manufacturers to establishment of meaningful business protocols. (Id. at ¶ 5).  Thus, NAMAD is a minority trade advocacy organization whose goals span the political, economic, and social arenas. (Id.).

**B.    The Lawsuit.**

Southern Motors Chevrolet, Inc. ("Southern Motors") is an automotive dealership located in Savannah, Georgia. (Declaration of Rodney Moore, attached hereto as "Exhibit B", Ex. 2, ¶ 7).  On July 16, 2014, Southern Motors filed an Amended Complaint against General Motors, LLC (hereinafter, "GM") in the District

Court for the Southern District of Georgia which case was assigned Civil Action File

No. CV414-152 (hereinafter, the "Lawsuit"). (Id. at Ex. 2).

In the Lawsuit, Southern Motors contends it had entered into an agreement with

the then-owner, Fuller, to purchase his Chevrolet dealership (the "Dealership"). (Id. at

Ex. 2, ¶ 9). Southern Motors alleges that it expended significant time and resources in

preparing for the acquisition of the Dealership. (Id. at ¶ 24). The Amended Complaint

alleges that GM exercised its right of first refusal in the Dealer Agreement so as to

disallow the sale of the Dealership to Southern Motors and instead directed that the

Dealership be sold to Chatham Motors Sales ("Chatham"). (Id. at ¶¶ 27, 37-38).

According to the Amended Complaint, race was the sole reason behind GM's

decision to disallow the sale to Southern Motors and to facilitate the sale to Chatham[1].

(Id. at ¶ 38). Southern Motors claims that GM's actions with respect to the Dealership

were illegal, discriminatory and resulted in violations of constitutional and statutory

rights. (Id. at ¶¶ 32-61).

## C.     The Subpoena.

Southern Motors served NAMAD with a Subpoena to Produce Documents

(hereinafter, the "Subpoena") on December 2, 2014. (Moore Dec., ¶ 3). The

Subpoena demanded that NAMAD produce a variety of materials created over a

---

[1] The owners of Southern Motors are white. The owners of Chatham Motors Sales
are African American. (Ex. B.).

roughly five (5) year period, including the internal deliberations of its members and employees and communications with other civil rights groups. (Id. at Ex. 1). The subpoena is issued on the 2009 form and as such, does not contain the mandatory 2013 language.

NAMAD maintains that the Subpoena infringes upon its First Amendment rights of speech and association and that the Subpoena subjects NAMAD to undue burden and expense. To that end, NAMAD provided Southern Motors with its formal Objections to the Subpoena in its Entirety on December 16, 2014. (Moore Dec., ¶ 6, Ex. 3). NAMAD's counsel has, however, conferred in good faith with counsel for Southern Motors in an attempt to achieve a mutually agreeable resolution without court involvement. (Moore Dec., ¶¶ 6-11). More specifically, NAMAD offered to produce communications between NAMAD and GM regarding the Minority Dealer Development Program and the Minority Dealer Advisory Counsel and to allow Southern Motors to conduct a search of each NAMAD owned or controlled desktop. (Id. at ¶ 10).

NAMAD and Southern Motors were nonetheless unable to resolve their differences. Accordingly, NAMAD hereby respectfully moves this Court[2] to quash or modify the Subpoena.

---

[2] Fed. R. Civ. P. provides that a litigant may petition "the court for the district where compliance is required" to quash or modify a subpoena. As the Subpoena specifies
(footnote continued)

## II. ARGUMENT AND CITATION OF AUTHORITY

Motions to quash or modify a subpoena to a non-party are governed by Fed. R. Civ. P. 45(d)(3). That provision states that the court for the district where compliance is required must quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies . . . or subjects a person to undue burden." Id. As the entity seeking relief from subpoena compliance, NAMAD bears the burden of demonstrating that a subpoena should be modified or quashed. E.g., Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co., 276 F.R.D. 376, 379 (D.D.C. 2011).

NAMAD contends the Subpoena must be quashed or modified because the demanded discovery would constitute a restraint on its First Amendment freedom of association. The D.C. Circuit has set out principles to guide a trial court's decision in cases involving the implication of a First Amendment right in the discovery context. The threshold inquiry is whether NAMAD has asserted a "substantial claim of constitutional privilege." Greyhound Lines, Inc. v. International Amalgamated Transit Union, etc., 1992 U.S. Dist. LEXIS 10095, 6-7 (D.D.C. July 9, 1992). If NAMAD has asserted such a claim, the "court must assess (1) whether the information goes to

---

performance at Capital Reporting Company, 1821 Jefferson Place, NW, 3rd Floor, Washington, D.C. 20036, NAMAD has sought relief in the District Court for the District of Columbia.

the 'heart of the lawsuit,' (2) whether the party seeking the discovery sought the information through alternative sources, and (3) whether the party seeking disclosure made reasonable attempts to obtain the information elsewhere." Wyoming v. United States Dep't of Agric., 208 F.R.D. 449, 454 (D.D.C. 2002).

## A.   NAMAD Has Asserted a Substantial Claim of First Amendment Privilege.

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." NAACP v. Alabama, 357 U.S. 449, 460 (1958); see also Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). Thus, "[t]he First Amendment protects political association as well as political expression," Buckley v. Valeo, 424 U.S. 1, 15 (1976), and the "freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments." Kusper v. Pontikes, 414 U.S. 51, 56-57 (1973).

"It is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." Wyoming v. United States Dep't of Agric., 208 F.R.D. 449, 454 (D.D.C. 2002).

Where, as here, discovery is sought from political action groups, this Court has noted that "it is crucial to remember that we are considering the essence of First Amendment freedoms -- the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest." Id. at 454.

It is well-established that a movant demonstrates a substantial claim of constitutional privilege by offering evidence that the requested discovery would have a chilling effect on the associational rights of the organization or its members. Wyoming, 208 F.R.D. 499 at 454-455 (disclosure of internal communications, "would have a potential for chilling the free exercise of political speech and association guarded by the First Amendment."); Perry v. Schwarzenegger, 591 F.3d 1126, 1139-1140 (9th Cir. Cal. 2010)(political action group made prima facie showing of constitutional privilege where compelled disclosure of its internal campaign communications would "chill participation and mut[e] the internal exchange of ideas); Dunnet Bay Constr. Co. v. Hannig, 2011 U.S. Dist. LEXIS 129959, 9 (C.D. Ill. Nov. 9, 2011)(subpoena seeking internal communications of political campaign committee triggered First Amendment privilege where evidence showed reasonable probability that disclosure would have chilling effect on associational rights).

Through the Declaration of Damon Lester, NAMAD has set forth a substantial claim of First Amendment privilege. "The fundamental issue is what will happen in

the future if documents are disclosed." <u>Hannig</u>, 2011 U.S. Dist. LEXIS 129959 at 17. Mr. Lester has averred that the disclosure of NAMAD's internal communications, strategies and deliberations would have a chilling effect on the First Amendment rights of NAMAD and its members. (Lester Dec., ¶ 16). NAMAD officers, members, and employees freely exchange their thoughts and opinions regarding strategies and diversity efforts in the automotive sector. (<u>Id</u>.). Those officers, member, and employees would be reluctant to share ideas candidly if they were forced to divulge those thoughts and opinions. (<u>Id</u>.). Moreover, membership in NAMAD would be discouraged if the private communications of its officers and members were subject to disclosure in any suit involving allegations of reverse discrimination in the auto industry. (<u>Id</u>. at 16).

Mr. Lester has also offered testimony that the compelled disclosure of "any and all communications and/or emails . . . between [NAMAD] and any civil rights organization or other third party" would have a chilling effect on NAMAD's associational rights. (Lester Dec., ¶ 17). Southern Motors' demand for all communications with any third parties is particularly troubling because it inherently

requires NAMAD to divulge the identities of other, like-minded organizations with whom NAMAD has collaborated.[3]

NAMAD's advocacy efforts within the larger topic of affirmative action have at times been met with opposition.  As the Declaration of Damon Lester makes clear, NAMAD and its employees have received multiple, anonymous threats. (Id. at ¶ 16). Forcing NAMAD to identify and disclose communications with like-minded groups and supporters would discourage third parties from collaborating with NAMAD for fear of suffering the same threats and hostility. (Id. at 17). See, Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc., 2007 U.S. Dist. LEXIS 19475 (D. Kan. Mar. 16. 2007)("[A]ctions may infringe on the First Amendment right of association . . . by attempting to require disclosure of membership where anonymity is desired . . .").

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." NAACP, 357 U.S. at 460.  NAMAD and its members "have First Amendment rights to associate with like-minded individuals to articulate their views to the public and to advocate their views . . ." City of Greenville v. Syngenta Crop Prot., Inc., 2011 U.S. Dist. LEXIS

---

[3] To the extent there is a confusion as to Plaintiff's intent, Plaintiff has requested electronic discovery using, among others, the following search terms:  "Jesse Jackson", "strategy", "Rainbow Push", etc.

124453, 22(C.D. Ill. Oct. 27, 2011).  The First Amendment's protection "extends not only to the organization itself, but also to its staff, members, contributors, <u>and others who affiliate with it</u>." <u>Wyoming</u>, 208 F.R.D. at 454 (emphasis added).

Mr. Lester's testimony makes clear that the compelled disclosure of NAMAD's internal communications and/or communications with other groups would have a chilling effect on NAMAD's First Amendment rights by: (1) preventing the free exchange of ideas; (2) discouraging NAMAD membership; and (3) deterring other, like-minded groups from pursuing collective action alongside NAMAD. (Lester Dec., ¶¶ 15-17).   NAMAD has accordingly satisfied its burden of demonstrating a substantial claim of constitutional privilege under established law. <u>E.g.</u>, <u>Hannig</u>, 2011 U.S. Dist. LEXIS 129959 at 13 (compelled disclosure of  political campaign committee's internal communications triggered First Amendment privilege).

**B.**    **The Subpoena Does Not Go to the "Heart of the Lawsuit"**

The material sought in the Subpoena does not and cannot go to the "heart of the Lawsuit." <u>See</u>, <u>Black Panther Party</u>, 661 F.2d at 1268 (to overcome First Amendment privilege, the information sought must go "to the heart of the matter, that is . . . it [must be] crucial to the party's case."; <u>Perry</u>, 591 F.3d at 1161 (once the party resisting a subpoena asserts a valid constitutional privilege, the party seeking discovery must show "that the information sought is <u>highly relevant</u> to the claims or defenses in the

litigation – a more demanding standard of relevant than that under [Fed. R. Civ. P. 26(b)(1)].")(emphasis added).

Any connection between the material sought in the Subpoena and the Lawsuit is tenuous at best. Southern Motors contends GM's conduct with respect to a discrete transaction involving the sale of a dealership was discriminatory and amounted to a violation of its constitutional and statutory rights. (Moore Dec., Ex. 2, ¶¶ 32-60). GM has countered that it merely exercised the contractual right of first refusal expressly set forth in the Dealer Agreement, and that it selected Chatham to purchase the Dealership because of its successful track record and qualifications. (Moore Dec., Ex. 8). Southern Motors' entitlement to recovery in the Lawsuit, if any, thus depends upon the terms of the Dealer Agreement and GM's subjective, underlying reasons for selecting Chatham as the purchaser.

It is undisputed that NAMAD had no knowledge of or involvement in the transaction underlying the Amended Complaint. (Lester Dec., ¶ 14). NAMAD accordingly does not possess any documents which shed light on the legality or constitutionality of GM's selection of Chatham to operate the Dealership. (Id. at ¶ 13). While NAMAD is an advocacy group, NAMAD is not affiliated with GM and plays no role in the process whereby GM decides to whom particular dealerships may be sold. (Id.).

Communications between NAMAD's members, supporters, and like-minded groups thus cannot be said to be crucial to Southern Motors' case. At most, Southern Motors can point to an esoteric connection between NAMAD's goals of diversity in the auto industry and Southern Motors' allegations of reverse discrimination with respect to the Dealership. This arguably fails the lesser relevancy standard of Fed. R. Civ. P. 26 and is patently insufficient under the heightened, "heart of the Lawsuit" standard applicable in light of NAMAD's established First Amendment privilege.

**C.     Southern Motors Has Not Made Reasonable Efforts to Seek Discovery from Alternative Sources.**

Southern Motors fares no better on the final inquiry. Even assuming Southern Motors could show the discovery sought from NAMAD is crucial to its case, "disclosure should be compelled only after the litigant has shown that [it] has exhausted every reasonable alternative source of information. Black Panther Party, 661 F.2d at 1268. "Because of the preferred position of First Amendment rights, compelled disclosure is normally the end, and not the beginning, of the inquiry." Id. "Infringement of First Amendment interests must be kept to a minimum." Id.

Southern Motors has done absolutely nothing to minimize its infringement of NAMAD's associational rights. Southern Motors served the Subpoena upon NAMAD in the early phases of the suit and before securing discovery from GM itself. (Moore Dec., Ex. 6). Unlike NAMAD, GM is a party to the lawsuit. Southern Motors' response to their obligation to obtain the records from GM is perplexing "we have

requested documents from GM.  However, I am sure you understand that I have a duty to attempt to gather the documents from available sources." (Moore Dec. Ex. 4).  To the extent Southern Motors contends GM's Minority Dealer Development Program is unlawful, information relevant to that program should be obtained from GM.  While NAMAD obviously supports GM's commitment to diversity, NAMAD did not develop the Minority Dealer Development Program and does not possess documents which reflect how that program is implemented.  (Lester Dec., ¶ 14 ).

Southern Motors thus sought to compel the production of documents from NAMAD before exhausting more appropriate, alternative sources of information.  In light of the Subpoena's impairment of First Amendment rights, the tenuous connection between the discovery sought and the Lawsuit, and Southern Motors' failure to make reasonable efforts to secure documentation from other sources, NAMAD's Motion to Quash should be granted.

**D.    The Subpoena Subjects NAMAD to Undue Burden**

Beyond NAMAD's First Amendment privilege, this Court should quash or modify the Subpoena because it subjects NAMAD to undue burden.  While quashing a subpoena goes against courts' general preference for a broad scope of discovery, limiting discovery is appropriate when the burden of providing the documents outweighs the need for it. E.g., Wyoming, 208 F.R.D. at 452.  Undue burden is determined by reference to factors such as "relevance, the need of the party for the

documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." Flatow v. Islamic Republic of Iran, 196 F.R.D. 203, 206-07 (D.D.C. 2000) (Lamberth, J.). Moreover, nonparty status is also relevant in considering the burden. Wyoming, 208 F.R.D. at 452.

"The text of Rule 45 makes quite clear that parties and attorneys who issue subpoenas have an affirmative duty to prevent undue burden or expense to the persons subject to the subpoena." In re Denture Cream Prods. Liab. Litig., 292 F.R.D. 120, 123-124 (D.D.C. 2013). A court considering a subpoena to a non-party "has the discretion to limit discovery to prevent undue expense to third parties, even if the discovery sought is within the permissible scope" of the Federal Rules of Civil Procedure. Id. Accordingly, the courts of this District are to consider "whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive.'" Millennium TGA, Inc. v. Comcast Cable Communs. LLC, 286 F.R.D. 8, 11 (D.D.C. 2012).

The Subpoena demands the production of "any and all documents, policies, procedures, internal memos, notes, communication and/or emails" pertaining to any GM diversity initiative over a period of five (5) years. (Moore Dec., Ex. 1, ¶ 3). As an organization advocating for greater diversity in the U.S. auto industry, there is a

wealth of material that may "reflect or relate to" diversity initiatives at one of the largest auto manufacturers in the U.S.

Thus, complying with the Subpoena would require NAMAD staff to sift through every document or digital file created over a five year period to pull any material that so much as mentions GM. Such a process would be extremely expensive and time-consuming, particularly when considering that NAMAD only has four (4) employees and an estimated annual budget of $1.5 Million. (Lester Dec., ¶ 8). Imposing such a burden upon NAMAD cannot be justified under the circumstances because the material sought is, at best, only marginally relevant to the Lawsuit and Southern Motors has made not showing that it bothered to pursue other, more convenient sources before making an extraordinarily broad discovery request on a non-party.

NAMAD asserts that the undue burden imposed by the Subpoena justifies a grant of its Motion to Quash. In the event the Court declines to quash the Subpoena, however, NAMAD requests in the alternative that the Court modify the Subpoena to less the labor and expense necessary for Compliance. The plain language of Rule 45(d)(2)(B)(ii) requires the district court to shift a non-party's costs of compliance with a subpoena, if those costs are significant. The rule states that the district court's order compelling compliance with a subpoena "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance," Fed.

R. Civ. P. 45(d)(2)(B)(ii), and provides no exceptions. This language leaves no room for doubt that the rule is mandatory. Thus, when discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party. If so, the district court must order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder "non-significant." Legal Voice v. Stormans Inc., 738 F.3d 1178, 1184 (9th Cir. 2013). See also, Linder v. Calero-Portocarrero, 251 F.3d 178 (D.C. Cir. 2001).

### III. MONETARY SANCTIONS

NAMAD respectfully request that the court award monetary sanctions in an amount according to proof. Rule 45(d)(1) provides:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

A court may impose sanctions when a party issues a subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law. Legal Voice v. Stormans Inc., 738 F.3d @ 1185. Federal Rule of Civil Procedure 26(g)(1)(B) requires parties seeking discovery to act (1) consistently with the rules of existing law or with good reason to change the law; (2) without bad faith; and (3) reasonably

without imposing undue burden or expense considering the needs of the case. A violation of any one of these duties without substantial justification results in sanctions. A violation of any one of the Rule 26 duties will be relevant to assessing propriety of sanctions under the "undue burden" language. <u>Mount Hope Church v. Bash Back</u>, 705 F.3d 418, 425-26 (9th Cir. 2012).

As shown herein, Plaintiff has a viable option to obtain the records directly from GM. Plaintiff's position that they may nonetheless also obtain the records from NAMAD is in direct contravention of the requirements of Rule 45. Moreover, Plaintiff took the position that the First Amendment is not applicable to this action; a position clearly contrary to well established jurisprudence.

## IV. Conclusion

In its Subpoena, Southern Motors seeks a wide range of internal communications between NAMAD members, employees and like-minded supporters. It is well-established that such communications are subject to the First Amendment privilege. Accordingly, courts will only compel the disclosure of such communications where they go to the "heart of the lawsuit" and the requesting party has taken reasonable steps to procure the material from alternate sources.

Southern Motors fails on both counts. The documents demanded in the Subpoena is wholly unrelated to the claims and defenses in the Lawsuit, and Southern Motors cannot demonstrate any efforts to seek information from alternate sources.

4852-9463-1457.1

-17-

The Court should therefore grant NAMAD's Motion to Quash or, in the alternative, modify the Subpoena to minimize the burden, expense, and infringement upon NAMAD's associational rights.[4]

Respectfully submitted and executed this 15th day of January, 2015.

By: _____
RODNEY G. MOORE, ESQ.
ATTORNEYS FOR NATIONAL ASSOCIATION
OF MINORITY AUTOMOBILE DEALERS

By: _____
JEAN-MARIE SYLLA, JR., ESQ.
STATE BAR NO. 469371
LCVR 83.2 (C)(1) SPONSO

TAYLOR SYLLA & AGIN, LLP
THE WASHINGTON SQUARE BUILDING
1050 CONNECTICUT AVENUE, NW, 10TH FL.
WASHINGTON, DC 20036
TELEPHONE: 202.689.9512
FACSIMILE: 202.783.7858
EMAIL: JMS@TSAFIRM.COM

---

[4]   A Proposed Order granting NAMAD's Motion to Quash is attached hereto as "Exhibit C".

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE RULE 45 SUBPOENA TO NON-PARTY NATIONAL ASSOCIATION OF MINORITY AUTOMOBILE DEALERS | ) ) ) ) ) | CIVIL ACTION FILE NO.: _____ |
| IN THE MATTER OF | ) ) | DECLARATION OF DAMON LESTER |
| SOUTHERN MOTORS CHEVROLET, INC., | ) ) ) | |
| PLAINTIFF, | ) ) | |
| VS. | ) ) | [UNDERLYING CIVIL ACTION FILED IN U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA SAVANNAH DIVISION CIVIL CASE NO. CV-414-152] |
| GENERAL MOTORS, LLC, | ) ) | |
| DEFENDANT. | ) ) | |

## DECLARATION OF DAMON LESTER

Pursuant to 28 U.S.C. § 1746, I, Damon Lester, declare under penalty of perjury that the foregoing testimony is true and correct.

1.

My name is Damon Lester. I am over 18 years of age, of sound mind and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge, and I am competent to testify to the truthfulness.

2.

I am the President of The National Association of Minority Automobile Dealers (hereinafter, "NAMAD").  I have served in that capacity at all times relevant to NAMAD's contemporaneously filed Motion to Quash or Modify Subpoena.

3.

NAMAD is a 501(c)(3) non-profit, tax-exempt organization with its headquarters located at 9475 Lottsford Road, Suite 150, Largo, Maryland 20774.

4.

Since 1980, NAMAD has pursued the meaningful presence and participation of minority businesses and diverse employees across all aspects of the automotive economic sector.

5.

NAMAD collaborates with local, regional and national policy-makers as well as domestic and international manufacturers to establish business protocols which are meaningful, equitable and sustainable for our nation's minority entrepreneurs and employees currently and potentially working within the automotive industry in America.  Thus, NAMAD is a minority trade advocacy group whose efforts span political, economic, and social arenas.

6.

NAMAD advocates for increased minority ownerships of dealerships, greater diversity in the automotive manufacturing environment, and greater engagement of minorities in automotive retail sales. We are the voice of many minority automobile dealers, and those who want to become dealers, on issues that are often too controversial for our members to personally confront.

7.

Beyond its advocacy role, NAMAD provides its members with strategic networking opportunities and consultation regarding regulatory compliance, marketing, and financial literacy.

8.

NAMAD has a total of four (4) employees and an annual estimated budget of $1.5 Million.

9.

NAMAD has the following officers: Chairman of the Board, Treasurer, and Secretary.

10.

NAMAD officers are elected every 2 years. In the last five years, NAMAD has had 3 separate sets of officers.

11.

NAMAD membership is composed of minority owners of automotive dealerships and those interested in becoming owners.

12.

NAMAD officers do not use NAMAD email accounts. Accordingly, NAMAD officers communicate via their personal email accounts.

13.

NAMAD has no records discussing or related to Southern Motors Chevrolet, Inc., the transaction referenced in the Amended Complaint, or GM's alleged selection of Chatham Motors Sales to operate the Dealership. Moreover, while NAMAD supports GM's commitment to diversity, NAMAD did not develop the Minority Dealer Development Program and does not possess documents which reflect how that program is implemented.

14.

NAMAD was not involved in any capacity in General Motors' selection of Chatham Motors Sales to operate the Dealership. NAMAD is not affiliated with GM in any way and plays no role in the process whereby GM decides to whom dealerships may be sold.

15.

Were NAMAD compelled to produce the internal communications, strategies and deliberations of its officers, staff, and members, it would have a chilling effect on NAMAD's operations and membership. NAMAD officers, members, and employees freely exchange their thoughts and opinions regarding strategies and diversity efforts in the automotive sector. NAMAD officers, member, and employees would be reluctant to share ideas candidly if they were forced to divulge those thoughts and opinions. Moreover, membership in NAMAD would be discouraged if the private communications of its officers and members were subject to disclosure in any suit involving allegations of reverse discrimination in the auto industry. I personally attempt to reassure our members that they can freely express their concerns with NAMAD and that, where appropriate, we will advocate on their behalf.

16.

Over the years, NAMAD's advocacy for greater diversity in the automotive industry has met opposition and hostility. NAMAD officers and employees have received multiple, anonymous threats.

17.

The compelled disclosure of "any and all communications and/or emails . . . between [NAMAD] and any civil rights organization or other third party" would have a chilling effect on NAMAD's associational rights. Disclosing such communications

would inherently require NAMAD to divulge the identities of other, like-minded organizations with whom NAMAD has collaborated. Forcing NAMAD to identify and disclose communications with like-minded groups would discourage such groups from collaborating with NAMAD for fear of suffering the same threats and hostility that NAMAD has experienced. Compelling discovery of NAMAD's communications with other groups would also discourage such groups from collaborating with NAMAD and, in turn, make effective collective action more difficult.

18.

Because the subpoena request does not identify any particular document and/or refers to broad categories of documents, my staff and I must essentially review all of our meeting minutes, notices, correspondence, emails, reports, etc., over the past five (5) years to ascertain whether they are required to be produced. The fundamental problem is that NAMAD and its staff, and to some degree its officers, are engaged in advocacy activities with General Motors and other civil rights groups on a daily basis. Thus, the request essentially asks NAMAD to review substantially all of its records over a five (5) year period.

19.

I estimate that in addition to the expense and time associated with retaining a consultant to conduct an electronic search of our records, it will take approximately 100 to 130 hours for me to review the historic records of NAMAD covering a five (5)

4820-6613-1489.1

year period.  For the search phrases requested by Plaintiff in "Exhibits 11-13" of the Declaration of Rodney G. Moore, I estimate that NAMAD will have over 2,000 emails to review.

20.

The burden on NAMAD would not only be financial, it would also remove me from my key responsibility as President of NAMAD.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted and executed this 15th day of January, 2015.

By: _____

DAMON LESTER
PRESIDENT FOR NATIONAL ASSOCIATION
OF MINORITY AUTOMOBILE DEALERS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE RULE 45 SUBPOENA TO          )
NON-PARTY                          )
NATIONAL ASSOCIATION OF            )
MINORITY AUTOMOBILE DEALERS        )      CIVIL ACTION FILE
                                   )      NO.: _____
IN THE MATTER OF                   )
                                   )      DECLARATION OF
SOUTHERN MOTORS                    )      RODNEY G. MOORE
CHEVROLET, INC.,                   )
                                   )
        PLAINTIFF,                 )
                                   )
VS.                                )      [UNDERLYING CIVIL ACTION FILED IN
                                   )      U.S. DISTRICT COURT FOR THE
GENERAL MOTORS, LLC,               )      SOUTHERN DISTRICT OF GEORGIA
                                   )      SAVANNAH DIVISION
        DEFENDANT.                 )      CIVIL CASE NO. CV-414-152]
_____    )

## DECLARATION OF RODNEY G. MOORE

Pursuant to 28 U.S.C. § 1746, I, Rodney G. Moore, declare under penalty of

perjury that the foregoing testimony is true and correct.

1.

I am over 18 years of age, of sound mind and otherwise competent to make this

Declaration.  The evidence set out in the foregoing Declaration is based on my

personal knowledge, and I am competent to testify to the truthfulness.

2.

I am a partner with the law firm of Lewis, Brisbois, Bisgaard & Smith LLP in Atlanta, Georgia.  I have served as The National Association of Minority Automobile Dealers' ("NAMAD") counsel at all times relevant to NAMAD's contemporaneously filed Motion to Quash.

3.

NAMAD was served with the Subpoena to Produce Documents (the "Subpoena") on  December 2, 2014 via its President, Damon Lester.  A true and accurate copy of the Subpoena is attached hereto as "Exhibit 1".

4.

The Subpoena was issued in connection with a civil action pending in the District Court for the Southern District of Georgia which case was assigned Civil Action File No. CV-414-152 (hereinafter, the "Lawsuit").

5.

A true and accurate copy of Southern Motors' Amended Complaint against GM is attached hereto as "Exhibit 2".

6.

On December 16, 2014, I emailed counsel for Southern Motors, Bill Hunter, to communicate NAMAD's belief that the Subpoena infringes upon NAMAD's First Amendment rights of speech and association and that the Subpoena subjects NAMAD

to undue burden.   To that end, attached to my December 16, 2014 email was NAMAD's Objection the to the Subpoena in Its Entirety.  I also sought in good faith to achieve a mutually agreeable resolution that would not require court intervention. True and accurate copies of my December 16, 2014 email to Bill Hunter and NAMAD's Objection the to the Subpoena in Its Entirety are attached hereto as "Exhibit 3".

7.

A true and accurate copy of Bill Hunter's December 18, 2014 email to me is attached hereto as "Exhibit 4".

8.

I once again emailed Bill Hunter on December 19, 2014 regarding the Subpoena.  A true and accurate copy of that email is attached hereto as "Exhibit 5".

9.

On December 21, 2014, Tom Withers, a partner of Mr. Hunter, sent me an email regarding the Subpoena.  A true and accurate copy of Tom Withers' December 21, 2014 email is attached hereto as "Exhibit 6".

10.

I responded to Mr. Withers by email dated December 24, 2014.  In that email, I proposed a resolution whereby NAMAD (1) would produce communications between NAMAD and General Motors regarding the Minority Dealer Development Program

and the Minority Dealer Advisory Counsel; and (2) NAMAD would allow Southern

Motors to conduct a basic desktop search entering agreed upon search terms in each

NAMAD owned or controlled desktop.   I further clarified that, pursuant to its

constitutional objections, NAMAD would not produce records reflecting the internal

communications and deliberations of NAMAD officers or members or

communications between NAMAD and like-minded civil rights organizations.  A true

and accurate copy of my December 24, 2014 email to Tom Withers is attached hereto

as "Exhibit 7".

11.

Mr. Withers responded via email on January 7, 2015.  A true and accurate copy

of Tom Withers' January 7, 2015 email is attached hereto as "Exhibit 8".

12.

In a January 12, 2015 phone conversation, Mr. Withers agreed to extend the

timeframe for NAMAD to respond to the Subpoena until Friday, January 16, 2015 at

1:00 pm.  I memorialized our oral agreement in an email to Mr. Withers dated January

13, 2015.  A true and accurate copy of my email to Mr. Withers memorializing the

deadline for NAMAD's response to the Subpoena is attached hereto as "Exhibit 9".

13.

General Motors filed a Motion and Memorandum in Support of Motion to

Dismiss For Failure to State a Claim on August 6, 2014.  A true and accurate copy of

General Motors' Memorandum of Law in Support of Motion to Dismiss is attached hereto as "Exhibit 10".

14.

Attached hereto as "Exhibit 11", "Exhibit 12"; and "Exhibit 13", respectfully, are emails received by me from Tom Withers, where Plaintiff continues to seek massive discovery from NAMAD.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted and executed this 15th day of January, 2015.

By: _____

RODNEY G. MOORE, ESQ.



AO 88B (Rev. 01/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises

# UNITED STATES DISTRICT COURT
for the
Southern District of Georgia

SOUTHERN MOTORS CHEVROLET, INC.,

_____
_Plaintiff_
v.
GENERAL MOTORS, LLC,

_____
_Defendant_

)
)
)
)
)
)
)

Civil Action No.  CV414-152

(If the action is pending in another district, state where: )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES

To:  National Association of Minority Automobile Dealers, Inc., c/o Damon Lester, President,
9475 Lottsford Road, Suite 150, Largo, Maryland 20774

☑ _Production:_ YOU ARE COMMANDED to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Attachment A.

| Place: Capital Reporting Company<br>1821 Jefferson Place, NW, 3rd Floor<br>Washington, D.C. 20036 | Date and Time:<br><br>Dec. 29, 2014, 13:00 |
|---|---|

☐ _Inspection of Premises:_ YOU ARE COMMANDED to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  11/25/2014

CLERK OF COURT

_____
_Signature of Clerk or Deputy Clerk_

OR

_____
_Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_
Southern Motors Chevrolet, Inc. _____, who issues or requests this subpoena, are:

R. Benjamin Lingle, Esq., Oliver Maner LLP, P.O. Box 10186, Savannah, GA 31412·
blingle@olivermaner.com, (912) 236-3311

AO 88B (Rev. 01/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises (Page 2)

Civil Action No. CV414-152

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*  National Association of Minority Automobile Dealers, Inc.

was received by me on *(date)* _____ .

☐ I personally served the subpoena on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the subpoena at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the subpoena to *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because _____ ; or

☐ other *(specify):*


Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____        _____

*Server's signature*

_____

*Printed name and title*


_____

*Server's address*

Additional information regarding attempted service, etc:

AO 88B  (Rev.  01/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF GEORGIA
#### SAVANNAH DIVISION

SOUTHERN MOTORS CHEVROLET, )
INC., )
                ) Civil Action No. CV414-152
                )
         Plaintiff, )
v. )
                )
GENERAL MOTORS, LLC, )
                )
         Defendant. )

## ATTACHMENT "A" TO PLAINTIFF'S SUBPOENA TO NATIONAL ASSOCIATION OF MINORITY AUTOMOBILE DEALERS, INC. TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES

In accordance with Rule 45 of the Federal Rules of Civil Procedure, you are commanded to produce the following documents that are in your possession, custody or control:

### INSTRUCTIONS

1.       In lieu of producing the documents at the time and place indicated on the face of the Subpoena, you may produce copies of the requested documents to Plaintiff's counsel, William J. Hunter, I. Gregory Hodges, Patricia T. Paul, Timothy D. Roberts, and R. Benjamin Lingle, Oliver Maner LLP, 218 West State Street, Savannah, Georgia 31401, on or before December 29, 2014.

2.       When used herein, the terms "General Motors, LLC," "General Motors," "GM," "Defendant," or any synonym or variation thereof are intended to and shall embrace and include, in addition to Defendant General Motors, LLC, all parent or subsidiary corporations, divisions, or corporate affiliates of Defendant General Motors, LLC, including all agents, servants, representatives, principals, and/or employees of the foregoing.

1

3.      When used herein, the terms "National Association of Minority Automobile Dealers, Inc.," "NAMAD," "you," or any synonym or variation thereof are intended to and shall embrace and include, in addition to National Association of Minority Automobile Dealers, Inc., all parent or subsidiary corporations, divisions, or corporate affiliates of National Association of Minority Automobile Dealers, Inc., including all agents, servants, representatives, principals, and/or employees of the foregoing.

4.      When used herein, the term "Southern Motors Chevrolet, Inc.," "Southern Motors," "Plaintiff," or any synonym or variation thereof is intended to and shall embrace and include, in addition to Southern Motors Chevrolet, Inc., all parent or subsidiary corporations, divisions, or corporate affiliates of Southern Motors Chevrolet, Inc., including Southern Motors of Savannah, Inc., and including all agents, servants, representatives, principals, and/or employees of the foregoing, including but not limited to Adam Kaminsky, Ross Kaminsky, and Myron Kaminsky.

5.      When used herein, the term "Chatham Motor Sales, Inc.," "Chatham Motor Sales," or any synonym or variation thereof is intended to and shall embrace and include, in addition to Chatham Motor Sales, Inc., all parent or subsidiary corporations, divisions, or corporate affiliates of Chatham Motor Sales, Inc., including but not limited to W.R. Pittman Enterprise, LLC, W.R. Pittman Enterprise-Rincon, LLC, Pittman REH Effingham LLC, and any other entity owned or operated in whole or part by Winston R. Pittman, Sr., including all agents, servants, representatives, principals, and/or employees of the foregoing, including but not limited to Winston R. Pittman, Sr.

6.     When used herein, the term "Dealership" or any synonym or variation thereof is intended to and shall embrace that certain automobile dealership located at 5480 Highway 21 South in Rincon, Georgia.

7.     Except as otherwise specified herein, please produce all responsive documents for the period of January 1, 2010, through the date of your response.

8.     Please produce all responsive discoverable matter, information, documents, or things either in your possession, in your control, or accessible to you by reasonable inquiry. This includes discoverable matter, information, documents, or things in the possession, custody, or control of your (a) agents, (b) employees; (c) attorneys, (d) corporate departments or divisions; (e) your parent or subsidiary corporations; (f) corporate affiliates; and (g) any other persons, firms or corporations which because of your business relationship would readily respond to your inquiry in the ordinary course of business.

9.     "Document" means: (1) every writing or record of every type and description that is or has been in your possession, control, or custody or of which you have knowledge, including but not limited to, correspondence, inter-office memoranda, tapes, emails, stenographic or hand-written notes, studies, publications, books, pamphlets, pictures (drawings and photographs), films, microfilms, voice recordings, maps, reports, surveys, minutes, statistical computations, invoices, production orders, sales records, and any other writing evidencing or reflecting facts relevant to the Plaintiff's claim; (2) every copy of the above-described writing record where the original is not in your possession, custody or control; (3) every copy of each such writing or record where such copy is not an identical copy of the original by virtue of any commentary or notation that does not appear on the original.

3

10.     As used herein, terms in the singular include the plural and terms in the plural include the singular.

## DOCUMENTS TO BE PRODUCED

1.     Please produce any and all documents reflecting communications and/or dealings between you and Fuller Chevrolet, Chatham Motors Sales, General Motors, NAMAD affiliate or subsidiary, and/or any civil rights organization or other third party, and/or any internal NAMAD documents regarding: (a) the Dealership, including but not limited any proposed sale of the Dealership and/or the exercise of a purported right of first refusal for the purchase of the Dealership; and/or (b) the selection or potential selection of automobile dealership opportunity(ies) for Chatham Motor Sales.

2.     Please produce any and all documents reflecting or relating to communications and/or dealings between you and General Motors and/or between you and any civil rights organization or other third party regarding General Motors' Minority Dealer Development Program, Minority Dealer Advisory Counsel, and/or other General Motors' plan, program, or policy relating to affirmative action or diversity, including but not limited to any General Motors' plan, program, or policy relating to the recruitment, selection, training, growth, development, education, installation, and/or retention of minorities as General Motors' dealers and/or potential dealers.

3.     Please produce any and all documents, policies, procedures, internal memos, notes, communications and/or emails pertaining to General Motors' Minority Dealer Development Program, Minority Dealer Advisory Counsel, Diversity Dealer Relations Program, and/or other General Motors' plan, program, or policy relating to affirmative action or diversity, including but not limited to any such documents pertaining to any General Motors' plan, program, or policy relating to the recruitment, selection, training, growth, development,

4

education, installation, and/or retention of minorities as General Motors' dealers and/or potential dealers.

      4.     Please produce any and all documents, policies, procedures, internal memos, notes, communications and/or emails, including but not limited to any documents reflecting or relating to communications and/or dealings between you and General Motors and/or between you and any civil rights organization or other third party, pertaining to the selection of dealer applicants to be included in any General Motors affirmative action plan, program, or policy referred to in the previously enumerated paragraphs, including any documents regarding goals related to this matter.

      5.     Please produce any and all documents, policies, procedures, internal memos, notes, communications and/or emails, including but not limited to any documents reflecting or relating to communications and/or dealings between you and General Motors and/or between you and any civil rights organization or other third party, pertaining to General Motors' use of its alleged right of first refusal as a result of or in furtherance of the goals of any General Motors affirmative action plan, program, or policy referred to in the previously enumerated paragraphs.



## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

SOUTHERN MOTORS CHEVROLET,     )
INC.,                          )
                               )     Civil Action No. CV414-152
    Plaintiff,     )
                               )
v.                             )
                               )
GENERAL MOTORS, LLC,           )
                               )
    Defendant.     )

## AMENDED COMPLAINT

Comes now Southern Motors Chevrolet, Inc., Plaintiff herein, and files this Amended

Complaint against General Motors, LLC, as follows:

### I.    PARTIES, JURISDICTION, and VENUE

1.

Southern Motors Chevrolet, Inc. (hereinafter "Southern Motors Chevy") is a corporation

formed and existing under the laws of the State of Georgia with its principal place of business in

Savannah, Chatham County, Georgia.

2.

Defendant General Motors, LLC (hereinafter "General Motors") is a limited liability

company formed and existing under the laws of the State of Michigan with its principal place of

business located at 300 Renaissance Center, MC 482-C14-C66, Detroit, Wayne County,

Michigan 48265. General Motors is authorized to do business in the State of Georgia and may

be served with process through its registered agent, CSC of Cobb County, Inc., 192 Anderson

Street S.E., Suite 125, Marietta, Georgia 30060.

1

3.

Southern Motors Chevy is subject to the personal jurisdiction of this Court because it seeks affirmative relief from this Court.

4.

General Motors is subject to the personal jurisdiction of this Court because it (1) transacted business within Georgia; (2) committed tortious acts or omissions within Georgia; (3) caused tortious injury to Southern Motors Chevy in Georgia caused by acts and omission outside of Georgia at a time when General Motors regularly transacted or solicited business in Georgia, and/or engaged in other persistent course of conduct in Georgia, and/or derived substantial revenue from goods used or consumed or services rendered in Georgia.  Moreover, General Motors has sufficient minimum contacts with Georgia that are purposefully directed to Georgia and the Southern District of Georgia such that the filing of this action does not offend traditional notions of fair play and substantial justice.

5.

This Court has subject matter jurisdiction over the claims at issue herein pursuant to 28 U.S.C. §§ 1331 and 1367.

6.

Venue in this Court is proper as to all parties pursuant to 28 U.S.C. §§ 90 and 1391 and L.R. 2.1 of the Local Rules of the United States District Court for the Southern District of Georgia.

## II.     **GENERAL ALLEGATIONS**

7.

Southern Motors of Savannah, Inc. is a family-owned automobile dealer that operates several automobile dealerships in and around Chatham and Effingham Counties, to wit, Southern

Motors Honda, Southern Motors Acura, and Southern Motors Springfield. Southern Motors of

Savannah, Inc. has been in the automobile sales business for more than eighty-five (85) years. It

is now primarily owned and operated by Myron Kaminsky and his sons Adam and Ross

Kaminsky ("the Kaminskys"), the family's second and third generations, respectively, to own

and operate the company. Myron Kaminsky has successfully been in the business for more than

forty (40) years. Adam and Ross Kaminsky have been in the business for more than twenty (20)

years and hope to one day pass the business on to the fourth (4th) generation. (*See* Ex. A to

Complaint, Doc. #1, Affidavit of A. Kaminsky, a copy of which is attached as Ex. A, at ¶ 2).

8.

The Kaminskys are white persons. (*See* Ex. A, ¶ 3).

9.

In or around December 2013 or January 2014, the Kaminskys formed Southern Motors

Chevy and negotiated and entered into an agreement with B.G. Fuller of Fuller Chevrolet, Inc.

for Southern Motors Chevy to purchase Mr. Fuller's Chevrolet dealership located at 5480

Highway 21 South in Rincon, Georgia (hereinafter "the Dealership"). Southern Motors Chevy

had a binding deal with Fuller Chevrolet, Inc. (*See* Ex. A, ¶ 4). Upon information and belief,

Mr. B. G. Fuller of Fuller Chevrolet, Inc. contacted General Motors on or about January 7, 2014

and let General Motors know that Mr. Fuller was going to sell the Dealership to the Kaminskys/

Southern Motors Chevy, and Mr. Fuller needed the change paperwork. Ms. Allisia Powell of

"ChannelVantage, Inc., Onsite at General Motors," with a "gm.com" suffix to her e-mail

address, contacted Mr. Adam Kaminsky of Southern Motors Chevy via e-mail for General

Motors on January 16, 2014 and requested numerous documents and forms to be completed. Ms.

Powell indicated she needed the information and documents "to start processing this buy/sell."

3

Southern Motors Chevy's counsel sent to Ms. Powell via e-mail a copy of the fully executed

Asset Purchase Agreement on January 20, 2014.

10.

Southern Motors Chevy then began to secure financing, form a business plan, and gather

the voluminous paperwork required by General Motors, as franchisor of the Dealership. (*See* Ex.

A, ¶ 5).

11.

The Southern Motors family of dealerships maintains strong sales and high customer

satisfaction scores, documentation of which was provided to General Motors. (*See* Ex. A, ¶ 6).

12.

The Kaminskys' plan was to own and operate the Dealership. Adam and Ross Kaminsky

planned to spend most of their time at the Dealership to ensure efficiency. (*See* Ex. A, ¶ 7).

13.

The Kaminskys, through the Southern Motors family of dealerships, have operated in the

Effingham community for more than twenty (20) years, which is one of the reasons why Mr.

Fuller offered the Kaminskys the opportunity to purchase the Dealership. The Kaminskys would

take care of the Dealership, the community, and his people. (*See* Ex. A, ¶ 8).

14.

However, unknown to the Kaminskys and to Southern Motors Chevy, by 2014 General

Motors intended that white persons, and therefore Plaintiff, would not be permitted to purchase

the Dealership upon its sale. Upon information and belief, in October of 2012 civil rights leader

and activist Rev. Jesse Jackson noted publicly that while the automotive industry was rebuilt by

the federal bailout, others were left out, and federal money did not lead to more black-owned car

4

dealerships. Rev. Jackson indicated that Rainbow PUSH would survey automotive companies to determine their level of ethnic inclusion and representation, noting, "This is not charity, this is parity," and "This is not generosity, this is reciprocity." (*See* Ex. B, "Rev. Jackson Addresses Ethnic Disparity in Auto Industry," www.blacdetroit.com, 10/3/12.) Upon information and belief, in June of 2013 Rev. Jackson criticized General Motors publicly at General Motors' Annual Meeting for having only 36 of General Motors' 4,000 or so dealerships owned by African Americans. Following Rev. Jackson as a speaker was Mr. Damon Lester, President of the National Association of Minority Automobile Dealers ("NAMAD"), who said that General Motors is near the bottom of automakers regarding minority-owned dealerships. Mr. Lester urged General Motors "to come up with a strategy," and, "That global strategy should encompass all types of diversity, all forms of it – from marketing, dealerships, philanthropy and so on." Mr. Lester also urged the General Motors Board to have an "external diversity committee" representing different areas to help grow minority-owned dealerships. (*See* Ex. B, "Rev. Jesse Jackson criticizes GM on lack of African American-owned dealerships," Michael Wayland, www.mlive.com, 6/6/13.) Mr. Lester indicated that 25 African American dealers owned the 36 General Motors dealerships, and that General Motors' strategy needed to be in writing. General Motors then-CEO Dan Akerson announced GM had 198 minority-owned dealerships, which Mr. Akerson called "inadequate." (*See* Ex. B, "NAMAD, Jesse Jackson: GM needs more minority dealers," Arlena Sawyers, Automotive News, www.autonews.com, 6/19/13.) Mr. Akerson told Rev. Jackson that Mr. Akerson was committed to recruiting more black automotive dealers for General Motors' dealership network. (*See* Ex. B, "At annual GM meeting, optimistic Dan Akerson says dividend is possible," Nathan Bomey, Detroit Free Press, www.freep.com, 6/6/13.)

15.

By July of 2013, General Motors had come up with the strategy urged by Mr. Lester to increase the number of African-American owned General Motors dealerships, which strategy included using General Motors' right of first refusal on sales of dealerships "to snag stores for minority dealers." Upon information and belief, on or about July 15, 2013 General Motors then-North America President Mark Reuss announced at NAMAD's annual conference that General Motors wanted to add 18 minority owned dealerships by the end of 2013, and General Motors had 45 candidates waiting in the wings. Mr. Reuss said, "The devil is in the detail [of how] to get these people in." Mr. Eric Peterson, then-General Motors vice president of global diversity, who was also attending the NAMAD conference stated publicly that GM had a plan, had shown it to NAMAD members, and intended to put the plan in writing. Mr. Peterson said that General Motors was working with its field organization to identify dealers who wanted to sell their stores but lacked succession plans, hoping "to snag stores for minority dealers." Mr. Peterson said that General Motors had exercised its right of first refusal option on dealership transactions twenty-two (22) times over the past three (3) years and would continue to do so in the twenty-two (22) states in which it had that option. Mr. Peterson indicated that using that option can open the door for a minority buyer. Mr. Peterson indicated that he was not happy with the numbers that they had. (*See* Ex. B., "GM goal: 25 more minority stores[;] Reuss says 45 candidates want to become dealership owners," Arlena Sawyers, Automotive News, www.autonews.com, 7/15/13.)

16.

Upon information and belief, on or about September 6, 2013 Mr. Eric Peterson was promoted by General Motors to U.S. Vice President, Diversity Dealer Relations. His role was to advance General Motors' commitment to increase the number of minority dealers in its dealer

6

network and to support automotive diversity. (*See* Ex. B, "Eric Peterson named U.S. vice

president, Diversity Dealer Relations, at General Motors," www.theautochannel.com, 9/6/13.)

At the Rainbow PUSH Global Automotive Summit in October, 2013, Mr. Reuss said that

General Motors was continuing with its goal of adding twenty-five (25) minority-owned

dealerships by year end. (*See* Ex. B, "Reuss, A more diverse GM reflects America, changes

automaker's culture," Arlena Sawyers, Automotive News, www.autonews.com, 10/3/13.) At the

same conference, Mr. Peterson said publicly that all minorities are included in General Motors'

stretch effort, but there is emphasis on African Americans. Rev. Jackson and NAMAD President

Lester said at the conference that the overall number of dealerships owned by African Americans

is not growing along with those owned by their minority and nonminority peers as the auto

industry rebounds. Mr. Peterson said, "The focus is there, the pressure is there, and we want to

hit our objectives." (*See* Ex. B, "GM: We'll hit goal on minorities," Arlena Sawyers,

Automotive News, www.autonews.com, 10/14/13.) Mr. Peterson had indicated that General

Motors likely would add African American dealers near the end of the fourth quarter of 2013.

(*See* Ex. B, "Rainbow PUSH calls for more African-American auto dealers, suppliers," Rainbow

PUSH coalition, 10/3/13.)

17.

However, by the end of 2013 General Motors had fallen short of its goal. Its efforts,

though, would continue unabated. In February of 2014 Mr. Peterson announced that General

Motors awarded dealerships to 21 minorities in 2013 and was aiming for 25 more in 2014. Mr.

Peterson indicated the company fell short of its stretch goal of adding 25 minority-owned

dealerships in 2013, but, "We've got some good momentum going and great support from our

field organization and our leadership." (*See* Ex. B, "GM touts dealer diversity gains," Arlena

Sawyers, Automotive News, www.autonews.com, 2/3/14.)

18.

General Motors' website with regard to its Minority Dealer Development Program

("MDDP") and Minority Dealer Development Key Points 2013 shows General Motors'

commitment to the growth in numbers of minority dealers, and commitment to the selection of

dealership opportunities for minority candidates. (*See* Ex. B, GM Minority Dealer Development

Key Points 2013; Ex. C, GM Minority Dealer Development webpage).

19.

Upon information and belief, Winston R. Pittman, Sr., majority or sole owner of Chatham

Motor Sales, Inc., is African American. Through Chatham Motor Sales, Mr. Pittman owns and

operates Chatham Parkway Toyota in Savannah.

20.

In early January 2014, General Motors informed Winston R. Pittman, Sr., that he would

be the new buyer of the Dealership.

21.

From January 10 through 26, 2014, Mr. Pittman incorporated three new entities, to wit,

W.R. Pittman Enterprise, LLC; W.R. Pittman Enterprise-Rincon, LLC; and Pittman REH

Effingham, LLC, to participate in the purchase and ownership of the Dealership.

22.

General Motors acted on its announced plan intended "to snag stores for minority

dealers" in this case, and General Motors exercised its right of first refusal and refused the

contract of sale of the Dealership to Southern Motors Chevy illegally on the basis of race.

8

General Motors desired and intended that the Dealership be provided by General Motors on the basis of race to an African American and that the Dealership not be sold on the basis of race to white persons and therefore Plaintiff.

23.

General Motors concealed its intent to exercise its right of refusal to disapprove the sale to Southern Motors Chevy for approximately two (2) months after General Motors decided to disallow Southern Motors Chevy's purchase and to facilitate the purchase to an African American dealer.

24.

During that time, General Motors led Southern Motors Chevy to believe it was examining qualifications and permitted Southern Motors Chevy to expend substantial time and resources in pursuing the Dealership (*see* Ex. A, ¶ 9), while actually having no intention of ever allowing the white-owned Southern Motors Chevy to purchase the Dealership.

25.

Despite numerous requests, the Kaminskys were not given the opportunity to meet with General Motors.  Regardless, the Kaminskys continued to meet with Fuller Chevrolet, Inc. to ensure Southern Motors Chevy was ready to operate immediately once General Motors' approval came.  (*See* Ex. A, ¶ 10).

26.

In light of the Southern Motors family of dealership's high customer satisfaction history, sales effectiveness, and business acumen, the Kaminskys assumed General Motors was properly processing the sale and franchise agreement.  (*See* Ex. A, ¶ 11).

9

27.

In a letter to Southern Motors Chevy dated March 4, 2014 ("the Letter"), General Motors

stated it had "decided to exercise its right of first refusal" and that it "should not in any way be

interpreted as reflecting on the qualifications of the applicant(s) or the contents of the proposal."

(*See* Ex. A, ¶ 12).  The Letter was post-marked March 8, 2014, and received by Southern Motors

Chevy's corporate counsel, Randall Bart, Esq., on March 14, 2014.  (*See* Ex. A, ¶ 13).

28.

In a letter dated March 26, 2014, Southern Motors Chevy's counsel submitted to General

Motors an accounting of its reasonable expenses incurred in connection with its preparation of

the purchase of the Dealership and demanded reimbursement of said expenses pursuant to

O.C.G.A. § 10-1-663.1.  (*See* Ex. D, Letter dated March 26, 2014).

29.

In a letter dated April 17, 2014, General Motors refused to pay Southern Motors Chevy's

reasonable expenses incurred in connection with its preparation of the purchase of the

Dealership.  In particular, General Motors refused to reimburse Southern Motors Chevy for time

spent by Southern Motors Chevy's owners and employees in connection with Southern Motors

Chevy's preparation of the purchase of the Dealership.  (*See* Ex. E, Letter dated April 17, 2014).

30.

Southern Motors Chevy's rights have been impaired, trammeled by and infringed upon by an

affirmative action plan exercised illegally.

III.    **CAUSES OF ACTION**

*Count I: Violation of 42 U.S.C. § 1981*

31.

Southern Motors Chevy re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 30 as if fully alleged herein.

32.

Pursuant to 42 U.S.C. § 1981, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

33.

"'Make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

34.

Sec. 1981 rights are protected against impairment by nongovernmental discrimination.

35.

Sec. 1981 prevents discrimination against white persons based upon race.

36.

Corporations owned by individuals of a particular race may assert § 1981 claims.

37.

Southern Motors Chevy submitted an application to purchase the Dealership that met General Motors' requirements; however, General Motors refused and rejected the application

and sales contract and awarded it to an entity owned by an individual of a different race than the

owners of Southern Motors Chevy on the basis of race.

38.

Race was the reason for General Motors' decision to disallow the sale of the Dealership

to Southern Motors Chevy and to facilitate the sale of the Dealership to Chatham Motor Sales or

its assignees.

39.

There was no legitimate, nondiscriminatory reason for the refusal and rejection of

Southern Motors Chevy.

40.

General Motors intended to discriminate against Southern Motors Chevy on the basis of

race in General Motors' refusal of Southern Motors Chevy's contract for the purchase of the

Dealership.

41.

General Motors' disapproval of the sale to Southern Motors Chevy violated § 1981.

42.

Southern Motors Chevy suffered and continues to suffer damages as a result of General

Motors' violations of § 1981.

### *Count II: Violation of 42 U.S.C. § 1982*

43.

Southern Motors Chevy re-alleges and incorporates by reference all allegations contained

in paragraphs 1 through 42 as if fully alleged herein.

44.

Pursuant to 42 U.S.C. § 1982, "All citizens of the United States shall have the same right,

in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease,

sell, hold, and convey real and personal property."

45.

Sec. 1982 rights are protected against impairment by nongovernmental discrimination.

46.

Sec. 1982 prevents discrimination against white persons based upon race.

47.

Corporations owned by individuals of a particular race may assert § 1982 claims.

48.

Southern Motors Chevy submitted an application to purchase the Dealership that met

General Motors' requirements; General Motors refused and rejected the application and sales

contract; and the Dealership was awarded to an entity owned and operated by an individual who

is of a different race than the owners and operators of Southern Motors Chevy.

49.

Race was the reason for General Motors' decision to disallow the sale of the Dealership

to Southern Motors Chevy and to facilitate the sale of the Dealership to Chatham Motor Sales or

its assignees.  Plaintiff's property rights have been infringed upon.

50.

There was no legitimate, nondiscriminatory reason for the refusal by General Motors of

the contract entered into by Southern Motors Chevy with regard to the purchase of the

dealership.

51.

General Motors disapproved the sale of the Dealership to Southern Motors Chevy because it desired that the Dealership be sold to an African-American and not be sold to white persons.

52.

General Motors intended to discriminate and did discriminate against Southern Motors Chevy on the basis of race.

53.

General Motors' refusal and disapproval of the sale to Southern Motors Chevy violated § 1982.

54.

Southern Motors Chevy suffered and continues to suffer damages as a result of General Motors' violations of § 1982.

### *Count III: Violation of the Ga. Motor Vehicle Franchise Practices Act*

55.

Southern Motors re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 54 as if fully alleged herein.

56.

Pursuant to O.C.G.A. § 10-1-663.1, "There shall be a right of first refusal to purchase in favor of the franchisor if the dealer has entered into an agreement to transfer the dealership or its assets, provided that all the following qualifications and requirements are met. . . . (5) The franchisor agrees to pay the reasonable expenses, including reasonable attorney's fees, which do not exceed the usual customary, and reasonable fees charged for similar work done for other clients incurred by the proposed new owner and transferee before the franchisor's exercise of its

right of first refusal in negotiating and implementing the contract for the proposed change of

ownership or transfer of dealership assets."

57.

General Motors refused to pay Southern Motors Chevy's reasonable expenses incurred in

connection with its preparation of the purchase of the Dealership. In particular, General Motors

refused to reimburse Southern Motors Chevy for time spent by Southern Motors Chevy's owners

and employees in connection with Southern Motors Chevy's preparation of the purchase of the

Dealership, in violation of O.C.G.A. § 10-1-663.1. (Ex. E).

58.

General Motors failed to meet the qualifications and requirements of O.C.G.A. § 10-1-

663.1, and there is no right of first refusal to purchase the Dealership in favor of General Motors.

59.

Pursuant to O.C.G.A. § 10-1-653, "If a new motor vehicle dealer desires to make a change

in its executive management or ownership or to sell its principal assets, . . . [t]he franchisor shall

not arbitrarily refuse to agree to such proposed change or sale and may not disapprove or

withhold approval of such change or sale unless the franchisor can prove that its decision is not

arbitrary and that the new management, owner, or transferee is unfit or unqualified to be a dealer

based on the franchisor's prior written, reasonable, objective, and uniformly applied, within

reasonable classifications, standards or qualifications which directly relate to the prospective

transferee's business experience, moral character, and financial qualifications."

60.

Southern Motors Chevy is fit and qualified to be an automobile dealer based upon its

business experience, moral character, and financial qualifications.

15

61.

General Motors arbitrarily refused to agree to the proposed change or sale to Southern

Motors Chevy; disapproved and withheld approval of the change or sale to Southern Motors

Chevy despite the fact that General Motors could and cannot prove its decision was not arbitrary;

and disapproved and withheld approval of the change or sale to Southern Motors Chevy despite

the fact that General Motors could and cannot prove Southern Motors Chevy is unfit or

unqualified to be a dealer based on General Motors' prior written, reasonable, objective, and

uniformly applied, within reasonable classifications, standards or qualifications which directly

relate to Southern Motors Chevy's business experience, moral character, and financial

qualifications, all in violation of O.C.G.A. § 10-1-653.

62.

Southern Motors suffered and continues to suffer damages as a result of General Motors'

violations of the Ga. Motor Vehicle Franchise Practices Act.

### *Count IV: Punitive Damages, and Attorney's Fees and Expenses*

63.

Southern Motors Chevy re-alleges and incorporates by reference all allegations contained

in paragraphs 1 through 62 as if fully alleged herein.

64.

General Motors has engaged in intentional discrimination, and has done so with malice

and/or reckless indifference to the federally-protected §§ 1981 and 1982 rights of Southern

Motors Chevy.

16

65.

Southern Motors Chevy is entitled to an award of punitive damages in an amount sufficient to penalize, punish, and deter General Motors from its tortious actions.

66.

Southern Motors Chevy is entitled to an award of attorney's fees and expenses under 42 U.S.C. § 1988.  Southern Motors Chevy is also entitled to an award of attorney's fees and expenses of litigation under Georgia law, O.C.G.A. § 13-6-11, because General Motors has shown bad faith, has been stubbornly litigious, and has caused the Plaintiff unnecessary trouble and expense.

**WHEREFORE**, Southern Motors Chevy respectfully requests:

(A)    That summons and process issue and be served upon Defendant as provided by law;

(B)    That a trial by a jury comprised of twelve (12) persons be had;

(C)    That judgment be rendered in favor of Southern Motors Chevy and against Defendant;

(D)    That Southern Motors Chevy recover special damages in an amount to be proven at trial;

(E)    That Southern Motors Chevy recover general damages in an amount to be determined by the fair and enlightened conscience of the jury;

(F)    That Southern Motors Chevy recover punitive damages in an amount sufficient to penalize, punish, and deter General Motors from its tortious actions;

(G)    That Southern Motors Chevy be awarded attorney's fees and expenses of litigation under 42 U.S.C. § 1988; and under Georgia law, O.C.G.A. § 13-6-11.

(H)     That Southern Motors Chevy receive any and all further relief which the Court

deems just and proper.

Respectfully submitted this *16th* day of July, 2014.

OLIVER MANER LLP


*/s/ William J. Hunter*
WILLIAM J. HUNTER
Georgia Bar No. 141288
I. GREGORY HODGES
Georgia Bar No. 358925
PATRICIA T. PAUL
Georgia Bar No. 697845
TIMOTHY D. ROBERTS
218 West State Street                                    Georgia Bar No. 609795
P.O. Box 10186                                           R. BENJAMIN LINGLE
Savannah, Georgia 31412                                  Georgia Bar No. 390252
(912) 236-3311
(912) 236-8725 (facsimile)
bhunter@olivermaner.com
ghodges@olivermaner.com
ppaul@olivermaner.com
troberts@olivermaner.com
blingle@olivermaner.com


GILLEN, WITHERS & LAKE, LLC


*/s/ Thomas A. Withers*
THOMAS A. WITHERS
8 East Liberty Street                                    Georgia Bar No. 772250
Savannah, Georgia 31401
(912) 447-8400                                           *Attorneys for Plaintiff*
twithers@gwllawfirm.com

18

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 64 of 172
Case 4:14-cv-001⁵_ ᴠTM-GRS   Document 24   Filed 07/. 14   Page 19 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-2   Filed 04/30/14   Page 1 of 6

STATE OF GEORGIA        )

COUNTY OF CHATHAM      )

### AFFIDAVIT OF ADAM KAMINSKY

COMES NOW Adam Kaminsky, who after being duly sworn before an officer authorized to administer oaths, deposes and states as follows:

1.     I am over eighteen (18) years of age and suffering of no legal disabilities. I give this affidavit of my own personal knowledge freely and voluntarily.

2.     Southern Motors of Savannah, Inc. is a family-owned automobile dealer that operates several automobile dealerships in and around Chatham and Effingham Counties, to wit, Southern Motors Honda, Southern Motors Acura, and Southern Motors Springfield. Southern Motors of Savannah, Inc. has been in the automobile sales business for more than eight-five (85) years. It is now primarily owned and operated by my father Myron Kaminsky, my brother Ross Kaminsky, and me. We are the family's second and third generations, respectively, to own and operate the company. My father has successfully been in the business for more than forty (40) years. My brother and I have been in the business for more than twenty (20) years and hope to one day pass the business on to the fourth (4th) generation.

3.     My father, my brother, and I are white persons.

4.     In or around December 2013 or January 2014, my family formed Southern Motors Chevrolet, Inc. (hereinafter "Southern Motors Chevy") and negotiated and entered into an agreement with B.G. Fuller of Fuller Chevrolet, Inc. for Southern Motors Chevy to purchase Mr. Fuller's Chevrolet dealership located at 5480 Highway 21 South in Rincon, Georgia (hereinafter "the Dealership"). Southern Motors Chevy had a binding deal with Fuller Chevrolet, Inc.

5.     Southern Motors Chevy then began to secure financing, form a business plan, and gather the voluminous paperwork required by General Motors, as franchisor of the Dealership.

1



EXHIBIT

A

Case 1:15-mc-00092-RDM  Document 1  Filed 01/26/15  Page 65 of 172
Case 4:14-cv-001⌐  WTM-GRS  Document 24  Filed 07/⌐  14  Page 20 of 56
Case 6:14-cv-00037-BAE-GRS  Document 1-2  Filed 04/30/14  Page 2 of 6

6.    The Southern Motors family of dealerships maintains strong sales and high customer satisfaction scores, documentation of which was provided to General Motors.

7.    My family planned to own and operate the Dealership. Ross and I planned to spend most of our time at the Dealership to ensure efficiency.

8.    My family, through the Southern Motors family of dealerships, has operated in the Effingham community for more than twenty (20) years, which is one of the reasons why Mr. Fuller offered us the opportunity to purchase the Dealership. My family would take care of the Dealership, the community, and his people.

9.    General Motors led Southern Motors Chevy to believe it was examining qualifications and permitted Southern Motors Chevy to expend substantial time and resources in pursuing the Dealership.

10.   Despite numerous requests, my family was never given the opportunity to meet with General Motors. Regardless, we continued to meet with Fuller Chevrolet, Inc. to ensure Southern Motors Chevy would be ready to operate immediately once General Motors' approval came.

11.   In light of the Southern Motors family of dealership's high customer satisfaction history, sales effectiveness, and business acumen, we assumed General Motors was properly processing the sale and franchise agreement.

12.   In a letter to Southern Motors Chevy dated March 4, 2014 ("the Letter"), General Motors stated it had "decided to exercise its right of first refusal" and that it "should not in any way be interpreted as reflecting on the qualifications of the applicant(s) or the contents of the proposal." A copy of the Letter, including the envelope and tracking information, is attached as Ex. "1."

13.   The Letter was post-marked March 8, 2014, and received by Southern Motors Chevy's corporate counsel, Randall Bart, Esq., on March 14, 2014.

2

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 66 of 172
Case 4:14-cv-00__-WTM-GRS   Document 24   Filed 0__/14   Page 21 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-2   Filed 04/30/14   Page 3 of 6

FURTHER AFFIANT SAYETH NAUGHT.

ADAM KAMINSKY

Sworn to and subscribed before me
this _28_ day of ~~March,~~ 2014. _April_

Notary Public

My commission expires:

Case 1:15-mc-00092-RDM  Document 1  Filed 01/26/15  Page 67 of 172
Case 4:14-cv-001..  -WTM-GRS  Document 24  Filed 07, ./14  Page 22 of 56
Case 6:14-cv-00037-BAE-GRS  Document 1-2  Filed 04/30/14  Page 4 of 6



## General Motors LLC

March 4, 2014

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Southern Motors Chevrolet, Inc.
PO Box 60069
Savannah, GA 31420

Attention: Mr. Adam J. Kaminsky

Gentlemen:

This letter responds to the application and proposal submitted in connection with the Asset Purchase Agreement as Amended and Restated dated February 10, 2014, (the "Purchase Agreement"), between Fuller Chevrolet, Inc., a Georgia corporation (the "Dealer Company"), and Southern Motors Chevrolet, Inc., a Georgia corporation. Article 12.3 of the Standard Provisions of the GM Dealer Sales and Service Agreement (the "Dealer Agreement") by and between General Motors LLC ("GM") and the Dealer Company reads in part as follows:

> ### 12.3 Right of First Refusal to Purchase
>
> #### 12.3.1 Creation and Coverage
>
> If Dealer submits a proposal for a change of ownership under Article 12.2, General Motors will have a right of first refusal to purchase the dealership assets or stock and such other rights proposed to be transferred regardless of whether the proposed buyer is qualified to be a dealer. If General Motors chooses to exercise this right, it will do so in its written response to Dealer's proposal. General Motors will have a reasonable opportunity to inspect the assets, including real estate and corporate records, before making its decision.

GM has decided to exercise its right of first refusal pursuant to Article 12.3 of the Dealer Agreement. GM's exercise of its right of first refusal should not in any way be interpreted as reflecting on the qualifications of the applicant(s) or the contents of the proposal.

Pursuant to the terms of Section 12.3.6 of the Dealer Agreement, GM is willing to reimburse you for reasonable expenses incurred in connection with preparation of the Purchase Agreement for which you can provide documentation. Please provide the undersigned with a written accounting of such expenses.

Very truly yours,

GENERAL MOTORS LLC, a Delaware limited liability company

By: _____

Title: Regional Director – Business Operations

cc:  Fuller Chevrolet, PO Box 886, Rincon, GA 31336
Bart, Meyer & Company LLP, PO Box 16089, Savannah, GA 31416, Attn: Randall K. Bart, Esq.

{ 01114384.1 07131-3342-TBD 2/16/2014 10:07:08 PM }

**EXHIBIT**

1

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 68 of 172
Case 4:14-cv-0015_ _VTM-GRS   Document 24   Filed 07/_ _14   Page 23 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-2   Filed 04/30/14   Page 5 of 6



General Motors Company
VSSM Southeast Region
11700 Great Oaks Way, Suite 400
Alpharetta, GA 30022

CERTIFIED MAIL

7009 0080 0000 2924 7840

BART, MEYER & COMPANY LLP
15 LAKE STREET, SUITE 130
SAVANNAH, GA  31411

ATTN: RANDALL K. BART ESQ.

31411≈2970

U.S. POSTAGE
PAID
SAVANNAH, GA
31419
MAR 19, '14
AMOUNT
$6.49
00064711S-03

314.:

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 69 of 172
Case 4:14-cv-001__-WTM-GRS   Document 24   Filed 0__ __/14   Page 24 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-2   Filed 04/30/14   Page 6 of 6

USPS.com® - USPS Tracking™                                                    Page 1 of 1

**USPS.COM**                                          Search USPS.com or Track Packages

Quick Tools
Track
**Enter up to 10 Tracking #Find**
First USPS Locations
Get Stamps
Schedule a Pickup
Schedule a Printer
Buy Stamps & Shop
Look Up a ZIP Code
**USPS Tracking™**                       Customer Service ›
                                                             Have questions? We're here to help.

Tracking Number: 70090080000029247840

Expected Delivery Day: Monday, March 10, 2014

## Product & Tracking Information

Postal Product:          Features:
First-Class Mail®        Certified Mail™        Return Receipt          Email Updates

| | | | |
|---|---|---|---|
| March 14, 2014 , 2:02 pm | Delivered | SAVANNAH, GA 31413 | |
| March 14, 2014 , 12:04 am | Out for Delivery | SAVANNAH, GA 31405 | |
| March 14, 2014 , 9:54 am | Sorting Complete | SAVANNAH, GA 31405 | |
| March 14, 2014 , 9:45 am | Arrival at Unit | SAVANNAH, GA 31405 | |
| March 9, 2014 , 8:43 pm | Processed at USPS Origin Sort Facility | JACKSONVILLE, FL 32203 | |
| March 9, 2014 | Depart USPS Sort Facility | JACKSONVILLE, FL 32203 | |
| March 9, 2014 , 11:54 pm | Processed at USPS Origin Sort Facility | JACKSONVILLE, FL 32203 | |
| March 9, 2014 , 6:01 pm | Dispatched to Sort Facility | SAVANNAH, GA 31419 | |
| March 8, 2014 , 10:53 am | Acceptance | SAVANNAH, GA 31419 | |

## Track Another Package

What's your tracking (or receipt) number?

[                                        ]        Track It

LEGAL                    ON USPS.COM               ON ABOUT.USPS.COM        OTHER USPS SITES
Privacy Policy ›         Government Services ›     About USPS Home ›        Business Customer Gateway ›
Terms of Use ›          Buy Stamps & Shop ›       Newsroom ›               Postal Inspectors ›
FOIA ›                  Print a Label with Postage › USPS Service Alerts ›  Inspector General ›
No FEAR Act EEO Data ›  Customer Service ›        Forms & Publications ›   Postal Explorer ›
                        Delivering Solutions to the Last Mile › Careers ›
                        Site Index ›

USPS.COM   |   Copyright© 2014 USPS. All Rights Reserved

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 70 of 172
Case 4:14-cv-001__-WTM-GRS   Document 24   Filed 07/__/14   Page 25 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-3   Filed 04/30/14   Page 1 of 1

# GM Minority Dealer Development
## Key Points 2013

✓ The Minority Dealer Development Program (MDD) is a key component of GM's diversity strategy. The Program, which began in 1972, was the first of its kind in the automotive industry, designed to train qualified minorities to become GM dealers.

✓ Today, MDD continues to recruit and develop minorities to become future dealers while addressing the new market challenges to grow and strengthen quality, profitable minority dealerships that more closely reflects the communities in which we live, work and conduct business..

✓ As of 2013, GM has the largest number of minority dealers in the automobile industry, 208 minority dealerships.

✓ Through 2013, GM minority dealers made the following contributions to GM and to their communities
  - 126,617 new vehicle sales
  - Over $8.5B in revenue
  - Employed more than 12,000 people
  - 68 minority dealerships earned $1 million or more ($NPBBT) Net Profit Before Bonuses & Taxes

✓ Profitability: Minority dealers continue to achieve profitability levels that closely mirror the profitability levels of the GM dealer body. Today, nearly 86 percent of minority dealers are profitable. *(GM's national dealership profitability reported at 89% as of January 15, 2014)*

✓ The MDD team works closely with, the Minority Dealer Advisory Council (MDAC) to increase the diversity and success of the GM minority dealer network. This 12 member elected council is comprised of minority dealers representing each ethnic dealer group: African-American, Asian, Hispanic and Native American.

✓ GM remains committed to the diversity of its dealer network and the development, growth and retention of minority dealers. That commitment is integrated in our MDD program and confirmed by the support from GM leadership.



EXHIBIT
15

7/7/2014   BLAC ...t Magazine | Rev. Jesse Jackson Addresses Ethnic Dis... in Auto Industry



ADVERTISEMENT

BLAC DETROIT / OCTOBER 2012 / REV. JESSE JACKSON ADDRESSES ETHNIC DISPARITY IN AUTO INDUSTRY

Like  Be the first of your friends to like this.

EMAIL    PRINT    FEED    SHARE

# Rev. Jesse Jackson Addresses Ethnic Disparity in Auto Industry

Rainbow PUSH Coalition and Citizens Education Fund's 13th annual Global Automotive and Energy Summit focuses on improving diversity and inclusion

**B.L.A.C. EDITORIAL**



Jackson and business leaders pose for a picture with this year's GM Scholarship recipients.
Rainbow PUSH Coalition via Twitter

*Wednesday, Oct. 3*

Ethnic and gender inclusion is vital to the automotive industry's sustained success, said the Rev. Jesse Jackson today, during the Rainbow PUSH Coalition and Citizenship Education Fund's 13th annual Global Automotive and Energy Summit at the MGM Grand Detroit.

The two-day conference, "Economic Parity: One Voice, One Goal," focuses on improving diversity and inclusion in the automotive industry. The event is the only national automotive conference designed to target minority and women's issues.

Jackson said that while the automotive industry was rebuild by the bail out, others were left out and the industry still followed the practices that dismantled it.

This includes the exclusion of women and people of color. In a small example, Jackson noted that federal money did not lead to more black-owned car dealerships.

"America didn't know how good baseball could be until everybody could play," Jackson said. Like the sport, Jackson said the auto industry needs to "globalize access to the playing field for all players."

## New Content

MORE



**'Married to Medicine's' Toya Bush-Harris Talks Making Drama**

The reality star and Detroit native says to expect drama from at the reunion. First part airs July 13 and second part airs July 17, 2014 on Bravo.

ALANA WALKER



**William F. Jones Jr., CEO of Focus: HOPE**

The head of the Detroit nonprofit, which is dedicated to aiding the community, oversees the various programs aimed at strengthening the city.

MEGAN KRUEGER



**Atomic Dawg Serves a Special Breed of Hot Dog Recipes**

Take a cue from this retro restaurant in Berkley, MI when preparing your next grilled confection.

EMELL DERRA ADOLPHUS



**Zookeeper Thomas Brown Charms Bears and Visiting Cubs**

The wild calls every day at the Detroit Zoo, but this devoted employee helps

7/7/2014

animals and kids find the fun.

EMELL DERRA ADOLPHUS

The Rainbow PUSH Automotive Project is the only national initiative that advocates for people of color in the industry by creating opportunities, challenging stereotypes in advertising and holding companies accountable.

Jackson said Rainbow PUSH will continue its work developing strategic partnerships and surveying companies throughout the year to determine their level of ethnic inclusion and representation.

"This is not charity, this is parity," he said. "This is not generosity, this is reciprocity."

Add your comment:

| Log In | Create an account |
| --- | --- |

Create an instant account, or please log in if you have an account.

Email address (not displayed publicly)                Password

Forgot your password?

2000 _____ Characters remaining

Please enter the letters from the image below :

captchas.net

Audio version (mp3)

Post

Copyright 2014 Metro Parent Publishing Group/BLAC Detroit. All rights reserved.

powered by RIVISTA | A Godengo Technology | Privacy Policy

7/3/2014                          Rev. Jesse Jackson criticizes GM on lack of African American-own    _lerships



# Rev. Jesse Jackson criticizes GM on lack of African American-owned dealerships

**Michael Wayland | mwayland@mlive.com** By Michael Wayland | mwayland@mlive.com

**Follow on Twitter**

on June 06, 2013 at 12:00 PM, updated June 06, 2013 at 1:38 PM

DETROIT- The Rev. Jesse Jackson is concerned with **General Motors Co.'s** amount of African American-owned dealerships.

At the Detroit-based automaker's **annual shareholders meeting Thursday in Detroit,** the controversial civil rights icon criticized GM for having only 36 of its 4,000 or so dealerships owned by African Americans.

"We saw the first African American dealership in 1966 – 40-plus years ago," he said during the meeting when stockholders could address the company's board. "That is very slow progress."



**View full size**

The Rev. Jesse Jackson speaks during General Motors Co.'s 2013 annual shareholders meeting in Detroit. The meeting was broadcast for media in a separate room inside the GM Renaissance Center.

Michael Wayland | MLive.com

Jackson was one of less than 10 attendees to speak during the annual meeting, which lasted about an hour. He also said GM should consider having more of a presence in Africa – particularly its emerging markets.

Jackson attended the **annual meeting in 2011 as well (video below).** At that meeting, Jackson said he was concerned with **GM's performance in black communities.**

GM could not confirm is Jackson himself is a stockholder, but said **Rainbow Push Coalition**, which Jackson founded, owns shares.

Following Jackson, stockholder Damon Lester, who serves as president of the **National Association of Minority Automobile Dealers**, said GM is near the bottom of automakers regarding minority-owned dealerships.

"We urge you to come up with a strategy," he said. "That global strategy should encompass all types of

7/3/2014                              Rev. Jesse Jackson criticizes GM on lack of African American-own ...alerships

diversity, all forms of it – from marketing,
dealerships, philanthropy and so on."

Lester also urged the board to have an
"external diversity committee" representing
different areas to help grow minor-owned
dealerships.

**The Rev. Jesse Jackson concerned with General Motors'
performance in urban communities**

The Rev. Jesse Jackson, a controversial civil rights icon, is
concerned about General Motors Co.'s performance in urban
communities. Jackson, who attended the automaker's
shareholders' meeting in Detroit, said he would like to see a
series of town hall meetings in cities like Chicago, New York,
Houston, that have large black populations.

GM CEO and Chairman **Dan Akerson** said GM
has 198 minority-owned dealerships
worldwide, and the company is working to
grow that number.

"It's inadequate. We understand that," said Akerson, adding he and GM President of North America
President Mark Reuss meet biannually with the minority councils. "We are making progress. I will argue that
we need to make greater progress."

GM has programs aimed at increasing not only diversity of dealer ownership, but customers, employees,
suppliers and communities.

**GM Dealer Development** is an umbrella organization supporting GM's diverse dealer network. Its mission is
to create a profitable dealer network across all brands that reflects consumer diversity in the U.S., according
to GM.

Among other diversity initiatives, the company also offers a **Minority Dealer Development program**, where
potential minority dealers can be nurtured to success, and current minority dealers can get the necessary
counseling and assistance to grow their businesses.

GM's 2013 meeting of stockholders was called to order around 9:30 a.m. Thursday with about **15 minutes
of remarks from Akerson.** During that time, Akerson highlighted many of the company's accomplishments
over the past year, adding officials know there is still work to be done.

"Our hard work, for now four years since the bankruptcy, is paying off," he told media following the
meeting. "But here's the real key, we all recognize that as far as we've come, we have many, many miles to
go in order to achieve the goals we have set out for ourselves."

Recent GM achievements include 13-consecutive profitable quarters; reacquiring Ally Financial Inc., which
helps give the company more control over lending and leasing to potential customers; de-risking its pension
plan by $29 billion for salaried employees and retirees; and reacquiring 200 million shares of common stock
from the U.S. Treasury Department, which plans to exit the automaker by March 2014.

*Click here* for more information on the meeting.

NAMAD, Jesse Jackson: GM needs more minority dealers



Current Issue | Video

Blogs    New Product    Photo Galleries    Automakers and Suppliers    Dealers    Access F&I    Opinion

Originally Published: June 17, 20__  __:__ AM
Modified: June 19, 2013 2:06 PM

# NAMAD, Jesse Jackson: GM needs more minority dealers

Arlena Sawyers 



Jackson: "Very slow progress"

DETROIT -- General Motors has too few minority-owned dealerships -- especially those owned by blacks -- civil rights leader Jesse Jackson said during GM's annual shareholders' meeting here this month.

GM CEO Dan Akerson said GM has 198 minority-owned dealerships, but called that "inadequate."

"We are making progress," he said. "We need to make greater progress."



Lester: Global diversity strategy

Black dealers owned 36 GM dealerships at the end of 2012, Jackson said. Damon Lester, president of the National Association of Minority Automobile Dealers, who also spoke during the meeting, said 25 dealers owned those dealerships. According to the Automotive News Data Center, GM had 4,355 dealerships on Jan. 1.

"We got the first African-American dealership in 1966, 40-plus years ago," Jackson told shareholders and GM

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 76 of 172
7/3/2014
Case 4:14-cv-001__-WTM-GRS   Document 24   Filed 07/_6/14   Page 31 of 56

executives at the meeting. "That's very slow progress."

At the end of 2012, Lester said, the 4 to 5 percent minority ownership of GM dealerships put the company fourth from the bottom among auto companies in terms of minority dealership representation.

At the end of 2012, Hispanics owned 100 GM dealerships, Asian-Americans owned 37 and Native Americans owned 25, NAMAD data indicate.

In an interview after the meeting, Lester said GM has not awarded a dealership to a black dealer in more than three years. He said GM should create a committee of company outsiders to help it craft a global diversity strategy.

He pointed to Toyota Motor Sales U.S.A., which created an outside board to assist its diversity efforts in the early 2000s. At the end of last year, minority dealers owned 7 percent of the 1,233 Toyota-brand dealerships and 11 percent of Lexus' 232 dealerships, NAMAD data indicate.

"We urge you to come up with a strategy -- a global strategy that encompasses all types of diversity, marketing, dealerships, philanthropy and so on," Lester told the meeting. "This strategy needs to be in writing and to have a plan and a way we can execute it."

*Mike Colias contributed to this report*





Search AutoNews.com                                                    SEARCH

**Home [Breaking News]**

**Automotive News Europe**

**Digital Issue**

**Industry Events**

**Webinars**

Subscribe

Register

Log In

Log Out

7/7/2014                    At annual GM meeting, optimistic Dan Akerson says dividend is possible | Detroit Free Press | freep.com

CLASSIFIEDS   CARS   JOBS   HOMES   APARTMENTS   CLASSIFIEDS   SHOPPING   E-CIRCULARS   DAILY DEALS   ADVERTISE   SUBSCRIBE

| News | Sports | Michigan Business | Entertainment | Life | Better Michigan | Obits | Help |

MORE   Surviving Cancer: A special section   Marathon   eEdition   Detroit bankruptcy


Holiday Inn Express Hotel & Suites Research Triangle Par
Hiexpress.com
$85.00
Best Price Guarantee

ADVERTISEMENT

# At annual GM meeting, optimistic Dan Akerson says dividend is possible

1:46 PM, June 6, 2013  |   7 Comments

Recommend   19 people recommend this. Be the first of your friends.

Fresh Fruit
Arrangement

Recommend   12          Tweet   0        8+1   0                                          A A




By Nathan
Bomey
Detroit Free
Press
Business Writer

FILED UNDER

Business
General Motors News

General Motors CEO Dan Akerson said today that the automaker would continue to seek ways to return capital to shareholders, possibly through future share buybacks or a dividend ⬀.

Akerson said the automaker's return to the Standard & Poor's 500 Index, which is expected to happen before the start of trading Friday, reflects the company's financial progress since filing for bankruptcy in 2009.

"We've come this far and I think the market recognizes that yes, we're no longer bedside and on the emergency list," Akerson told media after GM's annual meeting in Detroit.

"We're up, we're moving around, we're taking food, we're starting to exercise and we're getting stronger. That's important not only to our customer base - that's important to the people in this company and quite frankly in this community."

At GM's annual meeting, GM shareholders rejected a shareholder proposal to split the role of chairman and CEO into two positions, with 63.2% of shareholders voting against the proposal, 35.5% voting against and 1.3% abstaining.

Voters also reelected GM's board and approved an advisory "say-on-pay" vote to endorse GM's executive compensation package.

The annual meeting came as the U.S. government continues to reduce its stake in GM. The Treasury Department plans to sell an additional 30 million GM shares in an offering related to the S&P's decision, which effectively requires index-based investors to buy stock ⬀.

Sponsored Links                    ⬀


Extended Stay America
Official Site. Free WIFI, Kitchens. Our best rates here, guaranteed.
www.extendedstayamerica.com


LifeLock® Official Site
LifeLock Ultimate® Helps Keep you Protected. Learn More.
www.LifeLock.com/protection

Know Where You Stand
Monitor your credit, Manage your future. Equifax Complete™ Premier.
www.equifax.com

ADVERTISEMENT


ADVERTISEMENT

Most Popular   |   Most Commented   |   More Headlines

1   WXYZ chief meteorologist Dave Rexroth loses eye in fireworks accident

2   Tesla crash bolsters safety claims after car splits in half

3   Couple make a wish and their dream comes true

4   Dearborn cleric popular with militants faces travel, social media restrictions

7/7/2014                        An annual GM ... ing: optimistic Dan Akerson says dividend is possible | De...        freep.com | freep.com

The U.S. also sold 200 million shares back to GM in December for $5.5 billion in a move widely embraced by investors who want the government to exit its position in GM as soon as possible.

The government has said it plans to sell all of its GM shares by early 2014 and will continue to sell shares ⊡ on a daily basis until they're all gone.

Akerson was asked today whether GM would consider buying back more shares from the government, which would accelerate the government's exit, or whether it would consider introducing a dividend.

"We will continue to consider methods, ways, that we can return capital and it's either share repurchases or potential dividends," Akerson said. "I think first and foremost we must continue to invest in this company so we don't lose the competitive edge that we have today."

Akerson also:

•Declined to say whether he's concerned by the possibility of a Chapter 9 bankruptcy filing by the city of Detroit. "That's beyond my pay grade. I think the mayor and the emergency financial manager ⊡ will have to solve that problem," he said.

•Identified one of his biggest short-term goals as reacquiring GM's investment-grade credit rating. Today, all three major ratings agencies rate GM one step below investment-grade.

•Said GM's European business has "stabilized." He reiterated his target of GM Europe breaking even by mid-decade, which would end a streak of more than 15 consecutive years of losses.

•"It's a goal. Time will tell. We're at 20-year lows in Europe in terms of volume. And it's tough sledding," Akerson said.

•Said GM wants to get 96% of its volume from 13 global and four regional vehicle architectures by 2018.

•Told the Rev. Jesse Jackson, the civil rights activist, that he's committed to recruiting more black automotive dealers for GM's dealership network. Jackson made a surprise appearance at GM's annual meeting.

*Contact: Nathan Bomey at 313-223-4743 or nbomey@freepress.com. Follow him on Twitter @NathanBomey.*

## View Comments (7)  |  Share your thoughts »

5   Knife found in shoe at Detroit Metro Airport, authorities say

## Most Viewed

Save of the Day: Best and worst July 4th deals
Jul. 04, 2014   

PHOTO GALLERIES

 

Jobbie Nooner 2014     U-M's projected starters

SPONSORED LINKS

 


Classic golf mistake     Little Known Way to
amateurs make at t...     Pay Off Mortgage



Holiday Inn Express Durham

Hiexpress.com

$118.00

ADVERTISEMENT

michigan.COM   Now Hiring

MORE IN BUSINESS

**China sales surge for GM, Ford in first half of 2014**

TOP VIDEO PICKS
selected by Taboola

Chile's Missed Kick Sets

YOU MIGHT BE INTERESTED IN

NBA draft: Rochester's James Young selected 17th...

Woman dies after being hit by garbage truck in Berkley

Maize-N-Brew: Michigan defense will have to step up...

SPONSORED LINKS

The Hidden Secret in Booking Hotel Rooms (The Barefoot Nomad)

Why you no longer need a human financial advisor (PC Magazine)

7/7/2014
GM goal: 25 more minority stores

Digital Edition

Contact Us

Industry Events

Classifieds

Mobile

RSS

Sitemap

Awards and Events

Europe Monthly E-Magazine

Marketplace

Media Kit

Reprints and Licensing

Special Reports

Special Issues

About Us

About Crain Publications

Dealers » General Motors

# GM goal: 25 more minority stores

## Reuss says 45 candidates want to become dealership owners

🗩 4 Comments  🖶 Print  ⌦ Reprints  ✉ Respond  📷 📘 📖 🔖  [ Recommend  ]



Reuss: "The devil is in the detail [of how] to get these people in."

Arlena Sawyers
Automotive News
July 15, 2013 - 12:01 am ET

MIAMI BEACH, Fla. -- General Motors wants to add 18 minority-owned dealerships by year end and has 45 candidates waiting in the wings, GM North America President Mark Reuss said.

The company has added seven minority-owned stores this year and is aiming for 25.

"That's the goal, but I can't guarantee it," Reuss said.

He and Hyundai Motor America CEO John Krafcik fielded pointed questions last week during a panel discussion about diversity in the auto industry at the National Association of Minority Automobile Dealers' annual conference here.

### Related Topics

Retail
Mark Reuss
General Motors
Minority affairs
Sales

Asked if the 45 minority candidates had worked at or owned dealerships, Reuss said, "Some have and some haven't. The devil is in the detail [of how] to get these people in."

Reuss said GM, through its Motors Holding unit that invests in dealerships with qualified dealers that lack the capital, has "the ability to capitalize different risk profiles of people to enable them."

### A written plan

Last month, GM drew fire at its annual shareholders meeting from NAMAD President Damon Lester and civil rights leader Jesse Jackson. They criticized the company for having too few minority-owned dealerships and urged GM to devise a written strategy and plan for execution.

After last week's panel, Lester said GM's "stretch goal" of 25 minority dealership appointments in 2013 sounds good, but NAMAD wants to see a written plan.

"History has shown that when leadership moves on there's nothing in place to carry forth the plan and we have to start all over," Lester said. "The stretch goal -- it is a good start. However, when it's put in writing we have something we can refer back to.

"The issue is how are they going to do it? That goes for any manufacturer with a goal that far



DME automotive

Never let another call go unanswered!

MasterCall by DMEa

Latest Headlines

Mazda to recall 42,000 cars with Takata airbags in China

GM says it can weather South Africa supplier strike for medium term

Hyundai sued in S. Korea after overstating fuel efficiency of Santa Fe

GM victims bear burden of proof

Volkswagen to invest $2.7 billion to build China plants

A super SAAR and signs of a stellar second half

More Headlines

7/7/2014                                    GM goal: 25 more minority stores

reaching, that large a number. It's the how. If Motors Holding is going to be aggressive, that's a positive sign about the how," he said.

Eric Peterson, GM vice president of global diversity, was not a panelist but attended the session. He said GM has a plan, has shown it to NAMAD members and intends to put the plan in writing.

Minority dealer candidates under consideration include current dealers and some former ones who lost their stores when GM killed some of its brands, such as Saturn.



Krafcik: More black-owned dealerships

**'Not really adding points'**

Peterson said GM is trying to increase its stores' profitability and throughput and is "not really adding points."

Peterson said GM is working with its field organization to identify dealers who want to sell their stores but lack succession plans, hoping to snag stores for minority dealers.

"You start that process even though you know it's not going to happen overnight, so you'll have more impact when there is a buy-sell. Hopefully, it will be with us," Peterson said.

Peterson said GM has exercised its right-of-first-refusal option on dealership transactions 22 times over the past three years and will continue to do so in the 22 states in which it has that option. Using that option can open the door for a minority buyer.

He said that for a third time since 1997, GM has hired Washington attorney and diversity expert Weldon Latham to examine its minority dealer program. He said another study is needed because of significant changes within GM and the minority dealer network since GM filed for bankruptcy in 2009.

"We're not happy with the numbers that we have," Peterson said, "We're not too big to step back and see what we can do differently."

GM has 201 minority owned-dealerships, including 36 owned by 32 black dealers, Peterson said. GM had 4,355 dealerships on Jan. 1, according to the Automotive News Data Center.

Krafcik said with 822 dealerships at the end of 2012, Hyundai is still a "relatively small player." He said the company will grow to about 840 to 845 dealerships over the next few years and has deals in the works to increase the number owned by blacks to 10 from seven. The company had 49 minority-owned dealerships at the end of 2012, NAMAD data show.

Krafcik says Hyundai has a dealer development fund to assist candidates.

*You can reach **Arlena Sawyers** at asawyers@crain.com.*

advertising




 

⬚ 4 Comments   🖶 Print   ⧉ Reprints   ✉ Respond

Have an opinion about this story? **Click here to submit a Letter to the Editor**, and we may publish it in print.

Or submit an online comment below. (**Terms and Conditions**)

7/7/2014   Eric Peterson Named U.S. vice president, Diversity Dealer Relations, ... General Motors





Search   

## Eric Peterson Named U.S. vice president, Diversity Dealer Relations, at General Motors

Diversity E-learning

ibisconsultinggroup....
One Week Free Limited Access to D&I E-learning Course



#1 Exter War

We Pay Parts Roadside. Get Sec

Chevrolet Buyer's Guide

Workplace Conflict

Cold Calling Is Dead

$69 Chevrolet Power Chip

Workplace Diversity

DETROIT—September 6, 2013: Eric Peterson has been named U.S. vice president, Diversity Dealer Relations, at General Motors Co., effective immediately.

Peterson, 61, formerly U.S. vice president of Corporate Diversity, will advance GM's commitment to increase the number of minority dealers in its dealer network and support automotive diversity. In this role, he will represent GM at diverse dealer organization activities and strengthen GM's relationships with these organizations. Peterson will report to Mark Reuss, GM executive vice president and president of GM North America.

Additionally, Peterson will be responsible for expanding GM's Minority Dealer Development and Women's Retail Network activity and representing the interests of minority and women dealer candidates. In this role he will report to Brian Small, general manager, Sales Support.

Peterson began his GM career with Buick in 1976. He has held a number of sales positions with increasing levels of responsibility at Buick and Chevrolet, and was chosen to head GM's Minority Dealer Development organization in 1998. Most recently, Peterson has coordinated GM's efforts to engage with its minority dealers and external dealer organizations to understand and address the issues they face.

"GM was the first auto company to have a minority dealer development program and we look forward to working with Eric and his team to expand GM's minority dealer body," said Damon Lester, president of the National Association of Minority Automobile Dealers. "This move demonstrates that GM understands that empowering minority entrepreneurs is vital to its long-term success."

Peterson earned a bachelor's degree in marketing with a minor in management from Ohio University, and completed the Executive Development Program at Northwestern University and the Advanced Management Program at Harvard University.

Like   0   Tweet   0



Buy a Quality **Used Engine** for a **Great Price**

GET QUOTE

FREE SHIPPING

Cold Calling Scripts

Learn modern prospecting techniques that work! Free 37-pg .pdf download

Search The Auto Channel      Go

· livefyre

0 comments

1 person listening

Sign in or Post as Guest

+ Follow                    Share      Post comment as...

7/3/2014     Reuss: A more diverse GM reflects America, changes automaker's culture

View Resumes
Products, Pricing
Recruiter Account
MORE
This week's issue
E-Newsletters
Digital Edition
Contact Us
Industry Events
Classifieds
Mobile
RSS
Sitemap
Awards and Events
Europe Monthly E-Magazine
Marketplace
Media Kit
Reprints and Licensing
Special Reports
Special Issues
About Us
About Crain Publications

Suppliers » General Motors

# Reuss: A more diverse GM reflects America, changes automaker's culture



6 Comments | Print | Reprints | Respond



**Automotive News**
**MARKETING SEMINAR**
SPEAKER:
TIM MAHONEY
CHEVROLET
GLOBAL CMO
GENERAL MOTORS
**SEPT 23 • NEW YORK**
Exclusive lead sponsor: TREMOR VIDEO



Reuss: "You never want a good crisis to go to waste."

**Thought Leadership**

Sponsored by Idianalytics

» Discover how to unlock the potential of traditional and alternative credit data for smarter lending decisions
» Learn about options for identifying higher-quality loans at all credit levels
» Could a complete picture of consumer behavior help you identify more low-credit risk customers?

**Related Topics**

Dealers
Suppliers
General Motors

Arlena Sawyers
**Automotive News**
October 3, 2013 - 11:23 am ET

DETROIT -- The recession and General Motors' bankruptcy filing gave the automaker an inadvertent but timely opportunity to restructure itself to better reflect the country's diverse and changing population, said Mark Reuss, GM's president of North America.

GM at one time "recruited as a company that sold trucks in the Midwest," Reuss said at the Rainbow PUSH Global Automotive Summit here on Wednesday.

But considering that minorities are fast becoming majorities in select areas of the country, including New York and Los Angeles, GM has placed talented minorities in a number of leadership positions, Reuss said. He said those executives are helping set the company's tone for diversity now and into the future.

**'We used that crisis'**

"We had an opportunity to get that thinking into a company that was traditionally very bureaucratic and very white male oriented, and start to reflect in our products, our sales and marketing what the United States, Canada and Mexico have become today and in the future," Reuss said.

"You never want a good crisis to go to waste. We used that crisis to redo and rethink who we are and what we want to

**Latest Headlines**

Alliance drops suit over Florida warranty reimbursement law

Stuart leaves VW Credit to become CEO of TD Auto

Ford's Fields starts new job with 9% raise in annual salary

Twin Cities Automotive renamed Carousel Motor Group

Chrysler faces NHTSA query on delayed Jeep fix

Henry Nolte Jr., former chief counsel to 3 Ford CEOs, dies at 90

More Headlines

7/3/2014                    Reuss: A more diverse GM reflects America, changes autor___ ___s culture

Mark Reuss                                          be," he said.
Rev. Jesse Jackson

Among the female and minority executives Reuss cited were
Alicia Boler-Davis, senior vice president for global quality and customer experience; Grace Lieblein,
vice president for global purchasing and supply chain; Ed Welburn, vice president of global design;
and Eric Peterson, U.S. vice president for diversity dealer relations.

"These people are in the most powerful jobs in the company," Reuss said. "The influence these folks
have on a power basis in our company will change it faster than anything I can say today."

**Dealers' status**

Separately, Reuss and others at the conference reviewed the status of minority dealers and
suppliers.

Reuss said GM is continuing with its goal of adding 25 minority-owned dealerships by year end. He
noted that Greg Jackson, owner of Prestige Automotive Group in suburban Detroit, was awarded a
Cadillac dealership about three months ago, but would not comment on the company's overall
progress.

In July, at the National Association of Minority Automobile Dealers annual conference, Reuss said GM
had made seven appointments so far and 45 candidates were waiting in the wings.

Peterson said GM has 201 minority-owned dealerships, of which 36 are owned by African-Americans.

**Toyota dealers 'ready to grow'**

Osamu Nagata, CEO of Toyota Motor Engineering & Manufacturing North America Inc., said Toyota
has assisted minority dealers who lacked the financial resources to acquire dealerships and that the
company did not lose any minority-owned dealerships during the economic downturn.

He said those dealers are "ready to grow with us."

According to data compiled by NAMAD, there were 108 minority-owned Toyota and Lexus
dealerships at the end of 2012.

Still, at a press conference during the event, civil rights leader Jesse Jackson said African-American-
owned dealerships and suppliers were disproportionately lost during the recession. He said the
groups' numbers are not growing with their minority and nonminority peers as the industry rebounds.

NAMAD data show that the number of dealerships owned by African-Americans dropped to 261 at the
end of 2012 from 263 in 2011 and from a high of 751 in 2005.

**Supplier losses**

Leon Richardson, president of the National Association of Black Automotive Suppliers, said the
number of members in his group has dwindled to 16 from 64 about four years ago.

"It's not that they can't get business. It's just that they haven't been able to get the volumes they need
to sustain their business," said Richardson, who also is CEO of ChemicoMays, a suburban Detroit
maker of industrial chemicals.

"It's hard to rebuild a 20-year-old supplier company in just a couple of years," he said. "I think the
trend is not moving toward more African-American suppliers, quite frankly."

*You can reach Arlena Sawyers at asawyers@crain.com.*



**infor**

Live Broadcast:
The Future of Automotive
– a 20/20 View of 2020

Wed., July 23 at 11 a.m. ET



Register ›

advertising

7/8/2014    GM: We'll hit goal on minorities

Post a Job
View Resumes
Products, Pricing
Recruiter Account
MORE
This week's issue
E-Newsletters
Digital Edition
Contact Us
Industry Events
Classifieds
Mobile
RSS
Sitemap
Awards and Events
Europe Monthly E-Magazine
Marketplace
Media Kit
Reprints and Licensing
Special Reports
Special Issues
About Us
About Crain Publications

Dealers » General Motors

# GM: We'll hit goal on minorities

0 Comments   Print   Reprints   Respond

**Thought Leadership**

New Insights from ADP

Sponsored by 

» What Can Better
Communication do for Your
Dealership? (New e-book)

» 3 easy ways to get more referral
business.

» Best practices for building that
help build your dealershipâ€™s
security plan.

» Got a minute? Get the latest in
dealer digital marketing in 60
seconds.

» The Connection between
Customer Loyalty & Dealership
Profitability

**Related Topics**

Retail
Minority affairs
Mark Reuss
Eric Peterson

Arlena Sawyers
Automotive News
October 14, 2013 - 12:01 am ET

General Motors is on track toward its goal of awarding
dealerships to 25 African-Americans and other minorities by
year end, said Eric Peterson, GM's new U.S. vice president
of diversity dealer relations.

Peterson said franchisees are being drawn from a pool of
minority dealers and former dealers who lost stores in the
recession. Also under consideration: candidates whom GM
thinks are capable of running dealerships but have never
had stores.

Peterson's new duties focus on expanding GM's network of
stores owned by women and minorities.

At the National Association of Minority Automobile Dealers
conference in July, Mark Reuss, GM's North America
president, said the company had added seven minority-
owned dealerships since Jan. 1.

Neither Reuss nor Peterson, both of whom attended the
Rainbow PUSH Global Automotive Summit in Detroit this
month, would say how many have been awarded since then.

"When we get toward the end of the year, we will start
talking more specific numbers because the fourth quarter, fortunately or unfortunately, is when we
put the majority of our stores in," said Peterson, 61. "The focus is there, the pressure is there, and
we want to hit our objectives."



**Latest Headlines**

VW orders sales halt for Golf, GTI over steering
flaw

Ford announces 6 recalls covering 100,610
vehicles in North America

GM won't use insurance proceeds to pay ignition-
switch claims

Agnelli family may tighten grip on Fiat after merger
with Chrysler

Audi joins Mercedes in narrowing BMW's global
luxury lead

GM victims bear burden of proof

**More Headlines**

7/8/2014  GM: Well hit goal on minorities

He added: "We have a whole bunch in the works."

All minorities are included in GM's stretch effort, but Peterson said there is emphasis on African-Americans.

At the Rainbow PUSH event, NAMAD President Damon Lester and civil rights leader Jesse Jackson pointed out that the overall number of dealerships owned by African-Americans is not growing along with those owned by their minority and nonminority peers as the auto industry rebounds.

NAMAD data indicate that the number of dealerships owned by African-Americans dropped to 261 at the end of 2012, from 263 in 2011 and a high of 751 in 2005.

Minorities own 201 GM dealerships; 36 are owned by African- Americans, Peterson said. According to the Automotive News Data Center, GM had 4,355 dealerships on Jan. 1.

Peterson, formerly GM's U.S. vice president of corporate diversity, said his new role moves him from overseer of the company's minority dealer development and Women's Retail Network programs to working more directly with programs and their directors.

Ronald McCants is the director of dealer development, and Celeste Briggs is director of the program for women dealers. Briggs reports to McCants, who reports to Peterson.

Peterson retains his duties as company liaison with civil rights and diversity groups such as the NAACP, Rainbow PUSH and the National Council of La Raza.

Peterson joined GM's Buick Division in 1976. He had several sales jobs with Buick and Chevrolet. In 1998 he became head of GM's minority dealer development. In 2001 he was named to head GM's dealer development program.

*You can reach **Arlena Sawyers** at asawyers@crain.com.*



Which side would you like to see more of?

The World's First
Permanent Tire Protectant

www.NitroShield.com
1-877-246-3455   Tire Treatment System

advertising



Automotive News
TRACTION
WATCH
TOP VIRAL
VIDEOS
CLICK TO
PLAY »

⊙ 0 Comments   🖨 Print   📄 Reprints   ✍ Respond   ✉ 📘 🔗 ✉   Recommend

Have an opinion about this story? **Click here to submit a Letter to the Editor**, and we may publish it in print.

Or submit an online comment below. (Terms and Conditions)

0 Comments      Automotive News                        🄳 Login ⁃

Sort by Newest ⁃                              Share 📤 Favorite ★

 Start the discussion

Be the first to comment.

 Subscribe   🄳 Add Disqus to your site

7/8/2014



HOME    ABOUT US    ISSUES    PHOTOS    VIDEO    E-STORE    NEWS    LINKS    MEDIA REQUESTS    CONTACT US

## NEWS

October 03, 2013
### Rainbow PUSH calls for more African-American auto dealers, suppliers

Rainbow PUSH Coalition leaders Wednesday urged automakers to add more African-American automotive dealers ☑ and African-American suppliers during an annual summit in Detroit.

Of the about 18,000 dealers in the U.S., just 261 were owned by African-Americans at the end of last year — down from about 750 before the recession, according to the National Association of Minority Automobile Dealers. Just two had been added as of July this year, said Damon Lester, president of association, speaking at the Rainbow PUSH Coalition's Global Automotive Summit.

"Opportunities are not being awarded to us," Lester said.

General ☑ Motors Co. has a goal to add 25 minority dealers this year, though executives would not say how many GM has added so far.

Eric Peterson, GM's newly appointed U.S. vice president of diversity dealer relations, said the company likely will add the dealers near the end of the fourth quarter.

From The Detroit
News: http://www.detroitnews.com/article/20131002/AUTO01/310020101#ixzz2ggEydt58



### STAY INFORMED

| Email Address | Zip Code | SIGN-UP |

### RPC MILLION MEMBER CAMPAIGN
*Join Now!*

### DONATE

### Rainbow PUSH Report
*Minority Inclusion In Debt Capital Markets*

### JUSTICE FOR TRAYVON!
*Sign the Petition*

## PRESS RELEASES

JULY 05, 2014
Rainbow PUSH Premiers New Video: Changing the Face of Technology

JUNE 30, 2014
Rainbow PUSH Announcement: Google - doubling down on inclusion in technology industry

JUNE 29, 2014
Tech Giants Join Rainbow PUSH Coalition at 43rd Annual Conference - "inclusion/diversity" is key

More Press Releases +

### FEATURED VIDEO

Change the Face of Technology:

6/23/2014                                          GM touts dealer diversity gains

Awards and Events

Europe Monthly E-Magazine

Marketplace

Media Kit

Reprints and Licensing

Special Reports

Special Issues

About Us

About Crain Publications

Dealers » General Motors

# GM touts dealer diversity gains

🗨 0 Comments   🖶 Print   ⧉ Reprints   ⤷ Respond   

**Related Topics**

Dealers

Retail

General Motors

Minority affairs

Arlena Sawyers 🔊
Automotive News
February 3, 2014 - 12:01 am ET

NEW ORLEANS -- General Motors awarded dealerships to
21 minorities in 2013 and is aiming for 25 more this year,
said Eric Peterson, GM's U.S. vice president of diversity
dealer relations.



Latest Headlines

Ex-Toyota exec preaches production gospel to
aspiring supplier

Who's in charge at Cadillac?

Takata says moisture may be culprit in airbag
recalls

Reversal on stalling risk forces new look at ignition
issues

The DCH deal: How Lithia will absorb its new
asset

GM bogs down in effort to fix supplier ties

More Headlines

GM had 208 minority-owned dealerships at year end, a net gain of 10 in 2013, he said, and the
minority-owned stores are more profitable than GM's dealer network as a whole. "We're very proud of
that," Peterson said on the sidelines of the National Automobile Dealers Association convention here.
"It goes to the quality of dealers and candidates we're putting in."

He would not disclose profitability data.

Peterson said even though the company fell short of its stretch goal of adding 25 minority-owned
dealerships in 2013, he is pleased with the progress. He said it was a team effort that started with
Mark Reuss, now GM's global product chief, and was picked up by Alan Batey, when he took over
from Reuss as GM's North America president.

Also instrumental were GM's field organization and its Motors Holdings, a lending arm that invests in
GM stores with purchasing dealers.

Of GM's minority-owned dealerships at year end, Hispanics owned 106, African Americans owned 40,
Asians owned 36 and Native Americans owned 26.

Reuss was GM North American president when the company set the goal last summer during the
National Association of Minority Automobile Dealers annual conference.

"We've got some good momentum going and great support from our field organization and our
leadership," Peterson said. "We're happy with 21."

The people awarded dealerships were a combination of existing dealers who added stores and
candidates trained by GM. Peterson said GM is identifying and meeting with former minority dealers
who lost stores during the economic downturn to see if there are opportunities to get them back into
dealerships.

Damon Lester, president of the National Association of Minority Automobile Dealers, said he is
pleased with GM's progress.

"It also has to start at the top," he said. "We were always urging GM to make a commitment, honor
what you say and come up with a plan. They did what they said they were going to do."

*You can reach Arlena Sawyers at asawyers@crain.com.*

advertising

6/23/2014                          GM touts dealer diversity gains



☐ 0 Comments   🖨 Print   ⟳ Reprints   ☑ Respond   ✉ 🔲 🔲 🔲   Recommend ◁

Have an opinion about this story? Click here to submit a Letter to the Editor, and we may
publish it in print.

Or submit an online comment below. (Terms and Conditions)

0 Comments      Automotive News                        Ⓓ Login ⁃

Sort by Newest ⁃                             Share ⤴  Favorite ★

👤      ┌─────────────────────────────────────────┐
        │ Start the discussion…                    │
        └─────────────────────────────────────────┘

                    Be the first to comment.

✉  🔲 👤  Ⓓ

AUTOMOTIVE NEWS TV                        MORE »

        Fri., June 20            Fri., June 20
     »Watch the Newscast     »Watch the Newscast
    • Chrysler as 'Cinderella'  • Speeding GM repairs
    • Hyundai Sonata Eco        • Fuel for Alfa, Maserati
    • Smart look for Nissan »   • Jaguar kayos the XK »



| OEMs & Suppliers | Dealers | Multimedia | Opinion | Auto Shows | Reader Services | » SITEMAP |
|---|---|---|---|---|---|---|
| Manufacturing | Best Practices | Video | Columnists | Detroit | About Us | » Awards and Events |
| Executives | Dealer Associations | Interactive | Blogs | Chicago | About Crain | » Classifieds |
| Design | Dealer Awards | Photo Galleries | Letters to the Editor | Geneva | Publications | » Data |
| Future Product | Dealership Buy/Sell | | Editorials | New York | Contact Us | » Europe Monthly E- |
| Green Cars | Finance & Insurance | | Leo Michael | Beijing | Digital Edition | Magazine |
| Technology | Marketing | | Cartoons | Shanghai | Industry Events | » Marketplace |
| PACE Awards | Sales | | Send us a Letter | Frankfurt | Print Issue | » Media Kit |
| Cutaways | Fixed Operations | | | Paris | Table of Contents | » Reprints and |
| World Congress | Used Cars | | | Tokyo | RSS | Licensing |
| | NADA | | | Los Angeles | Sign up for E- | » Special Sections |
| | | | | | Newsletters | » Webinars |

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 89 of 172
Case 4:14-cv-00122-WTM-GRS   Document 24   Filed 07/16/14   Page 44 of 56
Minority Dealer Development 00037-BAE-GRS   Document 1-4   Filed 04/30/14   Page 1 of 2   Page 1 of 2



Home   Candidate Development   Minority Dealer Development   Women's Retail Network   Help

MDD Home   Advisory Council   Communications   20 Groups   Dealer Tools

## Minority Dealer Development



Since 1972, GM has provided industry leading training opportunities to qualified minorities to help prepare them to become future dealers and to help them succeed once they become dealers. GM was the first US automaker to institute a structured minority dealer initiative in the industry.

Through Minority Dealer Development, General Motors has created an arena through which potential minority dealers can be nurtured to success, and current minority dealers can get the necessary counseling and assistance to grow their businesses.

The General Motors Minority Dealer Development Program is coordinated through various entities and focuses on candidate development and training, the selection of a dealership opportunity for a minority candidate and the retention of minority dealerships.





Poll

No Poll available.

Survey

No Survey available.



Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 90 of 172
Case 4:14-cv-00_ _2-WTM-GRS   Document 24   Filed 0_ _16/14   Page 45 of 56
Minority Dealer Development 00037-BAE-GRS   Document 1-4   Filed 04/30/14   Page 2 of Page 2 of 2

GM Motors Holding          gm.com          WRN Scholarship

© General Motors  |  Privacy Statement                    Connect with us    

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 91 of 172
Case 4:14-cv-00_-WTM-GRS   Document 24   Filed 0_6/14   Page 46 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 1 of 11

WILLIAM P. FRANKLIN, JR.
DAVID H. DICKEY
I. GREGORY HODGES
ROBERT W. SCRIVERA (GA & NC)
PATRICK T. O'CONNOR
JAMES P. GERARD
PATRICIA T. PAUL
TIMOTHY D. ROBERTS
LEE A. SUMMERFORD
CHRISTOPHER L. RAY (GA & NY)
DOUGLAS J. GIORGIO, III (GA & SC)
ALISON SAWYER KIRKKICKELL
ANDREW M. WILKES
WILLIAM J. HUNTER
DOUGLAS E. NEIMAN (GA & PA)
BENJAMIN M. PERKINS (GA & FL)
PAUL H. THRELKELD
JACOB D MASSEE
BLAKE L. GRECO
GEORGE T. MAJOR, JR.
T LAWRENCE EVANS
R. BENJAMIN LINGLE
BRYAN A. SCRIVERA
JOE E. MATHEWS, JR. (GA & FL)
MELISSA L. BAILEY
KELLY E. MURPHY



# OLIVER MANER LLP

ATTORNEYS AT LAW

218 WEST STATE STREET
SAVANNAH, GEORGIA 31401

POST OFFICE BOX 10186
SAVANNAH, GA 31412

TELEPHONE (912) 236-3311
FACSIMILE (912) 236-8726
WWW.OLIVERMANER.COM

March 26, 2014

TWIGGS & OLIVER
1897-1905

OLIVER & OLIVER
1905-1941

OLIVER, OLIVER & DAVIS
1942-1955

OLIVER, DAVIS & MANER
1955-1963

OLIVER & MANER
1963-1967

OLIVER MANER & GRAY
1967-2008

JULIAN R. FRIEDMAN (GA & SC)
OF COUNSEL

## _CONFIDENTIAL_

**Via Federal Express**
General Motors LLC
General Motors Southeast Region
Attention: Regional Director – Business Operations
11700 Great Oaks Way, Suite 400
Alpharetta, Georgia 30022

Re:  Asset Purchase Agreement between Fuller Chevrolet, Inc. and Southern Motors Chevrolet, Inc., and General Motors LLC's Assertion of Purported Right of First Refusal

Dear Sir or Madam,

As you know, I represent Southern Motors Chevrolet, Inc. in regards to the above-referenced matter. This letter and the enclosures constitute an accounting of Southern Motors' reasonable expenses incurred in connection with its preparation of the purchase of Fuller Chevrolet, Inc. The total expenses are as follows:

| | | |
|---|---|---|
| 1. | Messina & Associates Ltd: | $3,500.00 |
| 2. | Bart Meyer & Company: | $15,817.00 |
| 3. | Southern Motors Chevrolet: | $5,725.00 |
| 4. | Opportunity Interest through 03/07/14: | $1,680.89 |
| **Total:** | | **$26,722.89** |

1


EXHIBIT
D

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 92 of 172
Case 4:14-cv-00⌐__-WTM-GRS   Document 24   Filed 07/__/14   Page 47 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 2 of 11

As noted in my correspondence dated March 14, 2014, Southern Motors objects to your assertion of a purported right of first refusal and to your attempted sale of the Dealership to Chatham Motor Sales, Inc. or other assignee of Mr. Winston R. Pittman, Sr. Southern Motors does not waive any rights through this demand for reimbursement, but rather reasserts all rights and demands as stated in the above-referenced March 14, 2014, correspondence.

Please immediately send the undersigned a check for $26,722.89 payable to Southern Motors Chevrolet, Inc. Should you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

OLIVER MANER LLP

WILLIAM J. HUNTER

WJH/rbl
cc: CSC of Cobb County, Inc.
General Motors LLC – Legal Department
Michael Millikin, Esq., GM Exec. V. Pres. & Gen. Counsel
Adam Kaminsky
Ross Kaminsky
Myron Kaminsky

2

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 93 of 172
Case 4:14-cv-0‒‒‒‒2-WTM-GRS   Document 24   Filed ‒‒16/14   Page 48 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 4 of 11



# Messina
## & Associates LTD.

*Understanding What Counts*

*Certified Public Accountants and Consultants*

**PAID**
**03/06/2014**

**Bill To**

Southern Motors Chevrolet, Inc.
10300 Abercorn Extension
Savannah, GA 31406

# Invoice

| Date | 2/27/2014 |
|------|-----------|
| Invoice # | 10880 |

| Date | Item | Description | Amount |
|------|------|-------------|--------|
| 1/10/2014 | PJM Accounting & Other Services | Randy/Adam re: Fuller Chevrolet acquisition | 500.00 |
| 1/23/2014 | PJM Accounting & Other Services | Adam re: GM application; Brenda re: info needed for GM application | 200.00 |
| 1/25/2014 | PJM Accounting & Other Services | PFS prep for GM app | 625.00 |
| 1/26/2014 | PJM Accounting & Other Services | Complete GM application for Myron, Danny, Toby, & Ross; scan & email to Adam | 1,200.00 |

| | |
|---|---|
| Total | $2,525.00 |
| Payments/Credits | -$2,525.00 |
| **Balance Due** | $0.00 |

1525 Kautz Rd.
Suite 1000
West Chicago, IL 60185

630-285-8200

7505 Waters Ave.
Suite D10
Savannah, GA 31406

912-303-9734

Website: messina-cpa.com

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 94 of 172
Case 4:14-cv-00___-WTM-GRS   Document 24   Filed 0_/_6/14   Page 49 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 5 of 11

# Bart, Meyer & Company⸗

Attorneys at Law (T.I.N. 80-0082733)
Post Office Box 16089
Savannah, Georgia  31416

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2014 | 2014-0262 |

**Bill To**

Attn: Mr. Myron E. Kaminsky
Southern Motors of Savannah, Inc.
Post Office Box 60069
Savannah, GA  31420

| | | | | | | Matter |
|---|---|---|---|---|---|---|
| | | | | | | Purchase of Fuller Chevrolet |

| Date | Item | Description | Rate | Hours | Amount |
|------|------|-------------|------|-------|--------|
| 1/8/2014 | TBS Time | | 225.00 | 2 | 450.00 |
| 1/8/2014 | RKB Time | | 350.00 | 1.4 | 490.00 |
| 1/9/2014 | TBS Time | | 225.00 | 0.5 | 112.50 |
| 1/9/2014 | RKB Time | | 350.00 | 0.5 | 175.00 |
| 1/10/2014 | RKB Time | | 350.00 | 6 | 2,100.00 |
| 1/10/2014 | TBS Time | | 225.00 | 3.8 | 855.00 |
| 1/11/2014 | RKB Time | | 350.00 | 0.6 | 210.00 |
| 1/12/2014 | TBS Time | | 225.00 | 1.8 | 405.00 |

| | |
|---|---|
| **Total** | |
| **Payments/Credits** | |
| **Balance Due** | |

WE NOW ACCEPT MAJOR CREDIT CARDS

Page 1

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 95 of 172
Case 4:14-cv-00_ 2-WTM-GRS   Document 24   Filed 0...6/14   Page 50 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 6 of 11

## Bart, Meyer & Company LLP

Attorneys at Law (T.I.N. 60-0032733)
Post Office Box 16089
Savannah, Georgia 31416

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2014 | 2014-0262 |

**Bill To**

Attn: Mr. Myron E. Kaminsky
Southern Motors of Savannah, Inc.
Post Office Box 60069
Savannah, GA  31420

| | Matter |
|--|--------|
| | Purchase of Fuller Chevrolet |

| Date | Item | Description | Rate | Hours | Amount |
|------|------|-------------|------|-------|--------|
| 1/12/2014 | RKB Time | | 350.00 | 0.5 | 175.00 |
| 1/13/2014 | TBS Time | | 225.00 | 0.5 | 112.50 |
| 1/13/2014 | RKB Time | | 350.00 | 0.5 | 175.00 |
| 1/14/2014 | TBS Time | | 225.00 | 2.2 | 495.00 |
| 1/14/2014 | RKB Time | | 350.00 | 0.6 | 210.00 |
| 1/17/2014 | RKB Time | | 350.00 | 0.2 | 70.00 |
| 1/20/2014 | RKB Time | | 350.00 | 0.4 | 140.00 |
| 1/21/2014 | TBS Time | | 225.00 | 0.5 | 112.50 |
| 1/21/2014 | RKB Time | | 350.00 | 0.8 | 280.00 |

| Total | |
|-------|--|
| **Payments/Credits** | |
| **Balance Due** | |

WE NOW ACCEPT MAJOR CREDIT CARDS

Page 2

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 96 of 172
Case 4:14-cv-00__ 2-WTM-GRS   Document 24   Filed 0_ _6/14   Page 51 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 7 of 11

# ▦ ▦ Bart, Meyer & Company..

Attorneys at Law (T.I.N. 80-0082733)
Post Office Box 16089
Savannah, Georgia 31416

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2014 | 2014-0262 |

**Bill To**

Attn: Mr. Myron E. Kaminsky
Southern Motors of Savannah, Inc.
Post Office Box 60069
Savannah, GA  31420

|  |  |
|--|--|
| | **Matter** |
| | Purchase of Fuller Chevrolet |

| Date | Item | Description | Rate | Hours | Amount |
|------|------|-------------|------|-------|--------|
| 1/22/2014 | RKB Time | | 350.00 | 0.6 | 210.00 |
| 1/23/2014 | PRL Time | | 175.00 | 5.5 | 962.50 |
| 1/23/2014 | TBS Time | | 225.00 | 0.3 | 67.50 |
| 1/23/2014 | RKB Time | | 350.00 | 0.3 | 105.00 |
| 1/23/2014 | RKB Time | | 350.00 | .1 | 350.00 |
| 1/24/2014 | RKB Time | | 350.00 | 0.2 | 70.00 |
| 1/24/2014 | RKB Time | | 350.00 | 0.3 | 105.00 |
| 1/25/2014 | RKB Time | | 350.00 | 0.3 | 105.00 |
| 1/27/2014 | RKB Time | | 350.00 | 2 | 700.00 |
| 1/28/2014 | RKB Time | | 350.00 | 0.1 | 35.00 |
| 1/29/2014 | RKB Time | | 350.00 | 0.2 | 70.00 |

| **Total** | |
|-----------|--|
| **Payments/Credits** | |
| **Balance Due** | |

WE NOW ACCEPT MAJOR CREDIT CARDS

Page 3

Case 1:15-mc-00092-RDM    Document 1    Filed 01/26/15    Page 97 of 172
Case 4:14-cv-00__2-WTM-GRS    Document 24    Filed 0_16/14    Page 52 of 56
Case 6:14-cv-00037-BAE-GRS    Document 1-5    Filed 04/30/14    Page 8 of 11

## Bart, Meyer & Company...

Attorneys at Law (T.I.N. 80-0092733)
Post Office Box 16089
Savannah, Georgia 31416

# Invoice

| Date | Invoice # |
|---|---|
| 3/13/2014 | 2014-0262 |

**Bill To**

Attn: Mr. Myron E. Kaminsky
Southern Motors of Savannah, Inc.
Post Office Box 60069
Savannah, GA  31420

| | | | | | Matter |
|---|---|---|---|---|---|
| | | | | | Purchase of Fuller Chevrolet |

| Date | Item | Description | Rate | Hours | Amount |
|---|---|---|---|---|---|
| 1/30/2014 | PRL Time | | 175.00 | 0.7 | 122.50 |
| 1/30/2014 | RKB Time | | 350.00 | 1.2 | 420.00 |
| 1/31/2014 | PRL Time | | 175.00 | 0.3 | 52.50 |
| 1/31/2014 | RKB Time | | 350.00 | 0.6 | 210.00 |
| 2/3/2014 | RKB Time | | 350.00 | 0.3 | 105.00 |
| 2/5/2014 | PRL Time | | 175.00 | 1.7 | 297.50 |
| 2/5/2014 | RKB Time | | 350.00 | 1 | 350.00 |
| 2/6/2014 | RKB Time | | 350.00 | 0.6 | 210.00 |

**Total**

**Payments/Credits**

**Balance Due**

WE NOW ACCEPT MAJOR CREDIT CARDS

Case 1:15-mc-00092-RDM    Document 1    Filed 01/26/15    Page 98 of 172
Case 4:14-cv-00. ._-WTM-GRS    Document 24    Filed 0. _6/14    Page 53 of 56
Case 6:14-cv-00037-BAE-GRS    Document 1-5    Filed 04/30/14    Page 9 of 11

# Bart, Meyer & Company LLP

Attorneys at Law (T.I.N. 80-0082733)
Post Office Box 16089
Savannah, Georgia 31416

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2014 | 2014-0262 |

**Bill To**

Attn: Mr. Myron E. Kaminsky
Southern Motors of Savannah, Inc.
Post Office Box 60069
Savannah, GA 31420

|  |  |  | Matter |  |  |
|--|--|--|--------|--|--|
|  |  |  | Purchase of Fuller Chevrolet |  |  |

| Date | Item | Description | Rate | Hours | Amount |
|------|------|-------------|------|-------|--------|
| 2/7/2014 | RKB Time | | 350.00 | 0.5 | 175.00 |
| 2/7/2014 | RKB Time | | 350.00 | 0.2 | 70.00 |
| 2/10/2014 | PRL Time | | 175.00 | 1.2 | 210.00 |
| 2/10/2014 | TBS Time | | 225.00 | 0.3 | 67.50 |
| 2/10/2014 | RKB Time | | 350.00 | 7 | 2,450.00 |
| 2/11/2014 | RKB Time | | 350.00 | 2.5 | 875.00 |
| 2/17/2014 | RKB Time | | 350.00 | 0.4 | 140.00 |
| 2/25/2014 | RKB Time | | 350.00 | 0.2 | 70.00 |
|  | Reimb Group | | | | |

| **Total** | |
|-----------|--|
| **Payments/Credits** | |
| **Balance Due** | |

WE NOW ACCEPT MAJOR CREDIT CARDS

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 99 of 172
Case 4:14-cv-001__-WTM-GRS   Document 24   Filed 0_ __/14   Page 54 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 10 of 11

# Bart, Meyer & Company

Attorneys at Law (T.I.N. 80-0082733)
Post Office Box 16069
Savannah, Georgia  31416

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2014 | 2014-0262 |

**Bill To**

Attn: Mr. Myron E. Kaminsky
Southern Motors of Savannah, Inc.
Post Office Box 60069
Savannah, GA  31420

| | Matter |
|--|--------|
| | Purchase of Fuller Chevrolet |

| Date | Item | Description | Rate | Hours | Amount |
|------|------|-------------|------|-------|--------|
| 1/28/2014 | | | 50.00 | | 50.00 |
| 2/11/2014 | | | 310.50 | | 310.50 |
| 3/10/2014 | | | 100.00 | | 100.00 |
| 3/10/2014 | | | 100.00 | | 100.00 |
| 3/10/2014 | | | 84.00 | | 84.00 |
| | | | | | 644.50 |

| **Total** | $15,817.00 |
|-----------|-----------|
| **Payments/Credits** | $0.00 |
| **Balance Due** | $15,817.00 |

WE NOW ACCEPT MAJOR CREDIT CARDS

Page 8

Case 1:15-mc-00092-RDM   Document 1   Filed 01/26/15   Page 100 of 172
Case 4:14-cv-00_2-WTM-GRS   Document 24   Filed 0_16/14   Page 55 of 56
Case 6:14-cv-00037-BAE-GRS   Document 1-5   Filed 04/30/14   Page 11 of 11

## Expenses for Southern Motors Chevrolet, Inc.

| Date | Individual | Desription | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 8-Jan-14 | Adam Kaminsky | conference call w/ attorney | 0.5 | $250/hr | $125.00 |
| 8-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 8-Jan-14 | Myron Kaminsky | conference call w/ attorney | 0.5 | $250/hr | $125.00 |
| 9-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 10-Jan-14 | Adam Kaminsky | meeting w accountant | 2 | $250/hr | $500.00 |
| 10-Jan-14 | Adam Kaminsky | various emails w/ attorney | 0.2 | $250/hr | $50.00 |
| 11-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 12-Jan-14 | Adam Kaminsky | conference call w/ attorney | 0.5 | $250/hr | $125.00 |
| 12-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 13-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 14-Jan-14 | Adam Kaminsky | conference call w/ attorney | 0.5 | $250/hr | $125.00 |
| 14-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 17-Jan-14 | Adam Kaminsky | various emails w/ attorney | 0.2 | $250/hr | $50.00 |
| 21-Jan-14 | Adam Kaminsky | various emails w/ attorney | 0.3 | $250/hr | $75.00 |
| 22-Jan-14 | Adam Kaminsky | various emails w/ attorney | 0.3 | $250/hr | $75.00 |
| 23-Jan-14 | Adam Kaminsky | meeting w/ accountant | 1 | $250/hr | $250.00 |
| 23-Jan-14 | Brenda Stone | meeting w/ accountant | 1 | $100/hr | $100.00 |
| 23-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 24-Jan-14 | Adam Kaminsky | various emails w/ attorney | 0.3 | $250/hr | $75.00 |
| 25-Jan-14 | Adam Kaminsky | various emails w/ attorney | 0.3 | $250/hr | $75.00 |
| 26-Jan-14 | Adam Kaminsky | email w/ accountant | 0.1 | $250/hr | $25.00 |
| 30-Jan-14 | Adam Kaminsky | various emails w/ attorney | 0.3 | $250/hr | $75.00 |
| 31-Jan-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 5-Feb-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| 6-Feb-14 | Adam Kaminsky | various emails w/ attorney | 0.2 | $250/hr | $50.00 |
| 6-Feb-14 | Adam Kaminsky | conference w/ accountant | 0.4 | $250/hr | $100.00 |
| 7-Feb-14 | Adam Kaminsky | Mtg w/ accountant | 1 | $250/hr | $250.00 |
| 7-Feb-14 | Myron Kaminsky | Mtg w/ accountant | 1 | $250/hr | $250.00 |
| 7-Feb-14 | Brenda Stone | Mtg w/ accountant | 1 | $100/hr | $100.00 |
| 7-Feb-14 | Adam Kaminsky | various emails w/ attorney | 0.5 | $250/hr | $125.00 |
| 10-Feb-14 | Adam Kaminsky | various emails w/ attorney | 0.2 | $250/hr | $50.00 |
| 11-Feb-14 | Adam Kaminsky | various emails w/ attorney | 0.2 | $250/hr | $50.00 |
| 17-Feb-14 | Adam Kaminsky | various emails w/ attorney | 0.2 | $250/hr | $50.00 |
| 25-Feb-14 | Adam Kaminsky | email w/ attorney | 0.1 | $250/hr | $25.00 |
| misc. dates | Adam Kaminsky | 30 emails w/ Allisia Powell | 0.1 per email | $250/hr | $750.00 |
| misc. dates | Adam Kaminsky | 29 emails w/ Allisia Powell | 0.2 per email | $250/hr | $1,450.00 |
| misc. dates | Adam Kaminsky | 8 calls w/ Allisia Powell | 0.2 per call | $250/hr | $400.00 |
| Total | | | | | $5,725.00 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| SOUTHERN MOTORS CHEVROLET, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. CV414-152 |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance

with the directives from the Court Notice of Electronic Filing ("NEF") which was generated as a

result of electronic filing.

This _16th_ day of July, 2014.

OLIVER MANER LLP


/s/ Patricia T. Paul
PATRICIA T. PAUL
Georgia Bar No. 697845

P. O. Box 10186
Savannah, Georgia 31412           Attorneys for Plaintiff Southern Motors
(912) 236-3311                    Chevrolet, Inc.
(912) 236-8725 (facsimile)
ppaul@olivermaner.com



**Moore, Rodney**

**From:** Moore, Rodney
**Sent:** Tuesday, December 16, 2014 5:51 PM
**To:** 'Ben Lingle'; Patty Paul; Bill Hunter
**Cc:** 'Jennifer Bunting-Graden'
**Subject:** NAMAD - Objections to Subpoena Duces Tecum

Counsel,

On behalf of the National Association of Minority Automobile Dealers ("NAMAD"), attached please find our objections to your Subpoena Duces Tecum.

As you are hopefully aware, NAMAD is a nonprofit association that advocates for diversity and inclusion in all aspects of the automotive industry. As such, NAMAD and its members enjoy the right to engage in constitutionally protect speech under the first amendment, and the right to privacy in their association under the Fourth Amendment. The United State Constitution protects both activities on a content neutral basis. As such, courts recognize that a Subpoena Duces Tecum entails the likelihood of a substantial restraint upon the exercise of the right to freedom of association and speech.

As a primary objection, we do not believe that it is proper for Plaintiff to seek information that reveals the identity of NAMAD members, and/or the records that reflect the activities of NAMAD (including the advocacy and deliberative process); this is especially true wherein information that may reflect advocacy with General Motors, if any, can be obtained directly from General Motors.

We also do not believe that your requests are appropriately drafted to obtain information from a nonparty, and further that the requests places an undue financial burden on NAMAD.

We are certainly open to engaging in a meet and confer process. However, you should be mindful of the high burden courts place on litigants seeking to pierce the constitutional protections afforded NAMAD and its members. The right to privacy in one's political associations and beliefs will yield only to some subordinating interest of the state that is compelling, and then only if there is a substantial relation between the information sought and an overriding and compelling state interest. In this instance, there is none.

Thank you.

1



**Rodney G. Moore**
Partner
Rodney.Moore@lewisbrisbois.com

**1180 Peachtree Street NE, Suite 2900**
**Atlanta, GA 30309**

**T: 404.991.3788  F: 404.467.8845**



LewisBrisbois.com 

**Representing clients from coast to coast. View our nationwide locations.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

SOUTHERN MOTORS CHEVROLET, INC.,    )
                                    )
PLAINTIFF,                          )   CIVIL ACTION NO. CV414-152
                                    )
GENERAL MOTORS, LLC,                )   OBJECTIONS TO SUBPOENA DUCES
                                    )   TECUM
DEFENDANT.                          )
_____ )   (FED. R. CIV. P. 45(D)(2)(B))

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

National Association of Minority Automobile Dealers (*hereinafter* "NAMAD"), pursuant to the provisions of *Rule 45(d)(2)(B) of the Federal Rules of Civil Procedure*, makes the following objections to the Subpoena Duces Tecum that was served on it on December 2, 2014:

**I.**
**OBJECTIONS TO THE SUBPOENA IN ITS ENTIRETY**

A. **First Amendment and Associational Privacy (Fourth Amendment Right of Privacy)**

The Requests, and each of them, infringes on the First and Fourth Amendment rights of NAMAD and its membership.  The right to freedom of association encompasses the right to privacy in one's associations in minority group organizations.  An essential component of the First Amendment freedom of association is a right of as-

-1-

sociational anonymity in its membership and records.   The right to privacy in one's association and beliefs will yield only to some subordinating interest of the state that is compelling, and then only if there is a substantial relation between the information sought and an overriding and compelling state interest.   The state must demonstrate a compelling governmental interest in order to justify chilling a party's association right through disclosing information to the public.   See NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958).

The National Association of Minority Automobile Dealers, on behalf of itself and its members, advocates for diversity and inclusion in all aspects of the automotive industry.   The advocacy efforts of NAMAD are designed to establish business protocols which are meaningful, equitable and sustainable for our nation's minority entrepreneurs and employees currently and potentially working within the automotive industry in America.

As evident by the at-issue litigation, NAMAD's advocacy often places the association at odds with segments of the population.   As the voice of many disenfranchised minority entrepreneurs and current and potential employees within the automobile industry, NAMAD serves as a voice on these social and political issues while insulating its members from retaliation.   "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."   NAACP, 357 U.S. at

462.  Likewise, the decision to remain anonymous is an aspect of the freedom of speech protected by the First Amendment.  <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 342, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995).

The at-issue federal subpoena requests documents and records that are so intertwined with the identity of NAMAD members, their views and the deliberative process, the disclosure and production of the records, to the extent they exist, will have a permanent chilling effect on the First amendment rights of NAMAD, its members and on other similarly situated groups that share both similar and competing views.  As such, NAMAD will not comply with the subpoena.

## B. <u>General Objections</u>

The request is (1) incomprehensible and (2) not appropriately addressed to a nonparty witness.  The subpoena is not accompanied with a copy of the complaint or even paragraphs of the complaint referred to in the request.  Therefore, the request is literally without meaning to this nonparty witness.  NAMAD's historic advocacy for diversity and inclusion does not mean that NAMAD may be treated like a party.  It would be unduly burdensome to compel a nonparty, such as NAMAD, to hire an attorney to analyze the complaint in question and determine which documents in possession of this nonparty witness do or do not support allegations made by a party in a pleading in this action.  Boilerplate requests for production of documents directed to

parties may not be used as a basis for subpoena requests directed to nonparty witnesses.

The definitions are improperly expansive of the obligations of a responding party under Rule 45.   For example:

- Paragraph "3" purports to embrace and include in the definition of NAMAD, "...all agents, servants, representatives, principles, and/or employees of the foregoing."   Seemingly, Plaintiff contends that NAMAD must thus respond for an unlimited category of individuals and entities, including its members, officers, supporters, donors, etc.

- Paragraph "6" defines the term dealership to "embrace that certain automobile dealership located at 5480 Highway 21 South, Rincon, Georgia."   Without providing any further identifiable information such as the name of the dealership, associated manufacture brand of the dealership, etc.   As such, the definition is fatally flawed, in that it is vague and ambiguous.

- Paragraph "7" request documents for the period commencing January 1, 2010, through the date of the response.   The temporal scope of the request is burdensome and oppressive.

- Similar to Paragraph "3", Paragraph "8" charges NAMAD with the responsibility of responding on behalf of "any other persons, firms or corporations which because of your business relationship would readily respond to your inquiry and ordinary course of business."

- Paragraph "9", while not specifically using the word electronic or E-Discovery, requests both records that are in electronic format, without providing any protocol for the collection of the discovery and imposes an unwarranted and unjustifiable expense on this nonprofit nonparty.   A party or an attorney who issues and serves a subpoena must "take reasonable steps to avoid imposing [an] undue burden or expense" on the subpoena recipient.   Fed. R. Civ. P. 45(d)(1). This duty is correlative of the increased power of a party's or attorney to issue a subpoena without specific court approval.   _See_, Fed. R. Civ. P. 45, Advisory Committee Note of 1991.

NAMAD further objects to Plaintiff directing the discovery requests to a nonparty. To the extent "documents reflecting or relating to communications and/or dealings between you [NAMAD] and General Motors" constitute appropriate discovery in the litigation, the request is properly directed to General Motors (a party to the litigation). *See*, Graham v. Casey's Gen. Stores, Inc., 206 F.R.D. 251, 253-254 (S.D. Ind. 2002) (subpoena seeking copies of plaintiff's medical files from plaintiff's former and current employers was quashed because plaintiff had signed releases for purpose of obtaining medical records directly from her health care providers); Precourt v. Fairbank Reconstruction Corp., 280 F.R.D. 462, 467 (D.S.D. 2011) ("If the party seeking the information can easily obtain the same information without burdening the nonparty, the court will quash the subpoena").

NAMAD is a 501(c)(3) non-profit, tax-exempt organization.   It is an "undue burden or expense" for NAMAD to assume the burden imposed by complying with the subpoena. *See*, Rule 45(d)(1).

## II.
## CATEGORY OBJECTIONS

### OBJECTION TO FIRST CATEGORY OF DOCUMENTS REQUESTED

The first category of documents requested by the subpoena is:

> *1) Please produce any and all documents reflecting communications and/or*
> *dealings between you and Fuller Chevrolet, Chatham Motors Sales, Gen-*

*eral Motors, NAMAD affiliate or subsidiary, and/or any civil rights organization or other third party, and/or any internal NAMAD documents regarding: (a) the Dealership, including but not limited any proposed sale of the Dealership and/or exercise of the purported right of first refusal for the purchase of the Dealership; and/or (b) the selection or potential selection of automobile dealership opportunity(ies) for Chatham Motor Sales.*

As set forth in the aforementioned objection to the entirety of the subpoena, this request infringes on the First and Fourth Amendment rights of NAMAD and its membership. NAMAD further incorporates by reference the general objections. As such, no documents will be produced. NAMAD further avers that the request is so broad and unparticularized that NAMAD cannot respond. It is well settled that a subpoena requiring production of "any and all documents related to" is overbroad on its face because it does not provide particular documentary descriptions or reasonable restrictions on time *See*, Williams v. City of Dallas, 178 F.R.D. 103, 109-110 (N.D. Tex. 1998). Sony Corp. v. S.W.I. Trading, Inc., 104 F.R.D. 535, 544 (S.D.N.Y. 1985) (documents must be identified, and there must be basis for concluding that they exist). Furthermore, the request provides no guidance as to what documents would or would not be considered "dealings", "civil rights organizations", or "other third parties."

## OBJECTION TO SECOND CATEGORY OF DOCUMENTS REQUESTED

The second category of documents requested by the subpoena is:

2) *Please produce any and all documents reflecting or relating to communications and/or dealings between you and General Motors and/or between you*

-6-

*and any civil rights organization or other third party regarding General Motors' Minority Dealer Development Program, Minority Dealer Advisory Counsel, and/or other General Motors' plan, program, or policy relating to affirmative action or diversity, including but not limited to any General Motors' plan, program, or policy relating to the recruitment, selection, training, growth, development, education, installation, and/or retention of minorities as General Motors' dealers and/or potential dealers.*

As set forth in the aforementioned objection to the entirety of the subpoena, this request infringes on the First and Fourth Amendment rights of NAMAD and its membership. NAMAD further incorporates by reference the general objections. As such, no documents will be produced.

NAMAD further avers that the request is (1) incomprehensible and (2) not appropriately addressed to a nonparty witness. The subpoena is not accompanied with a any underline facts describing the factual or legal contention of the parties. . Therefore, the request is literally without meaning to this nonparty witness. It would be unduly burdensome to compel a nonparty, such as NAMAD, to hire an attorney to analyze the complaint in question and determine which documents in possession of this nonparty witness do or do not support allegations made by a party in a pleading in this action. Boilerplate requests for production of documents directed to parties may not be used as a basis for subpoena requests directed to nonparty witnesses.

Furthermore, the request provides no guidance as to what documents would or would not be considered "dealings", "civil rights organizations", or "other third parties."

## OBJECTION TO THIRD CATEGORY OF DOCUMENTS REQUESTED

The third category of documents requested by the subpoena is:

> 3) *Please produce any and all documents, policies, procedures, internal memos, notes, communications and/or emails pertaining to General Motors' Minority Dealer Development Program, Minority Dealer Advisory Counsel, Diversity Dealer Relations Program, and/or other General Motors' plan, program or policy relating to affirmative action or diversity, including but not limited to any such documents pertaining to any General Motors' plan, program, or policy relating to the recruitment, selection, training, growth, development, education, installation, and/or retention of minorities as General Motor' dealers and/or potential dealers.*

As set forth in the aforementioned objection to the entirety of the subpoena, this request infringes on the First and Fourth Amendment rights of NAMAD and its membership.   NAMAD further incorporates by reference the general. As such, no documents will be produced.

It is well settled that a subpoena requiring production of "any and all documents related to" is overbroad on its face because it does not provide particular documentary descriptions or reasonable restrictions on time See Williams v. City of Dallas, 178 F.R.D. 103, 109-110 (N.D. Tex. 1998). Sony Corp. v. S.W.I. Trading, Inc., 104 F.R.D. 535, 544 (S.D.N.Y. 1985) (documents must be identified, and there must be basis for concluding that they exist).

## OBJECTION TO FOURTH CATEGORY OF DOCUMENTS REQUESTED

The Fourth category of documents requested by the subpoena is:

4) *Please produce any and all documents, policies, procedures, internal memos, notes, communications and/or emails, including but not limited to any documents reflecting or relating to communications and/or dealings between you and General Motors and/or between you and any civil rights organization or other third party, pertaining to the selection of dealer applicants to be included in any General Motors affirmative action plan, program, or policy referred to in the previously enumerated paragraphs, including any documents regarding goals related to this matter.*

As set forth in the aforementioned objection to the entirety of the subpoena, this request infringes on the First and Fourth Amendment rights of NAMAD and its membership.   NAMAD further incorporates by reference the general.   As such, no documents will be produced.

It is well settled that a subpoena requiring production of "any and all documents related to" is overbroad on its face because it does not provide particular documentary descriptions or reasonable restrictions on time.   *See*, Williams v. City of Dallas, 178 F.R.D. 103, 109-110 (N.D. Tex. 1998). Sony Corp. v. S.W.I. Trading, Inc., 104 F.R.D. 535, 544 (S.D.N.Y. 1985) (documents must be identified, and there must be basis for concluding that they exist).

### OBJECTION TO FIFTH CATEGORY OF DOCUMENTS REQUESTED

The Fifth category of documents requested by the subpoena is:

5) *Please produce any and all documents, policies, procedures, internal memos, notes, communications and/or emails, including but not limited to any documents reflecting or relating to communications and/or dealings between you and General Motors and/or between you and any civil rights organization or other third party, pertaining to General Motors' use of its alleged right of refusal as a result of or in furtherance of the goals of any*

-9-

*General Motors affirmative action plan, program, or policy referred to in the previously enumerated paragraphs.*

As set forth in the aforementioned objection to the entirety of the subpoena, this request infringes on the First and Fourth Amendment rights of NAMAD and its membership.  NAMAD further incorporates by reference the general.  As such, no documents will be produced.

It is well settled that a subpoena requiring production of "any and all documents related to" is overbroad on its face because it does not provide particular documentary descriptions or reasonable restrictions on time.  *See*, Williams v. City of Dallas, 178 F.R.D. 103, 109-110 (N.D. Tex. 1998).  Sony Corp. v. S.W.I. Trading, Inc., 104 F.R.D. 535, 544 (S.D.N.Y. 1985) (documents must be identified, and there must be basis for concluding that they exist).

NAMAD expressly reserves the right to amend these objections.

Respectfully submitted, this 16th day of December, 2014.

LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _____

RODNEY G. MOORE, ESQ.
STATE BAR NO.:  520715
*Attorney for Defendant, National
Association of Minority Automobile
Dealers, Inc. (NAMAD)*

1180 PEACHTREE STREET, NE
SUITE 2900
ATLANTA, GEORGIA 30309
T:   404.348.8585
F:   404.991.3788

-11-

## CERTIFICATE OF SERVICE

I hereby certify that this day I have served a copy of the foregoing **OBJECTIONS TO SUBPOENA DUCES TECUM** upon Plaintiffs by depositing a copy of same in U.S. mail with adequate postage affixed thereto as follows:


R. Benjamin Lingle, Esq.
OLIVER MANER LLP
Post Office Box 10186
Savannah, Georgia   31412
blingle@olivermaner.com

Jennifer Bunting-Graden, Esq.
jbuntinggraden@jonesday.com
Rebecca Thornhill, Esq.
rmthornhill@jonesday.com
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA   30309-3053


This 16th day of December, 2014.


LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _____

RODNEY G. MOORE, ESQ.
STATE BAR NO.:  520715
*Attorney for Defendant, National*
*Association of Minority Automobile*
*Dealers, Inc. (NAMAD)*

1180 PEACHTREE STREET, NE
SUITE 2900
ATLANTA, GEORGIA 30309
T:   404.348.8585
F:   404.991.3788


-12-



**Moore, Rodney**

| | |
|---|---|
| **From:** | Bill Hunter <bhunter@olivermaner.com> |
| **Sent:** | Thursday, December 18, 2014 5:49 PM |
| **To:** | Moore, Rodney |
| **Cc:** | Ben Lingle; Patty Paul; Jennifer Bunting-Graden; T Withers; Justin Jones |
| **Subject:** | Re: NAMAD - Objections to Subpoena Duces Tecum |

Mr Moore:  I am out of the office and have a leave of absence through the 23rd. I am familiar with the NAACP case you cited which protects membership lists. We did not ask for membership lists. NAACP produced the documents in that case except for the membership list. I am not sure I understand your constitutional objections.

We have requested documents from GM. However, I am sure you understand that I have a duty to attempt to gather the documents from all available sources. If there is a reasonable charge associated with producing the documents please let me know. I do not believe, despite your multiple citations to non profit business, that Namad is indigent.

Our requests were very specific regarding communications with Gm about the minority dealer program and the right of first refusal. While the any and all documents language may be offensive in some circuits, it is not here. Even if it is, the requests were modified by subsequent language to make that objection meaningless. Thus, the requests are not burdensome.  In addition, third parties regularly produce documents in cases in which they are not involved directly.

I also do not understand your complaint or even your concern with the allegations in the complaint. If Namad has some interest in this case, I would like to know it. Moreover, we sent you a copy of the Complaint when you asked so I am not sure about that objection either.

I am happy to revise or reissue the subpoena in a manner to make this as easy on Namad as possible. The tone of the objection made me believe that Namad will never produce any documents absent a court order. If that is the case, I respectfully request you tell me. If not, I am glad to set up a time to speak with further to try to work out these issues.

Thanks.

Bill Hunter
Sent from my iPhone



## Moore, Rodney

| | |
|---|---|
| **From:** | Moore, Rodney |
| **Sent:** | Friday, December 19, 2014 12:37 PM |
| **To:** | 'Bill Hunter' |
| **Cc:** | Ben Lingle; Patty Paul; Jennifer Bunting-Graden; T Withers; Justin Jones |
| **Subject:** | RE: NAMAD - Objections to Subpoena Duces Tecum |

Mr. Hunter,

Thank you for the below email. Please feel free to respond to this email when you return from your leave of absence. I will confer with my client relative to the contents of your email.

My impression is that if your subpoena is simply requesting copies of letters (or emails that are readily available) from NAMAD to "Gm about the minority dealer program and the right of first refusal" as it relates to the **disputed transaction** involving Southern Motors, *I suspect that NAMAD may be inclined to assume the burden of a production* (assuming NAMAD has any such records). However, to the extent that you seek broader discovery related to NAMAD's historic advocacy, or assert that NAMAD has a broader responsibility to respond for others and/or include e-discovery, I suspect that NAMAD will likely opt for a protective order. **You are encouraged to clarify your position.**

As to any confusion as to our position, please note the following:

- With respect to your query as to whether NAMAD has "some interest in this case", please know NAMAD has no interest in this or other similar litigation, other than to encourage GM and Southern Motors to support NAMAD's commitment to ensuring that economic diversity and parity become a priority for the automotive industry. The data suggest that only 5% of American automotive dealerships are minority-owned. NAMAD is hopeful that Southern Motors can become supportive of ensuring all Americans have equitable access to business growth opportunities in one of our nation's most significant economic sectors.

- Our view is that the constitution protects not only the freedom of speech and the freedom of association, it also protects against any unwarranted intrusion that has an unwarranted chilling effect on the exercise of the aforementioned constitutional rights. Thus, any subpoena that seeks to obtain records from NAMAD relative to its *internal deliberations* between NAMAD members and employees will be resisted.

- As a result of his advocacy on behalf of NAMAD and its members, NAMAD President Damon Lester has received threats of harm from interest adverse to NAMAD's advocacy for economic diversity and parity within the automotive industry. As the public face of NAMAD, Lester has limited options but to accept the threats as part of legacy efforts to suppress minority economic advancement through fear. NAMAD has an interest, however, in protecting its membership from both physical and economic harm associated with their exercise of their aforementioned constitutional rights. As such, to the extent any such records exist, producing internal records that reveal the interworking of NAMAD, including positions considered and advance, private meetings, internal communications, etc., will expose the membership to potential harm.

- Courts are generally in agreement that if the material sought by subpoena is readily available from a party to the action, obtaining it through subpoena on a nonparty witness creates an undue burden. In this instance, your requests to "gather the documents from all available sources" is contrary to the required showing that it is more expeditious to obtain the documents from the NAMAD. Again, see Circuit Precourt v. Fairbank Reconstruction Corp., 280 F.R.D. 462, 467 (D.S.D. 2011) ("If the party seeking the information can easily obtain the same information without burdening the nonparty, the court will quash the subpoena"). As stated earlier, NAMAD is a nonprofit with four employees, and a very limited budget.

- As noted in our objection, Paragraph "3" purports to embrace and include in the definition of NAMAD, "...all agents, servants, representatives, principles, and/or employees of the foregoing."  Moreover, Paragraph "8" charges NAMAD with the responsibility of responding on behalf of "any other persons, firms or corporations which because of your business relationship would readily respond to your inquiry and ordinary course of business."  You are welcome to clarify as to whether the expectation is  that NAMAD must respond based on information in the possession of  individuals and entities, such as its members, officers, supporters, donors, etc.?

I am available to discuss this issue at any reasonable time. Please be clear that nothing in this email should suggest that we are withdrawing any of our objections. We are nonetheless open to exploring a resolution that is acceptable to all concerned interest.

All the best.



## Moore, Rodney

| | |
|---|---|
| **From:** | Tom Withers <twithers@gwllawfirm.com> |
| **Sent:** | Sunday, December 21, 2014 10:00 PM |
| **To:** | Moore, Rodney; 'Bill Hunter' |
| **Cc:** | 'Ben Lingle'; 'Patty Paul'; 'Jennifer Bunting-Graden'; 'Justin Jones'; 'R Jenkins' |
| **Subject:** | RE: NAMAD - Objections to Subpoena Duces Tecum |

Rodney – please accept this letter as a good faith effort to resolve the discovery dispute outlined in your emails to Mr. Hunter and others on December 16, 2014 and December 19, 2014 with respect to the objections that you have interposed on behalf of NAMAD in response to the subpoena served upon them.

To be specific, this letter is meant to comply with the good faith requirements set forth in both Federal Rule 37 and Local Rule for the SDGA 26.5.

First, I think it bears remembering that the scope of subpoenas for the production of documents pursuant to Rule 45 is the same as the scope of discovery under Rule 26 – that is, information that could lead to the discovery of admissible evidence.

Second, I am a little surprised at the stance you've taken regarding some of the objections interposed. I don't mean to speak for the judges in this district, but trifling objections are not well received. For instance, you object that there is no guidance provided as to what documents would be considered "dealings," "civil rights organizations," or "other third parties." Somewhat similar objections were met with skepticism in this district when the district court noted that,

> "Other terms that the Defendants found ambiguous included 'change, alteration, or modification,' 'risk of personal injury,' 'substantially similar,' 'other sport utility vehicle,' and 'engineer.' (Pl.'s Br. at 29, citing responses to Interrog. Nos. 8, 17, 18, 24.) To the ordinary layperson, the terms "test, research or other investigation," and 'risk of rollover' are clear and unambiguous. The Defendants and their lawyers, however, have managed to inject ambiguity into these ordinary words. The Court believes that no sanction by this Court will change this aspect of the Defendants' conduct."

Malautea v. Suzuki Motor Corp., 148 F.R.D. 362, 366 (S.D. Ga. 1991), aff'd 987 F.2d 1536 (11th Cir. 1993).

Third, your citation to NAACP v. Alabama, is inapposite because we are not a state actor and, besides in that case, the organization fully complied with the production except for the production of the membership list. Id. at 1173.

Now, you have asserted two overarching objections. First, that the subpoena commands records so intertwined with the identity of its members that production of the records will reveal the identity of its members. However, the subpoena commands the production of communications and/or dealings between NAMAD and:

- Fuller Chevrolet,
- Chatham Motors Sales,
- General Motors,
- NAMAD affiliate or subsidiary,
- any civil rights organization,
- other third party, and/or
- any internal NAMAD documents.

Since virtually all of the documents sought deal with third parties – any privilege you might assert is waived. To the extent you want to redact a document that might otherwise reveal the membership of NAMAD, I think we can agree to that. Second, you object to Plaintiff directing discovery requests to a non-party because these documents may be obtained from GM. There is no requirement that we forego third party discovery simply because that information might be discoverable from a party to the litigation. This objection is without merit and I trust will be withdrawn.

Now, I'll address your specific objections in turn. Regarding your general objections, as to paragraph 3, you state that NAMAD objects to responding for "all agents, servants, representatives, principles (sic), and/or employees" asserting that it would require NAMAD to respond for an unlimited number of individuals and entities, including its members, officers, supporters, donors, etc. NAMAD's interpretation of this paragraph is unreasonable. The subpoena is directed to NAMAD and its employees and principals. I trust you will withdraw this objection.

NAMAD also objects to the definition of "Dealership" in paragraph 6 as fatally flawed in that it is vague and ambiguous because it provides the address of the dealership formerly known as Fuller Chevrolet but does not provide the name of the dealership. There is only one dealership at the address provided, this objection is meritless.

NAMAD objects to the five year temporal scope set forth in paragraph 7 as burdensome and oppressive, but does not explain how it is burdensome and oppressive. Temporal scopes of five years or more have been approved. See Norton v. Assisted Living Concepts, Inc., 786 F. Supp. 2d 1173 (E.D. Tex. 2011)(five years); Zelaya v. UNICCO Service Co., 682 F. Supp. 2d 28 (D.D.C. 2010)(five years); Erone Corp. v. Skouras Theatres Corp., 22 F.R.D. 494 (S.D. N.Y. 1958)(five years); Stewart v. Orion Federal Credit Union, 285 F.R.D. 395 (W.D. Tenn. 2012)(seven years); Stanzler v. Loew's Theatre & Realty Corp., 19 F.R.D. 286 (D.R.I. 1955)(ten years). I trust you will withdraw this objection.

NAMAD also objects to paragraph three contending that it burdens it to respond on behalf of "any other persons, firms or corporations which because of your business relationship would readily respond to your inquiry and (sic) ordinary course of business." This objection is without merit. NAMAD is required to respond by producing documents within its control. A non-party may be compelled to produce documents and other materials in its control even though it does not have possession of them. NAMAD has an obligation, as the recipient of a subpoena, to produce not only documents in its actual possession, but also those over which it has custody or control. Dering v. Serv. Experts Alliance LLC, No. CIVA 106CV-00357-RWS, 2007 WL 4299968, at *2 (N.D. Ga. Dec. 6, 2007); See also DeGeer v. Gillis, 755 F. Supp. 2d 909, 924 (N.D. Ill. 2010)(non-party with control over documents was required to produce them, even though they were in counsel's possession); Douga v. D&B Boat Rentals, Inc., D.C.La.2007, 2007 WL 677202. (Although document was physically possessed by counsel, the party controlled the document such that they could direct it to be produced). I trust you will withdraw this objection.

NAMAD objects to paragraph 9 because it seeks e-discovery without providing any protocol for the collection of the discovery. Let's do this – please provide e-discovery in native format. I trust that resolves this objection.

NAMAD objections to the specific categories of documents are nearly identical; that the categories are overbroad and unparticularized without any particularized documentary description or reasonable restrictions on time, but the case cited does **not** disapprove of the "any and all documents related to" language:

> "Category 1 of the instant subpoenas is overbroad on its face. It requires production of '[a]ny and all documents relating to Erik Williams, Michael Irvin and Nina Shahravan.' *It is limited neither by reasonable restrictions on time nor by particular documentary descriptions*."

<u>Williams v. City of Dallas</u>, 178 F.R.D. 103, 110 (N.D. Tex. 1998)(emphasis added).  Thus the language in the subpoena, "any and all documents related to" is not "overbroad on its face." In fact, it is a little disconcerting to have to even address this issue. The language in the subject subpoena following the "any and all document related to" language is specific enough for NAMAD to identify the documents sought. Moreover, each of the categories is limited temporally to five years by paragraph seven.

Rodney, I will be out of pocket all of tomorrow, but would like to schedule a time to speak mid-day on Tuesday, December 23, 2014. I look forward to hearing from you.

Thomas A. Withers
Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, GA 31401
912-447-8400

gwllaw.com
twitherslaw.com

This email, and any attachment(s), is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged under federal and state laws, including but not limited to laws applicable to the attorney-client privilege and other private matters. The information contained in this e-mail is intended only for use of the individual or entity to whom it is directed. If the reader of this message is not the intended recipient, please notify us that you have received the e-mail in error and then destroy it. The receipt by anyone other than the designated recipient(s) does not waive the attorney client privilege or the work product doctrine.



## Moore, Rodney

| | |
|---|---|
| **From:** | Moore, Rodney |
| **Sent:** | Wednesday, December 24, 2014 3:11 PM |
| **To:** | 'Tom Withers'; 'Bill Hunter' |
| **Cc:** | 'Ben Lingle'; 'Patty Paul'; 'Jennifer Bunting-Graden'; 'Justin Jones'; 'R Jenkins' |
| **Subject:** | RE: NAMAD - Resolution of Subpoena |

Mr. Withers,

Thank you for your December 23, 2014 email. I enjoyed our telephone conversation, and firmly believe that it has brought us closer to resolving our respective concerns. Without engaging in the art of semantics, while I agree with the spirit of your email, it is important that my commitment yesterday was to discuss the contents of our conversation with NAMAD, and respond back to you accordingly. The general description of our conversation is reasonably accurate, although clearly no actual agreement on production was reached. **Hopefully, through this email, we can finalize a workable resolution.** First, however, it may be helpful if I place into further context our primary constitutional objections as it relates to your earlier email discounting the same. Thereafter, I will outline **what we are agreeable to providing** in response to the subpoena.

Constitutional Basis of our Objections

You initially raised concerns that the constitutional objections do not apply to this subpoena because **"we [Southern Motors] are not a state actor"** and that you are not requesting a membership list. As to the former, it is well settled that a court order, even when issued at the request of a private party in a civil lawsuit, **constitutes state action** and as such is subject to constitutional limitations. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). As such, the First Amendment privilege applies to discovery orders issued in litigation involving only private parties. Grandbouche v. Clancy 852 F.2d 1463, 1466 (10th Cir.1987).

As to your latter point, the constitution protects more than simple membership list. The Supreme Court has emphasized that "'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.' This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." Boy Scouts of Am. v. Dale, 530 U.S. 640, 648, 657-58 (2000) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609 (1984) for the proposition that protection of the right to expressive association is "especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority"). Stated simply, the First Amendment privilege applies to district court discovery orders that require trade groups and their members to disclose to a private party their communications regarding strategy for lobbying. See IN RE: MOTOR FUEL TEMPERATURE SALES PRACTICES LITIGATION, Nos. 10–3086, 10–3101 (10th Cir. 2011).(overruling district court decision in 707 F. Supp. 2d 1145 on this limited point of law). In this instance, NAMAD is a minority and trade advocacy association where members are able to associate to express dissenting and controversial viewpoints on issues of diversity and inclusion.

You further contend that the subpoena is appropriate because it seeks "information that could lead to the discovery of admissible evidence." In adjudicating compliance with discovery obligations, Rule 26 simply provides the general context for determining the scope of discovery in the at-issue civil action. The ultimate determination to compel disclosure in this instance is controlled not by Rule 26, but by well established constitutional jurisprudence. As such, district courts are required to apply strict, or "exacting," scrutiny, requiring that government actions that burden freedom of association be "adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Knox v. SEIU, 132 S. Ct. 2277 (2012) (applying Roberts standard); Boy Scouts of Am., 530 U.S. at 659 (applying Roberts standard and refusing to apply O'Brien

intermediate scrutiny standard); Roberts , 468 U.S. at 623. **District courts emphasize that a factual showing of actual chilling effect is not a necessity for a decision forbidding disclosure, though such a showing does weigh in the balance on the side of First Amendment values.** The District of Columbia Circuit Court of Appeals described the threshold requirement in this manner: "the litigant seeking protection need not prove to a certainty that its First Amendment rights will be chilled by disclosure. It need only show that there is some probability that disclosure will lead to reprisal or harassment." The California Supreme Court suggested an even lesser threshold showing by stating that private association *affiliations and activities* are presumptively immune from disclosure and that the government bears the burden of justifying compelled disclosure. Britt v. Superior Court, 20 Cal.3d 844, 855, 574 P.2d 766, 143 Cal. Rptr. 695 (1978)

With regard to relevancy of the requested discovery, the interest in disclosure will be regarded as relatively weak unless the information goes to the "heart of the matter", or is crucial to the case of litigant seeking discovery. As the District of Columbia Circuit Court of Appeals has pointed out: Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe the information they hope to obtain and its importance to their case with a reasonable degree of specificity. Black Panther Party v. Smith, 661 F.2d 1243, 1268 (D.C. Cir.1981), vacated in Moore v. Black Panther Party, 458 U.S. 1118 (1982) (mootness). The litigant seeking disclosure also must show that efforts have been made to obtain the information by other means. **"Even when the information sought is crucial to a litigant's case, disclosure should be compelled only after the litigant has shown that he has exhausted every reasonable alternative source of information."**

Our position remains that the subpoena fails to meet the requirements established by volumes of constitutional jurisprudence.

<u>Suggested Resolution</u>

**Our belief remains that upon application, the court is required and will quash the subpoena.** However, in an good faith effort to resolve this subpoena without affirmatively *moving to quash* or defending against a *motion to compel* and consistent with our telephone conversation yesterday, **we are open to producing certain categories of documents (to the extent they exist).** As I indicated to you yesterday, **if it will resolve all issues contained in the subpoena,** NAMAD is willing to search for and produce, within the requested **temporal scope:**

- External communications to/from/between NAMAD and General Motors ("GM") discussing the requested *diversity/Southern Motors/Dealer Option* topics;
- External communications discussing or mentioning Southern Motors.
- NAMAD is willing conduct a **basic desk top search** entering agreed upon search terms in each relevant NAMAD owned or controlled desk top. NAMAD may produce material from e-discovery in one of several formats: printed paper, "native file,", or a petrified, paper-like format, such as PDF files or TIFF images.

The aforementioned is subject to the standard right to withhold privileged documents (which will be reflected in a privileged log if any exist). NAMAD reserves the right to request cost-shifting if it incurs significant expense for compliance with a subpoena.

NAMAD will not:

- Produce any internal documents or records, including records reflecting internal deliberations, meeting minutes, notes or agendas, membership list, member/officer internal emails, notes or letters, etc.
- NAMAD is a nonprofit corporation. Unlike traditional corporate officers, non-profit officers are not controlled by the entity. For example, NAMAD does not control their electronic communications, meeting scheduling, etc., of its officers. **NAMAD can not currently agree to produce any documents that are in the exclusive hands of its officers.** NAMAD is the custodian of all of its official records and as a general matter, current and former officers do not have sole or exclusive possession of NAMAD documents.

- Produce any documents or records reflecting communications with third parties, including other civil rights groups.

I will be in my office most of next week if you would like to finalize the above.

Happy holidays.

Rodney G. Moore



**Rodney G. Moore**
**Partner**
Rodney.Moore@lewisbrisbois.com
**1180 Peachtree Street NE, Suite 2900**
**Atlanta, GA 30309**

**T: 404.991.3788  F: 404.467.8845**

LewisBrisbois.com 

**Representing clients from coast to coast. View our nationwide locations.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.



**Moore, Rodney**

| | |
|---|---|
| **From:** | Tom Withers <twithers@gwllawfirm.com> |
| **Sent:** | Wednesday, January 07, 2015 2:08 PM |
| **To:** | Moore, Rodney; 'Bill Hunter' |
| **Cc:** | 'Ben Lingle'; 'Patty Paul'; 'Jennifer Bunting-Graden'; 'Justin Jones'; 'R Jenkins' |
| **Subject:** | RE: NAMAD - Resolution of Subpoena |

Rodney – I trust you and your family had a pleasant Holiday Season. Since we extended the time for compliance with the subpoena, I have waited until after the New Year to respond to your email of December 24.

In a continued effort to reach a good faith resolution of your objections, I will address the issues you raise, but first I want to put in context the history of our discussions.

First, in my email of December 21, 2014, in an effort to reach an accommodation regarding the subpoena, I had agreed that we would forego seeking any information related to membership lists. Our phone call was on December 23, 2014, which was followed up by my email of that date where I tried to address each issue raised in your first email of December 19, 2014.

However, your email of December 24, 2014 addresses issues not originally raised and, so, I feel a little as though we are losing ground by continued discussion. Nevertheless, I'll address each of your concerns in turn.

Second, the Grandouche case cited in your email noted that the First Amendment "**may** be applicable in the context of discovery orders, even if all of the litigants are private entities." 825 F.2d 1463, 1466 (10th Cir. 1987) (emphasis supplied). Please note that your citation to Grandbouche actually lands the reader on United States v. Benton, a case dealing with Double Jeopardy in the context of a federal criminal prosecution.

Third, as mentioned above, in an effort to resolve this discovery dispute in good faith, I had agreed to forego seeking discovery of membership lists. However, in your email of December 24, 2014, you cite In Re Motor Fuel Temperature Sales Practices Litigation (10th Cir.) (no case citation is provided), for the proposition that the First Amendment applies "to district court discovery orders that require trade groups and their members to disclose to a private party their communications regarding strategy for lobbying." This is a curious contention on 2 fronts: 1) we have not requested "communications regarding strategy for lobbying" and 2) that case did not overrule the district court in any respect. In fact, the Court of Appeals upheld the district court Order, see 707 F.Supp.2d 1145 (D. Kan. 2010), finding that the First Amendment did not protect against disclosure of the information sought. 641 F.3d 470.

Fourth, your discussion of the Knox, Boy Scouts and Roberts cases have absolutely nothing to do with discovery matters.

Fifth, both In Re Motor Fuel Temperature and Grandbouche are instructive, so let's examine. There is no presumptive privilege, and, as such, NAMAD must prove through "objective and articulable facts" that disclosure will affect its First Amendment rights. In Re Motor Fuel Temperature, 707 F.Supp.2d at 1159. If that is done, then the district court must engage in the  balancing test set forth in Grandbouche.

Sixth, we are **not** agreeable to a resolution that NAMAD produce only the limited categories of documents that you have set forth in your "suggested resolution." You had originally addressed each specific paragraph of the subpoena, Rodney, but now you are in broad strokes telling me that you will produce some documents and not

others, but your suggested resolution is not addressed in any respect to the 5 paragraphs of information that we are seeking. So, I'll address each paragraph of the subpoena in turn:

1) This paragraph is narrowly drawn seeking information related to the subject dealership. We insist that this paragraph be complied with in full.

2) This paragraph seeks documents between NAMAD, General Motors and Third Parties regarding GM's Minority Dealer Development Program, or other similar programs. As such there can be no valid claim of privilege.

3) This paragraph also seeks documents pertaining to GM's Minority Dealer Development Program, or other similar programs at GM. We believe that the requested information must be produced.

4) This paragraph seeks documents related between NAMAD and GM, or other civil rights organizations, regarding dealer applicants for GM's affirmative action programs. Again, it is hard to see how this impacts any protected activity, especially as it relates to GM.

5) This paragraph seeks documents related between NAMAD and GM, or other civil rights organizations, regarding GM's right of first refusal. Again, it is hard to see how this impacts any protected activity, especially as it relates to GM.

Rodney, I will continue to work to resolve this issue, but we need to address specifics in terms of what you are willing to produce, or not. Saying NAMAD will not produce any "internal documents" tells me nothing without some definition of what that means. I trust you can understand my concern.

I look forward to hearing from you by Friday, January 9, 2015.


Thomas A. Withers
Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, GA 31401
912-447-8400

gwllaw.com
twitherslaw.com

This email, and any attachment(s), is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged under federal and state laws, including but not limited to laws applicable to the attorney-client privilege and other private matters. The information contained in this e-mail is intended only for use of the individual or entity to whom it is directed. If the reader of this message is not the intended recipient, please notify us that you have received the e-mail in error and then destroy it. The receipt by anyone other than the designated recipient(s) does not waive the attorney client privilege or the work product doctrine.



## Moore, Rodney

| | |
|---|---|
| **From:** | Moore, Rodney |
| **Sent:** | Tuesday, January 13, 2015 9:04 AM |
| **To:** | 'T Withers' |
| **Subject:** | RE: NAMAD |

Good morning Mr. Withers,

This email memorializes our agreement reached yesterday during our telephone conference.  You graciously agreed to extend the date and time of the deposition for the subpoena to Friday, January 16, 2015, at 1:00pm. The production procedural requirements remain as set forth in the subpoena.

Additionally, you will send me your recommended search terms sometime today.

Again, thank you.

Rodney



**Rodney G. Moore**
**Partner**
Rodney.Moore@lewisbrisbois.com

**1180 Peachtree Street NE, Suite 2900**
**Atlanta, GA 30309**

**T: 404.991.3788  F: 404.467.8845**

LewisBrisbois.com   

**Representing clients from coast to coast. View our nationwide locations.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

|  |  |
|---|---|
| Southern Motors Chevrolet, Inc., | |
| Plaintiff, | |
| v. | Civil Action No.: 4:14-cv-00152-WTM-GRS |
| General Motors, LLC, | |
| Defendant. | |

**GENERAL MOTORS LLC'S MOTION AND MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, General Motors LLC

("GM") moves the Court to dismiss Southern Motors Chevrolet, Inc.'s ("Plaintiff") Amended

Complaint for failure to state a claim upon which relief can be granted.  In support of its motion,

GM states as follows:

**I.      INTRODUCTION**

Plaintiff brings this suit because GM selected a well-qualified African American

candidate to operate a GM dealership instead of Plaintiff.  Plaintiff contends that this selection

constitutes illegal discrimination because GM has publicly acknowledged its aspiration to build a

dealer network that reflects the diversity of the communities in which it operates.  If such a

diversity goal or policy were equal to *per se* discrimination, most large companies in the United

States and even the federal judiciary—all of which have explicit diversity policies and goals—

would be exposed to liability.  This is not the law.

Plaintiff nevertheless claims it was entitled to be selected by GM such that the ***only***

***reason*** GM could have selected another candidate is GM's diversity goals.  This claim ignores

ATI-2606140

the host of alternate explanations for GM's decision, including the most obvious: the candidate that GM chose is a very successful owner/operator of dealerships for several automobile manufacturers.

Plaintiff's formulaic, speculative, and conclusory legal statements concerning GM's alleged discriminatory conduct fail to meet the United States Supreme Court's heightened "*plausibility*" pleading standard.  Under that standard, the "*obvious alternative explanation*" showing that GM did not engage in any discriminatory conduct dooms Plaintiff's Amended Complaint.  The Court should therefore dismiss Plaintiff's claims under 42 U.S.C. §§ 1981 and 1982 and O.C.G.A § 10-1-653.  Plaintiff has likewise failed to state a claim for reimbursement under O.C.G.A. § 10-1-663.1 because it has failed to plead facts sufficient to demonstrate a plausible right to recompense for the claimed expenses.

## II.    FACTUAL BACKGROUND[1]

In or around December 2013, Fuller Chevrolet, Inc., a General Motors, LLC ("GM") dealership located at 5480 Highway 21 South, Rincon, Georgia ("Fuller Chevrolet") was up for sale.  Doc. 24, Amended Complaint ("Am. Compl."), ¶9.  Section 12.3 of the Dealer Sales and Service Agreement ("Dealer Agreement") between GM and the owner of Fuller Chevrolet expressly gives GM a right of first refusal to purchase the dealership if Fuller Chevrolet submits

---

[1] GM cites to the facts in Plaintiff's Amended Complaint because they are accepted as true for the purposes of a motion to dismiss. *See Arch Ins. Co. v. Clements, Purvis & Stewart, P.C.*, 850 F. Supp. 2d 1371, 1373 (S.D. Ga. 2011).  GM does not, however, waive its right to deny such facts should it become necessary to answer Plaintiff's complaint or for any other purpose.

a proposed sale agreement for the dealership.  Doc. 24, p. 22.[2]  It provides:

### 12.3 Right of First Refusal to Purchase

#### 12.3.1 Creation and Coverage

If Dealer submits a proposal for a change of ownership under Article 12.2, General Motors will have a right of first refusal to purchase the dealership assets or stock and such other rights proposed to be transferred regardless of whether the proposed buyer is qualified to be a dealer.  If General Motors chooses to exercise this right, it will do so in its written response to Dealer's proposal. General Motors will have a reasonable opportunity to inspect the assets, including real estate and corporate records before making its decision.

*Id.*  The Dealer Agreement also provides that if GM chooses to exercise its right of first refusal,

GM will reimburse the party seeking to purchase the dealership for reasonable expenses incurred

in connection with the purchase proposal.  *Id.*  A similar provision is codified in O.C.G.A. § 10-1-663.1:

*There shall be a right of first refusal to purchase in favor of the franchisor* if the dealer has entered into an agreement to transfer the dealership or its assets, provided that all the following qualifications and requirements are met. ... (5) The franchisor agrees to pay the reasonable expenses, including reasonable attorney's fees, which do not exceed the usual customary, and reasonable fees charged for similar work done for other clients incurred by the proposed new owner and transferee before the franchisor's exercise of its right of first refusal in negotiating and implementing the contract for the proposed change of ownership or transfer of dealership assets.

Am. Compl., ¶57 (emphasis added).

In early January 2014, GM informed Winston R. Pittman, Sr. ("Pittman") that he was a

---

[2] The Court may properly consider the exhibits to Plaintiff's complaint in evaluating GM's motion to dismiss because "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c).  *See also Solis-Ramirez v. DOJ*, 758 F.2d 1426, 1430 (11th Cir. 1985) ("[A]ttachments are considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion.").

candidate to purchase Fuller Chevrolet.  Am. Compl., ¶20.  Pittman currently owns and operates

Chatham Parkway Toyota in Savannah.  Am. Compl., ¶19.  Pittman also owns an interest in

Lexus, Toyota, Scion, and Subaru dealerships in Savannah, Ford and Nissan dealerships in Ohio,

and a Lexus dealership in South Carolina.[3]  From January 10 through January 26, 2014, Pittman

prepared to purchase Fuller Chevrolet, including incorporating three new entities to consummate

the deal.  Am. Compl., ¶21.

On January 20, 2014, Plaintiff's owners submitted to GM a purchase agreement they had

executed with the owner of Fuller Chevrolet for the purchase of the Fuller Chevrolet dealership

("Purchase Agreement").  Am. Compl., ¶9.  Plaintiff was not registered to do business with the

Georgia Secretary of State (and therefore did not exist) until January 23, 2014.[4]  Plaintiff's

"status date" with the Secretary of State is actually a full two weeks later—February 7, 2014—

long after GM had informed Pittman that he was a candidate to purchase the Fuller Chevrolet

dealership.  On or about February 10, 2014, Plaintiff and the owner of Fuller Chevrolet amended

the Purchase Agreement and thereafter submitted it to GM.  Doc. 24, p. 22.

---

[3] The Court may take judicial notice of such publicly available information, which is reflected on Pittman's website. *See Horne v. Potter*, 392 Fed. Appx. 800, 802 (11th Cir. 2010) ("A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment."); Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *R.S.B. Ventures Inc. v. FDIC*, 514 Fed. Appx. 853, 857, n. 2 (11th Cir. 2013) (taking judicial notice of information found on a website); *Mawulawde v. Bd. of Regents of Univ. Sys. of Ga.*, CV 105-099, 2007 U.S. Dist. LEXIS 62700, *26 (S.D. Ga. Aug. 24, 2007) (deeming a school's website a matter of public record and taking judicial notice of it).  A true and correct print out from Pittman's website (including the website address) is attached hereto as Exhibit "A."

[4] The Court may take judicial notice of Plaintiff's incorporation record available on the Georgia Secretary of State website. *See Mawulawde*, 2007 U.S. Dist. LEXIS at *26.  A true and correct copy of such record is attached hereto as Exhibit "B."

A few weeks later, in a letter dated March 4, 2014, GM informed Plaintiff that it was exercising its right of first refusal pursuant to its Dealer Agreement with the owner of Fuller Chevrolet. *Id.* As set forth in the Dealer Agreement, GM offered to reimburse Plaintiff for reasonable expenses it incurred in connection with preparing the Fuller Chevrolet Purchase Agreement. *Id.*

On or about March 26, 2014, Plaintiff, through its counsel located in Savannah, Georgia, sent a letter to GM requesting reimbursement for, among other things, costs charged by outside professionals in connection with the Purchase Agreement and time that Plaintiff's owners allegedly spent for items such as "various emails with w/attorney," "30 emails w/Allisia Powell," and "meeting w/accountant." Doc. 24, p. 55. The owners billed their time at the rate of $250/hr, for a total charge of $5,725. *Id.* Plaintiff also requested reimbursement for "Opportunity Interest." *Id.*, p. 1. In response, GM stated that time spent by the proposed owners (as opposed to remuneration paid to outside professionals) did not qualify as a reimbursable expense incurred under O.C.G.A. § 10-1-663.1. Doc. 1-6, p. 1. GM also requested an explanation of the reimbursement request for "Opportunity Interest." *Id.*

On April 30, 2014, Plaintiff filed its complaint—amended on July 16, 2014—against GM purporting to plead causes of action for discrimination under 42 U.S.C. §§ 1981-1982 and for violation of O.C.G.A. §§ 10-1-653 and 10-1-663.1. Am. Compl., ¶¶31-62. Plaintiff's discrimination claim is premised on a group of internet blog and news articles attached to the Amended Complaint, which describe minority advocacy groups' attendance at GM's annual shareholders meeting and other forums to petition GM to increase its diversity efforts and GM's response to these inquiries showing its commitment to diversity. Am. Compl., ¶¶ 14-17. *See*

*also, e.g.,* Doc. 24, pp. 26-27.   Plaintiff points to statements in these articles purporting to describe GM's plans to increase the number of minority dealers as supposed evidence of GM's discriminatory intent.  Am. Compl., ¶¶ 14-17.  For example, Plaintiff claims that GM's strategy was to use its right of first refusal "to snag stores for minority dealers," (Am. Compl., ¶¶ 15, 22) but that phrase was coined by the author of one of the internet articles Plaintiff attaches to the Amended Complaint, not GM.   *See* Doc. 24, p. 35.   Similarly, Plaintiff claims that GM "indicated that using [the right of first refusal] can open the door for a minority buyer," but the author of the referenced article does not attribute that particular statement to GM either.  *See id.* The author states only that GM said it had exercised its right of first refusal twenty-two times in the past three years.  *See id.* The article does not describe the circumstances under which GM exercised such rights.  *See id.*  Plaintiff also references GM's Minority Dealer Development Program ("MDDP") as evidence of GM's "commitment to the growth in numbers of minority dealers[.]"  Am. Compl., ¶18.

Based on the internet blog and news articles and GM's MDDP, Plaintiff summarily concludes that "General Motors intended that white persons, and therefore Plaintiff, would not be permitted to purchase the [Fuller Chevrolet] Dealership upon its sale."  Am. Compl., ¶14.  Plaintiff further concludes—without providing any ***facts*** regarding Pittman's candidacy or regarding his qualifications to purchase the dealership—that "[r]ace was the reason" GM exercised its right of first refusal.  Plaintiff states that GM discriminated against Plaintiff merely because GM "awarded [the dealership] to an entity owned by an individual of a different race than the owners of Southern Motors Chevy[.]"  Am. Compl., ¶¶ 37-42.

Additionally, Plaintiff claims that GM violated O.C.G.A. § 10-1-653 because its decision to exercise its right of first refusal to purchase Fuller Chevrolet, thereby mooting Plaintiff's proposal, was "arbitrary." Am. Compl., ¶61. Plaintiff acknowledges, however, that O.C.G.A. § 10-1-663.1 authorizes GM to exercise a right of first refusal regarding the proposed transfer of Fuller Chevrolet and that GM notified Plaintiff that GM was exercising this right pursuant to GM's dealer agreement with Fuller Chevrolet. Am. Compl., ¶¶ 27, 56. Plaintiff does not attempt to demonstrate why GM should be liable for exercising an express contractual and statutory right.

Finally, Plaintiff claims that GM violated O.C.G.A. § 10-1-663.1 by refusing to reimburse Plaintiff's owners for all their claimed expenses, including their personal time spent working on the proposal to purchase Fuller Chevrolet at a seemingly arbitrary rate of $250/hr. Am. Compl., ¶57; Doc. 24, p. 55. However, under O.C.G.A. § 10-1-663.1, GM is required to pay only "reasonable expenses … which do not exceed the usual customary, and reasonable fees charged for similar work done for other clients." Am. Compl., ¶56. The statute does not provide for reimbursement for work done by a company's own employees. *Id.*

## III.   ARGUMENT

### A.   PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM AGAINST GM

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the United States Supreme Court interpreted Fed. R. Civ. P. 8(a) to require a plaintiff to show a "*plausible*" claim for relief. Under the first prong of the elevated plausibility standard, bare or speculative assertions and conclusory statements are not sufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681. Nor are legal conclusions. *Id.* at 679.

Under the second prong of the analysis, a complaint showing a mere possibility of liability does not pass the bar, and the Court must "draw on its judicial experience and common sense" and dismiss a complaint where an "***obvious alternative explanation***" exists for the alleged wrongful conduct. *Twombly*, 550 U.S. at 567; *Iqbal*, 556 U.S. at 681. The purpose of this two-pronged, heightened standard is to ensure that a defendant does not waste resources fighting a meritless claim that would not otherwise withstand analysis. *Iqbal*, 556 U.S. at 685.

### Prong One—Substantive Pleading Requirements

Fed. R. Civ. P. 8(a) requires "more than labels and conclusions[] and a formulaic recitation of a cause of action's elements." *Twombly*, 550 at 555. A plaintiff must describe the grounds of his entitlement to relief, and the "[f]actual allegations must be enough to raise a right to relief ***above the speculative level***." *Id.* (Emphasis added). In other words, "Rule 8(a)(2) [] requires a 'showing', rather than a blanket assertion, of entitlement to relief[,]" and "[t]he complaint should be dismissed if the facts as pled do not set forth a claim to relief that is ***plausible on its face***." *Id.* at 555; *Roszell v. Abolt*, No. CV407-055, 2007 WL 2345228, * 1 (S.D. Ga. Aug. 15, 2007) (internal punctuation omitted) (emphasis added).

Further, the plausibility standard requires the plaintiff to plead facts that permit the court "to infer ***more than the mere possibility of misconduct***." *Ebert v. Sears Retail Outlet Store*, Case No.: 8:11-cv-409-T-24EAJ, 2011 U.S. Dist. LEXIS 42299, * 5 (M.D. Fla. Apr. 19, 2011) (emphasis added). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief" and should be dismissed. *Iqbal*, 556 U.S. at 678 (emphasis added) (internal punctuation omitted). The bottom line is that "[p]leadings must be something more than an ingenious academic

exercise in the conceivable," (*Roszell*, 2007 WL 2345228 at *2), and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### Prong Two—"Obvious Alternative Explanation" Bar

Even where a complaint has stated facts that may be consistent with liability, the Court is nevertheless required to dismiss it for failure to state a claim if an "obvious alternative explanation" exists for the alleged wrongful conduct.  For example, in *Twombly*, the plaintiff alleged that the defendants had entered into an unlawful anticompetitive contract simply because there was no meaningful competition between the companies and in light of the companies' parallel course of conduct.  *Twombly*, 550 U.S. at 555.  Finding that the alleged misconduct was "just as much in line with a wide swath of rational and competitive business strategy" as it was with the alleged anticompetitive conspiracy, the Court affirmed the dismissal of the complaint for failing to state a ***plausible*** claim for violation of antitrust laws.  *Id.*

Similarly, in *Iqbal*, the plaintiff claimed that—in the wake of the September 11, 2001 terrorist attacks—the FBI arrested and detained certain Arab Muslim men and instituted a policy that subjected them to harsh conditions of confinement on account of their race, religion, or national origin.  556 U.S. at 678.  There, the Court held that even if these allegations were consistent with the government purposefully designating detainees "of high interest" because of their race, religion, or national origin, the "***obvious alternative explanation***"—that the government detained aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts"—meant that the plaintiff's

complaint had failed to state a ***plausible*** claim for constitutional violations.[5]  *Id.* at 681-682.  The

Court therefore reversed the denial of the defendant's motion to dismiss.  *Id.* at 678.

> **1.  Plaintiff Fails To State A Claim For Discrimination Under 42 U.S.C. §§ 1981-82.**

Plaintiff's speculative and conclusory assertions of discrimination paired with

unsupported legal conclusions are not sufficient to show a plausible entitlement to relief,

especially in light of the obvious alternative explanations that controvert Plaintiff's claims.

> **a.  Plaintiff's Speculative And Threadbare Assertions Fail To State A Plausible Discrimination Claim.**

In the Eleventh Circuit, a plaintiff alleging a claim for non-employment discrimination

under 42 U.S.C. § 1981 must "demonstrate that (1) he or she is a member of racial minority; (2)

the defendant had an intent to discriminate on the basis of race; and (3) the discrimination

concerned one or more of the activities enumerated in the statute."[6]  *Rutstein v. Avis Rent-A-Car*

*Sys., Inc.*, 211 F.3d 1228, 1239 (11th Cir. 2000).  "The second requirement [of this test] is more

demanding …, requiring, as it does, that the plaintiff bring forth evidence of ***actual intent*** on the

part of the defendant."  *Id.* (Emphasis added).  *See also Ebert*, 2011 U.S. Dist. LEXIS 42299 at

---

[5] "It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest." *Twombly*, 550 U.S. at 546.  "[T]his basic deficiency should …. be exposed at the point of minimum expenditure of time and money by the parties and the court [, *i.e.*, at the motion to dismiss stage]." *Id.* at 555.  Indeed, "a plaintiff with a largely groundless claim [should not] be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Id.* at 558.

[6] In addition to meeting the Fed. R. Civ. P. 8 and Twombly pleading requirement to plead these elements with specific facts, "[c]ourts have held that under the civil rights statutes[,] a complaint will be held to a greater degree of specificity[.]" *White v. Fla. Highway Patrol*, 928 F. Supp. 1153, 1159 (M.D. Fla. 1996).  *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984).

*9 (dismissing a complaint for discrimination under Section 1981 where the plaintiff did "not

allege[] any facts to demonstrate that [the defendant's] actions were motivated by an intent to

discriminate against her because of her race").

In attempting to state a claim for discrimination, a plaintiff's **evidence of intent must be**

**concrete, and a claimed policy of discrimination cannot suffice.** For example, in *Rutstein,* the

Eleventh Circuit emphasized that "[a] finding that [the defendant] ha[d] a policy or practice of

discrimination could not possibly function as a meaningful substitute for the establishment of an

***actual intent to discriminate*** against an individual plaintiff on the basis of his or her ethnicity"

because "[the defendant] may have refused to contract with a plaintiff for any number of reasons

having nothing to do with the plaintiff's ethnicity." 211 F.3d at 1239 (emphasis added).

Likewise in *Foy v. Pat Donalson Agency*, the Court held that "[t]he absence of ***evidence of***

***purposeful discrimination*** requires the court to [find] that [the plaintiff] has failed to establish

her *prima facie* case []as to the non-employment claim." 946 F. Supp. 2d 1250, 1269 (N.D. Ala.

2013) (emphasis added).

Indeed, courts across the country have recognized that a commitment to diversity is a

laudable goal, which in no way heralds discriminatory intent. *See, e.g.*, *Bissett v. Beau Rivage*

*Resorts, Inc.*, 442 Fed. Appx. 148, 152 (5th Cir. 2011) (disagreeing with the plaintiff's

contention that she was terminated to increase diversity simply because her company "'value[s]

diversity and consider[s] it an important and necessary tool that will enable [it] to maintain a

competitive edge and that [it was] committed to maintaining a workforce that reflects the

diversity of the community'"); *Bernstein v. St. Paul Cos.*, 134 F. Supp. 2d 730, 739, n. 12 (D.

Md. 2001) ("A company's (or its CEO's) commitment to 'diversity', if expressed in terms of

creating opportunities for employees of different races and both genders, or fostering workplace tolerance, is not proof of discriminatory motive with respect to any specific hiring decision."); *Altizer v. City of Roanoke*, Civil Action No. 7:02cv00484, 2003 U.S. Dist. LEXIS 4303, *10-11 (W.D. Va. Mar. 21, 2003), *aff'd*, 78 Fed. Appx. 301 (4th Cir. 2003) (10/22/2003) ("[C]oncern about the lack of diversity in [an organization] is not evidence of discriminatory animus. Nor is the fact that [the organization] thought it important to recruit and prepare minorities for promotion. … In fact, the expression of those concerns may have the salutary effect of an announcement that a predominantly white, male institution will conduct itself as an equal opportunity employer.").

In this case, Plaintiff relies on internet blog and news articles containing statements attributed to GM regarding GM's diversity and inclusion goals and GM's Minority Dealer Development Program as purported evidence of discrimination.  Plaintiff claims that the mere existence of these diversity aspirations and goals means that GM must have discriminated against Plaintiff when GM identified Pittman, who is African American, as a candidate to purchase Fuller Chevrolet, and subsequently told Plaintiff, which is owned by "white persons," that GM was exercising its right of first refusal to allow Pittman to purchase Fuller Chevrolet.

As an initial matter, Plaintiff has failed to plead facts showing *any actual intent* by GM to discriminate against it, which is a required element of Plaintiff's claims.  *See Rutstein*, 211 F.3d at 1239.  Plaintiff makes the sizeable leap from the fact that GM aims to improve the diversity within its dealership ranks and the fact that GM has a diversity program to the unsupported conclusion that GM has therefore discriminated against it.  But *Twombly* and *Iqbal* make clear that Plaintiff must rise above speculation, show more than mere possibility, and

demonstrate "*plausibility* of entitlement to relief." *Twombly*, 550 U.S. at 546; *Iqbal*, 556 U.S. at 678. GM's aspiration to build a dealership network that reflects the community in which GM operates and a collection of internet blog and news articles supposedly discussing GM's diversity goals do not equal *actual intent* to discriminate against Plaintiff. Far from it. In short, Plaintiff's claims of discriminatory intent fail to cross the threshold of illogical speculation and fall well short of the requisite plausibility standard under *Twombly* and *Iqbal*.

Indeed, if a diversity policy or an articulation of diversity goals were equal to *per se* discrimination, most large companies and even the federal judiciary would be exposed to liability.[7] The federal Judiciary has explicitly stated its "goal to strengthen workforce diversity

---

[7] In a recruitment and outreach policy that is similar to GM's in many respects, the federal judiciary states:

> The federal Judiciary has long recognized the importance of diversity in its workforce and has for many years developed programs, policies, and training that support fair employment practices. A goal to strengthen workforce diversity is part of the Judiciary's strategic plan. Beginning in fiscal year 2010, the Committee on Judicial Resources piloted a Diversity Recruiting and Outreach Program to increase awareness of the breadth and scope of legal and non-legal positions in the Judiciary….

> As part of the pilot program, the Diversity Recruiting and Outreach Program built a strategic network of partnerships between various program offices, local courts, and working groups of judges and court staff, as well as external organizations such as Just the Beginning Foundation, Congressional Caucuses (Black, Asian, and Hispanic), Council on Legal Education Opportunity, Minority Corporate Council Association, National Association for Legal Career Professionals, and the American Bar Association. The effort to reach institutions with diverse student bodies and those serving minorities, has yielded additional candidates for judicial internships through a nascent partnership with Just the Beginning Foundation. The partnership has reviewed 331 applications in its first year and led to the selection of 42 law students for judicial internships with 31 judges.

Administrative Office of the United States Courts 2011 Annual Report of the Director (last accessed at http://www.uscourts.gov/annualreport_2011/ Judiciary_Workforce.aspx on May 25, 2014).

[as] part of [its] strategic plan." It would be absurd to hold that, due to this statement, a non-diverse applicant who failed to earn a judicial clerkship could bring a plausible discrimination claim against the Court solely because the successful applicant was diverse. It would be similarly untenable to hold that GM's goals to improve its dealer diversity and the mere existence of GM's diversity policy are grounds for a "plausible" claim for discrimination against GM. Because Plaintiff's Amended Complaint fails to show a plausible entitlement to relief under Sections 1981 and 1982, Plaintiff's discrimination claim must be dismissed.

> **b.** **The "Obvious Alternative Explanations" For GM's Actions Controvert Any Plausible Claim For Relief And Requires Dismissal of Plaintiff's Complaint.**

Plaintiff fails to account for the "obvious alternative explanation[s]" that controvert any claim of discrimination in this case. For example, Plaintiff's own Amended Complaint alleges that GM had identified Pittman as a suitable candidate to purchase Fuller Chevrolet and had communicated such candidacy to Pittman *before Plaintiff even submitted a proposal to purchase the dealership*. Stated differently, GM identified Pittman as an excellent candidate to purchase the Fuller Chevrolet dealership before even knowing the identity of Plaintiff or even knowing the race of any other proposed buyers. Thus, a very reasonable explanation for GM's actions is that GM identified Pittman as an outstanding candidate to purchase Fuller Chevrolet. Plaintiff cannot plausibly allege discrimination *against it* when GM selected Pittman as an excellent candidate before knowing Plaintiff's identity or knowing that Plaintiff's owners were "white." This fatal flaw dooms Plaintiff's complaint.

Moreover, even though Plaintiff acknowledges that Pittman is the owner and operator of Chatman Parkway Toyota, Plaintiff's Amended Complaint omits any discussion of Pittman's

qualifications as a dealer.  Plaintiff does not mention that Pittman owns an interest in Lexus, Subaru, Scion, Nissan and Ford dealerships.  Instead, Plaintiff extols its own experience as a Honda/Acura dealer as the reason GM should have selected it instead of Pittman.  But Pittman has stronger experience and credentials as an automobile dealer and ***Plaintiff pleads no facts to suggest otherwise***.  Indeed, the crux of Plaintiff's claim is that Plaintiff was entitled to be selected by GM such that the ***only reason*** GM could have selected another candidate is GM's alleged intention to discriminate against Plaintiff.  ***As a matter of law, Plaintiff "is not 'entitled' to be chosen … from a pool of otherwise qualified applicants[.]"***  *Fountain v. City of Waycross*, 701 F. Supp. 1570, 1581 (S.D. Ga. 1988).

In sum, the timing of Plaintiff's proposal and other business reasons for awarding the dealership to Pittman, including his qualifications, are obvious alternative explanations for GM's conduct, which only confirm that Plaintiff has failed to state a plausible claim for relief under 42 U.S.C. §§ 1981-1982.  Such claims should therefore be dismissed.

### 2. Plaintiff Failed To State A Claim For Relief Under O.C.G.A. § 10-1-653.

There is no question that O.C.G.A. § 10-1-663.1 authorized GM to exercise a right of first refusal regarding the proposed transfer of Fuller Chevrolet.  There is also no question that GM's Dealer Agreement with the owner of Fuller Chevrolet gave GM the same right.  GM simply exercised a contractual and statutory right that Georgia law expressly recognizes.  That cannot be the basis of a claim for relief.  In any event, Plaintiff's Amended Complaint should also be dismissed for the separate reason that Plaintiff's § 10-1-653 claim fails to satisfy the plausibility pleading standard.

ATI-2606140

15

      **a.**    **GM Has A Clear Right To Exercise Its Contractual And Statutory Right Of First Refusal, Which Requires Dismissal Of Plaintiff's Claim For Relief Under O.C.G.A. § 10-1-653.**

Plaintiff expressly acknowledges that "[p]ursuant to O.C.G.A. § 10-1-663.1, [t]here shall be a right of first refusal to purchase in favor of [GM]." Am. Compl., ¶57. Indeed, the statute expressly provides that GM can exercise that right. Yet, Plaintiff nevertheless makes the illogical claim that the same statute that expressly authorizes GM's right of first refusal somehow creates a claim against GM for exercising that right. That argument does not withstand analysis. O.C.G.A. § 10-1-653 has no application to this proceeding. GM did not "disapprove" the buy-sell, but instead exercised its right of first refusal as expressly permitted by O.C.G.A. § 10-1-663.1. As a matter of law, Plaintiff cannot argue that the exercise of that statutory right constituted "arbitrary" conduct.

Georgia courts and other courts throughout the country have routinely approved or enforced the right of first refusal. *See, e.g., Hinson v. Roberts*, 256 Ga. 396, 398, 349 S.E.2d 454, 456 (1986); *Wilbur Lime Prods., Inc. v. Arhndt*, 2003 WI App. 259, 268 Wis.2d 650 (2003); *Rosado v. Ford Motor Co.*, 337 F.3d 291 (3d Cir. 2003); *Crivelli v. General Motors Corp.*, 215 F.3d 386, 392-94 (3d Cir. 2000); *Victory Lane Quick Oil Change, Inc. v. Hoss*, 2001 U.S. Dist. LEXIS 16520, *30-31 (E.D. Mich. Sept. 27, 2001); *Roberts v. General Motors Corp.*, 643 A.2d 956, 961-62 (N.H. 1994); *Sherwood Ford, Inc v. Ford Motor Co.*, 860 F. Supp. 659, 662-63 (E.D. Mo. 1994); *Blair v. General Motors Corp.*, 838 F. Supp. 1199 (W.D. Ky. 1993); *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1551 (7th Cir. 1990).

In this case, GM clearly has an independent right to exercise its right of first refusal under O.C.G.A. § 10-1-663.1. That provision governs here. As other courts have found, a plaintiff

cannot seek relief from other more general statutes when there is a *specific statute that authorizes the conduct at issue*. In *Am. Honda Motor Co., Inc. v. Bernardi's, Inc.*, 735 N.E.2d 348, 356 (Mass. 2000), for instance, the Supreme Judicial Court of Massachusetts rejected challenges to Honda's decision to establish a new dealer outside the relevant market area, finding that allowing such claims under a general statutory provision would "undermine and essentially nullify" a statute that specifically addressed the issues raised in the plaintiff's complaint. *Id.* at 435 (citation omitted). *See also Nw. Datsun v. Okla. Motor Vehicle Comm'n*, 736 P.2d 516, 518-20 (Okla. 1987) (applying specific statutory provision and declining to rely on more general provision of dealer statute). In the same vein, Georgia courts "construe a statute to give sensible and intelligent effect to all of its provisions and should refrain, whenever possible, from construing the statute in a way that renders any part of it meaningless." *In re L.B.*, 319 Ga. App. 173, 177, 735 S.E.2d 162, 165 (2012).

Additionally, Plaintiff cannot allege "arbitrary" or bad faith conduct when GM exercised a right that is expressly authorized by both contract and by statute. Indeed, a party to a contract cannot be liable for doing "what the provisions of the contract expressly give him the right to do." *Southern Bus. Machines of Savannah, Inc. v. Norwest Fin. Leasing, Inc.*, 194 Ga. App. 253, 256, 390 S.E.2d 402, 405 (1990). *See also Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1280 (11th Cir. 2005) (The defendant's decision was not arbitrary "[b]ecause there was a reasonable basis for the conclusion."); *Pacesetter Motors Inc. v. Nissan Motor Corp.*, 913 F. Supp. 174, 179-80 (W.D.N.Y. 1996) (party cannot be held liable for merely exercising right it possessed); *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 877-78 (5th Cir. 1989)(same); *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 834 (6th Cir. 1997) ( "parties to a contract

[are] entitled to enforce them to the letter without being guilty of bad faith") (citing trial court's

decision) (quotation omitted); *Kerns, Inc. v. Wella Corp.*, 114 F.3d 566, 570 (6th Cir. 1997) ( "if

a party has a contractual right to take an action, the court may not inquire into that party's motive

for exercising that right"). In this case, GM merely exercised the right expressly given to it.

Accordingly, Plaintiff's claim under O.C.G.A. § 10-1-653 fails as a matter of law.

> **b.      Even If Plaintiff's Claim Under O.C.G.A. § 10-1-653 Were
> Otherwise Viable, Plaintiff Has Failed To State A Plausible
> Claim For Relief.[8]**

Even if Plaintiff could bring a claim under § 10-1-653 (which it cannot do), Plaintiff's

pleading on that claim is exactly the "unadorned, the-defendant-unlawfully-harmed-me

accusation" that fails to satisfy the requirements of Rule 8. *Ebert*, 2011 U.S. Dist. LEXIS 42299

at *5. In paragraph 59 of the Amended Complaint, Plaintiff merely recites O.C.G.A. § 10-1-653.

In paragraph 60, Plaintiff makes the unsupported assertion that it is "fit and qualified" to be an

automobile dealer. Plaintiff then concludes in paragraph 61 that GM violated O.C.G.A. § 10-1-

653 because GM arbitrarily refused to agree to a proposed change in ownership of a dealership.

---

[8] Plaintiff has similarly failed to state a claim for relief under O.C.G.A. § 10-1-663.1. Plaintiff claims that GM violated O.C.G.A. § 10-1-663.1 by refusing to reimburse Plaintiff's owners for claimed expenses such as personal time spent working on the proposal to purchase Fuller Chevrolet. But under O.C.G.A. § 10-1-663.1, GM is required to pay **only** "reasonable expenses," *i.e.*, out of pocket expenses incurred by the dealer. Moreover, such expenses cannot "exceed the usual customary, and reasonable fees charged for similar work done for other clients." The statute does not require GM to pay for work done by a company's owners or its own employees calculated at arbitrary hourly rates. *Id.* In fact, the statute specifically states that a party may be reimbursed only for those fees that are similar to what the vendor would charge other clients. *Id.* Accordingly, Plaintiff's claim under O.C.G.A. § 10-1-663.1 should be dismissed because Plaintiff has failed to plead facts sufficient to demonstrate that the amounts sought are actual expenses under the statute or that such expenses are reimbursable under the statute.

That is the extent of Plaintiff's pleading with respect to this claim.

Absent from Plaintiff's Amended Complaint is any description of facts showing that GM's decision to exercise its statutory and contractual right of first refusal should be deemed an arbitrary refusal to approve Plaintiff's proposal. Indeed, plaintiff's Amended Complaint is "utterly devoid of any factual specifics [regarding its claims under O.C.G.A. § 10-1-653], containing instead bare, conclusory allegations of wrongdoing by [GM]." *Jones v. City of Manning*, Civil Case No. 1:12-cv-03660-JEC, 2014 U.S. Dist. LEXIS 32334, *5 (N.D. Ga. Mar. 13, 2014). Under *Iqbal*, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement" and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." 556 U.S. at 678 (internal punctuation omitted). *See also Ebert*, 2011 U.S. Dist. LEXIS 42299 at *5 ("The door to discovery will not open for a plaintiff 'armed with nothing more than legal conclusions.'"). Where Plaintiff "has fashioned a wholly conclusory statement of [its O.C.G.A. § 10-1-653] claim that does not meet the pleading standard of Rule 8[,]" it has failed to show a plausible entitlement to relief, and its claims must be dismissed. *Roszell*, 2007 WL 2345228 at *2.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant GM's Motion To Dismiss For Failure To State A Claim.

Dated: August 6, 2014

JONES DAY
1420 Peachtree Street, N.E.,
Suite 800
Atlanta, GA  30309-3053
Telephone:  (404) 581-3939

Respectfully submitted,

/s/ Jennifer Bunting-Graden
Jennifer Bunting-Graden
jbuntinggraden@jonesday.com
  (Ga. Bar No. 188520)
  (admitted *pro hac vice*)
Rebecca Thornhill
rmthornhill@jonesday.com
  (Ga. Bar No. 813060)

ATI-2606140

20

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed GENERAL MOTORS LLC'S

MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR FAILURE

TO STATE A CLAIM with the Clerk of Court using the CM/ECF system, which will

automatically send e-mail notification of such filing to the following attorneys of record:

William J. Hunter
I. Gregory Hodges
Patricia T. Paul
Timothy D. Roberts
R. Benjamin Lingle
OLIVER MANER LLP
218 West State Street
P.O. Box 10186
Savannah, Georgia 31412

Thomas A. Withers
GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401

*Attorneys for Southern Motors Chevrolet, Inc.*

This 6th day of August, 2014.

/s/ Jennifer Bunting-Graden
An Attorney for General Motors LLC

ATI-2606140

# EXHIBIT A

Pittman Enterprises - Car Sales in _____



PITTMAN ENTERPRISE

Friday, June 13, 2014

| HOME | ABOUT | GALLERY | LOCATIONS | FLEET SOLUTIONS | LEADERSHIP TEAM | CONTACT US |

## ABOUT



AT PITTMAN ENTERPRISE WE'RE

DEDICATED TO INTEGRITY AND PROVIDING QUALITY SERVICE TO OUR CLIENTS

VIEW ALL OUR DEALERSHIPS

Under President Winston Pittman Sr.'s leadership, and the support of his family, Pittman Enterprise has grown from a single new car dealership to an enterprise offering seven major brands.

Winston R. Pittman, Sr. was born on August 31, 1950 in Grenada, Mississippi. Early on in his childhood, spent in Kilmicheal, Mississippi, Winston had great ambitions. This determination was instilled in him during his formative years by his parents. The primary values that served as the backbone of his upbringing were working diligently, and living by moral standards. Their motto in their home was the "Golden Rule" -- Do unto others, as you would have them to do unto you.

Winston learned the value of hard work by working on his parents' farm, ploughing fields, tending to cattle, and picking cotton. After graduating from Montgomery County High School he became a student at Mary Holmes Junior College, where he met his life long partner and wife, Alma Jean Dent Pittman. In 1971, Winston attended Jackson State University in Jackson, M.S., concentrating in accounting.

While attending college, Winston worked for United Parcel Service (UPS). During his tenure, he became hub manager. In 1975, Winston began his career in the automotive industry after applying for a car salesman position at Capitol Dodge in Jackson, M.S. In 1979, he became the used car manager; 1980 new car manger; 1981 F&I manager, and 1983 to 1986 general manager.

Serving as general manager ignited Winston's dream of becoming a dealership owner. In 1986, Winston entered the Chrysler Dealer Development Program in Detroit, MI. After completing the program in 1987, Winston's vision of becoming an entrepreneur unfolded.

In June 1988, Winston became president and owner of Cardinal Dodge, Inc. The passion thrived by the image of a dollar bill given to him by an individual, who stated, "You will go broke in 6 months from your start date as an automobile dealer." Winston attended to the comment as fuel stating, "I took the dollar bill, hung it on my wall, and never looked back." He later asserted, "You never have to worry about your first dollar, you only worry about your last." In 1994, he opened Cardinal Dodge Acceptance Corporation, a used car dealership in Louisville, Kentucky. During the same year, Winston acquired Winston Pittman Pontiac GMC, which he later sold in 1986. In 1995, Winston became owner of Dollar Rent A Car; 1997 Chatham Parkway Toyota in Savannah, GA; 2000 Kings Nissan in Cincinnati, OH, Bowling Green Imports -- a Mercedes Benz and BMW dealership, and Chatham Parkway Lexus in Savannah, GA; in 2005 Colerain Ford and Lebanon Ford, Lincoln, Mercury in Lebanon, OH, and in 2013 Hilton Head Lexus in Hartville, SC.

In addition to the business growth over the years, Winston continues to have a strong desire to lift others in a time of need. Winston provides his willingness to help others by serving on the National Dodge Dealer Council, the Cincinnati Dealer Council, DiamlerChrysler Minority Dealer Association (DCMDA) (president), the National Association of Minority Automobile Dealers (NAMAD) (the former president and current board member); Duquesne University 2007- 2011 (board member), Fifth Third Bank 2000- 2013 (board member), Toyota National Dealer Council 2008- 2012, Lexus National Dealer Council 2004-2008 (board member), and Toyota Lexus Minority Dealer Association (TLMDA) (president). Winston also serves as a mentor for many upcoming dealer candidates.

Over and beyond the business operations, Winston serves on numerous community boards and civic associations including Quinn Chapel A.M.E Church in Louisville, Kentucky (Pro tem, steward, and former trustee), and the Board of Overseers at the University of Louisville.

Amongst receiving numerous distinguishable awards from manufacturers as an outstanding dealer principle, Winston was also the recipient of the NAMAD's Jesse Jones Vision Award, the Dream Award, the Johnson and Johnson Celebration Award, The NAMAD's Lifetime Achievement Award, and the 2013 Issac Murphy Award for Business Man of the Year.

Along with successfully managing several dealerships, Winston's primary goal is to provide a life path for his children, so that they may first and foremost be humble, maintain good morals, and

Pittman Enterprises - Car Sales in...

values while successfully taking the family business to the next level. Winston acknowledges whole-heartedly that his achievements and success were attained by the love, support, and dedication of his wife of 43 years, Alma.

"To be successful in the competitive arena of automotive sales, you have to be a constant student because all clients require different needs" —Winston Pittman, Sr.

     

Subscribe to our Mailing List to receive updates

Email address    Name    Subscribe

©2012 Pittman Enterprise | Website created by CustomWeb

Pittman Enterprises - Car Sales in...



PITTMAN ENTERPRISE

Friday, June 13, 2014

| HOME | ABOUT | GALLERY | LOCATIONS | FLEET SOLUTIONS | LEADERSHIP TEAM | CONTACT US |

## LOCATIONS



**Chatham Parkway Lexus**

1120 Chatham Parkway
Savannah, GA 31405, USA
(912) 231-0005

**Sales:** (912) 231–0005
**Service:** (912) 231–0005
**Parts:** (912) 231–0005

Visit Website
Hours & Directions
View Inventory



**Chatham Parkway Subaru**

7 Park of Commerce Way
Savannah, GA 31405, USA
(912) 231-2020

**Sales:** (888) 430-0231
**Service:** (888) 430-1742
**Parts:** (888) 431-0043

Visit Website
Hours & Directions
View Inventory



**Chatham Parkway Scion**

41 Park of Commerce Blvd
Savannah, GA 31405, USA
(912) 231-2020

**Sales:** (912) 231-2020
**Service:** (888) 218-7558
**Parts:** (912) 231-2020

Visit Website
Hours & Directions
View Inventory



**Chatham Parkway Toyota**

41 Park of Commerce Blvd
Savannah, GA 31405, USA
(912) 231-2020

**Sales:** (912) 231-2020
**Service:** (888) 218-7558
**Parts:** (912) 231-2020

Visit Website
Hours & Directions
View Inventory



**Hilton Head Lexus**

540 New River Parkway
Hartville, SC 29927, USA
(843) 705-3987

**Sales:** (855) 255-4720
**Service:** (855) 255-4720
**Parts:** (855) 255-4720

Visit Website
Hours & Directions
View Inventory



**Kings Nissan**

9819 Kings Auto Mall Road
Cincinnati, OH 45249, USA
(513) 697-9770

**Sales:** (513) 697-9770
**Service:** (513) 697-9770
**Parts:** (513) 697-9770
**Fax:** (513) 677-4030
Email

Visit Website
Hours & Directions
View Inventory



**Lebanon Ford**

770 Columbus Ave.
Lebanon, OH 45036, USA
(513) 932-1010

**Sales:** (855) 367-9095
**Service:** (513) 932-1010
**Parts:** (513) 932-6922
**myTech:** (855) 567-0440

Visit Website
Hours & Directions
View Inventory



**Fleet Solutions**

401 W. Main St.
Suite 802
Louisville, KY 40202

**Office:** (502) 212.9407
**Fax:** (502) 515.3192
**Mobile:** (502) 417.8044
Email

     

Pittman Enterprises - Car Sales i...

Subscribe to our Mailing List to receive updates   [Email address]   [Name]   [Subscribe]

©2012 Pittman Enterprise | Website created by CustomWeb

# EXHIBIT B




Georgia
Secretary of State
Corporations Division

Home

## Southern Motors Chevrolet, Inc. Control Number: 14009284

Main     Reports     Officers     Filing History

**Entity Info**

    **Entity Id**   4825757

    **Key Indicators**

| | |
|---|---|
| **Model Type** | Corporation |
| **Locale** | Domestic |
| **Qualifier** | For-Profit |
| **Business Name** | Southern Motors Chevrolet, Inc. |
| **Registration Date** | 1/23/2014 |
| **Entity Status** | Active/Compliance |
| **Entity Status Date** | 2/07/2014 |
| **Foreign Name** | |
| **Date of Organization** | |
| **State** | |
| **Country** | |

**Principal Office Address**

PRINCIPAL
    **Line1**   5480 Georgia 21
    **Line2**

    **City**  Rincon   **State**  Georgia   **Zip**  31326

**Agent**

    **Is non-commercial Registered Agent?**     Yes
    **Name**                                          Adam Kaminsky

**Address**

    **Line1**   5480 Georgia 21
    **Line2**

    **City**  Rincon   **State**  Georgia   **Zip**  31326

    **Email**        adamjkaminsky@gmail.com

**Previous Names**

| Name Changed From | Name Changed To | Surviving Entity Id | Cancelled Entity Id | Effective Date | Due Date | File Number | Actions |
|---|---|---|---|---|---|---|---|

No Miscellaneous Filings were found.

15

Return to Home



**Moore, Rodney**

| | |
|---|---|
| **From:** | Tom Withers <twithers@gwllawfirm.com> |
| **Sent:** | Wednesday, January 14, 2015 1:59 PM |
| **To:** | Moore, Rodney |
| **Cc:** | 'Bill Hunter'; 'Ben Lingle'; 'R Jenkins' |
| **Subject:** | RE: NAMAD |

Rodney – a few other search terms:

- Brian Roberts;
- Michael Farnum;
- Garret Dvorsky;
- Rick White;
- Brian Small;
- Robert Owusu;
- Julia Shafer;
- Keith Battle;
- Mark Szymanski;
- Bill Mistele;
- Joann Terski;
- William Siegrist;
- Allisia Powell;
- Eric Peterson;
- "ROFR";
- Myron Kaminsky;
- Danny Kaminsky; and
- Toby Friedman.

Thomas A. Withers
Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, GA 31401
912-447-8400

gwllaw.com
twitherslaw.com

This email, and any attachment(s), is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged under federal and state laws, including but not limited to laws applicable to the attorney-client privilege and other private matters. The information contained in this e-mail is intended only for use of the individual or entity to whom it is directed. If the reader of this message is not the intended recipient, please notify us that you have received the e-mail in error and then destroy it. The receipt by anyone other than the designated recipient(s) does not waive the attorney client privilege or the work product doctrine.

12

**Moore, Rodney**

| | |
|---|---|
| **From:** | Tom Withers <twithers@gwllawfirm.com> |
| **Sent:** | Wednesday, January 14, 2015 10:37 AM |
| **To:** | Moore, Rodney |
| **Cc:** | 'Bill Hunter'; 'Ben Lingle'; 'Patty Paul'; 'R Jenkins' |
| **Subject:** | RE: NAMAD |

Rodney – in follow up to our discussion Tuesday, I propose the following search terms:

"Fuller Chevrolet", "Chatham Motor Sales", "first refusal", "Minority Development Dealer", "Minority Dealer Advisory Counsel", "Diversity Dealer Relations", Adam Kaminsky", "Ross Kaminsky", "Winston R. Pittman", "Winston R. Pittman, Sr.", and "Southern Motors".

Then, "General Motors" within the same paragraph of the following terms: "external diversity committee", "Jesse Jackson", "Reverend Jackson", "Rev. Jackson", "strategy", "Rainbow Push", "minority selection", and "diversity".

I may send you some additional search terms later this afternoon.

I look forward to receiving the production of NAMAD this Friday.

Thomas A. Withers
Gilien, Withers & Lake, LLC
8 East Liberty Street
Savannah, GA 31401
912-447-8400

gwllaw.com
twitherslaw.com

This email, and any attachment(s), is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged under federal and state laws, including but not limited to laws applicable to the attorney-client privilege and other private matters. The information contained in this e-mail is intended only for use of the individual or entity to whom it is directed. If the reader of this message is not the intended recipient, please notify us that you have received the e-mail in error and then destroy it. The receipt by anyone other than the designated recipient(s) does not waive the attorney client privilege or the work product doctrine.

13

**Moore, Rodney**

| | |
|---|---|
| From: | Tom Withers <twithers@gwllawfirm.com> |
| Sent: | Wednesday, January 14, 2015 2:04 PM |
| To: | Moore, Rodney |
| Cc: | 'Bill Hunter'; 'Ben Lingle'; 'R Jenkins' |
| Subject: | RE: NAMAD |

Rodney – please also search for whenever two of the following three words appear in the same paragraph: majority, minority, transition. Thx.

Thomas A. Withers

Gillen, Withers & Lake, LLC

8 East Liberty Street

Savannah, GA 31401

912-447-8400

gwllaw.com

twitherslaw.com

This email, and any attachment(s), is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged under federal and state laws, including but not limited to laws applicable to the attorney-client privilege and other private matters. The information contained in this e-mail is intended only for use of the individual or entity to whom it is directed. If the reader of this message is not the intended recipient, please notify us that you have received the e-mail in error and then destroy it. The receipt by anyone other than the designated recipient(s) does not waive the attorney client privilege or the work product doctrine.

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE RULE 45 SUBPOENA TO ) | |
| NON-PARTY ) | |
| NATIONAL ASSOCIATION OF ) | |
| MINORITY AUTOMOBILE DEALERS ) | CIVIL ACTION FILE |
| ) | NO.: _____ |
| IN THE MATTER OF ) | |
| ) | CERTIFICATE OF SERVICE |
| SOUTHERN MOTORS ) | |
| CHEVROLET, INC., ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | [UNDERLYING CIVIL ACTION FILED IN |
| ) | U.S. DISTRICT COURT FOR THE |
| GENERAL MOTORS, LLC, ) | SOUTHERN DISTRICT OF GEORGIA |
| ) | SAVANNAH DIVISION |
| DEFENDANT. ) | CIVIL CASE NO. CV-414-152] |
| _____ ) | |

## CERTIFICATE OF SERVICE

I hereby certify that the within and foregoing **MOTION OF NATIONAL ASSOCIATION OF MINORITY AUTOMOBILE DEALERS' TO QUASH OR MODIFY SUBPOENA; NATIONAL ASSOCIATION OF MINORITY AUTOMOBILE DEALERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH OR MODIFY SUBPOENA; DECLARATION OF RODNEY G. MOORE W/EXHIBITS 1 THROUGH 13; AND DECLARATION OF DAMON LESTER** has been served by First Class U.S. Mail to the following:

| | |
|---|---|
| Jennifer Bunting-Graden, Esq.<br>Rebecca Thornhill, Esq.<br>JONES DAY<br>1420 Peachtree Street, NE, Suite 800<br>Atlanta, Georgia 30309-3053<br>jbuntinggraden@jonesday.com<br>rmthornhill@jonesday.com | William J. Hunter, Esq.<br>I. Gregory Hodges, Esq.<br>Patricia T. Paul, Esq.<br>Timothy D. Roberts, Esq.<br>R. Benjamin Lingle, Esq.<br>OLIVER MANER LLP<br>218 West State Street<br>Post Office Box 10186<br>Savannah, Georgia 31412<br>bhunter@olivermaner.com<br>ghodges@olivermaner.com<br>ppaul@olivermaner.com<br>troberts@olivermaner.com<br>blingle@olivermaner.com |
| Thomas A. Withers, Esq.<br>GILLEN, WITHERS & LAKE, LLC<br>8 East Liberty Street<br>Savannah, Georgia 31401<br>twithers@gwllawfirm.com | |

Respectfully submitted and executed this 26th day of January, 2015.

By: _____

JEAN-MARIE SYLLA, JR., ESQ.
STATE BAR NO. 469371
LCvR 83.2 (c)(1) SPONSOR

TAYLOR, SYLLA & AGIN, LLP
THE WASHINGTON SQUARE BUILDING
1050 CONNECTICUT AVENUE, NW, 10TH FL.
WASHINGTON, DC 20036
TELEPHONE: 202.689.9512
FACSIMILE: 202.783.7858
EMAIL: JMS@TSAFIRM.COMDealers